UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

LEARNING ANNEX HOLDINGS, LLC
and LEARNING ANNEX, LLC,

                    Plaintiffs,

                                               09 CIV 4432

     - against -                              (SAS/GWG)

WHITNEY EDUCATION GROUP, INC.,
WHITNEY INFORMATION NETWORK, INC.,
WEALTH INTELLIGENCE ACADEMY, INC.,        **PLAINTIFFS'**
WEALTH INTELLIGENCE AGENCY,             **FIRST SET OF**
RICH DAD EDUCATION, LLC, RICH GLOBAL, LLC,  **INTERROGATORIES**
THE RICH DAD COMPANY and CASH FLOW     **TO THE RICH DAD**
TECHNOLOGIES, INC.,                          **DEFENDANTS**

And John Does # 1-10 and XYZ Corp # 1-10, the
said defendants consisting of individuals and/or
entities whose identities are currently unknown
and who are believed to have committed and/or
derived benefits from acts injurious to the Plaintiffs,

                    Defendants.
------------------------------------------------------------------X

       PLEASE TAKE NOTICE that plaintiffs Learning Annex Holdings, LLC and Learning

Annex, LLC by and through their undersigned attorneys LaRocca Hornik Rosen Greenberg &

Blaha LLP, hereby demand that defendants Rich Global, LLC and Cashflow Technologies, Inc.

respond to the within Interrogatories in the manner prescribed by Rule 33 of the Federal Rules of

Civil Procedure on or before September 14, 2009 at the offices of the undersigned.

**DEFINITIONS AND INSTRUCTIONS**

       A.      In addition to the definitions set forth in Local Rule 26.3, the following

definitions shall apply:

          (1)     "Learning Annex" and/or "Plaintiff" shall refer to plaintiffs Learning

Annex Holdings, LLC and Learning Annex, LLC and/or any of its/their present or former

members, managers, successors, assigns, officers, employees, agents, consultants, attorneys, accountants, or personnel, representatives and all other Persons or entities acting on its/their behalf.

(2)     "WEG" shall refer to defendant Whitney Education Group, Inc. and/or any of its present or former wholly or partially owned subsidiaries, affiliates, divisions, successors, assigns, officers, directors, partners, employees, agents, consultants, attorneys, accountants, or personnel, representatives and all other Persons or entities acting on its/their behalf.

(3)     "WIN" shall refer to defendant Whitney Information Network, Inc. and/or any of its present or former wholly or partially owned subsidiaries, affiliates, divisions, successors, assigns, officers, directors, partners, employees, agents, consultants, attorneys, accountants, or personnel, representatives and all other Persons or entities acting on its/their behalf.

(4)     "WIA" shall refer to defendant Wealth Intelligence Academy, Inc. and/or any of its present or former wholly or partially owned subsidiaries, affiliates, divisions, successors, assigns, officers, directors, partners, employees, agents, consultants, attorneys, accountants, or personnel, representatives and all other Persons or entities acting on its/their behalf.

(5)     "Whitney Defendants" shall collectively refer to WEG, WIA and/or WIN.

(6)     "RDE" shall refer to defendant Rich Dad Education, LLC and/or any of its present or former members, managers, successors, assigns, officers, employees, agents, consultants, attorneys, accountants, or personnel, representatives and all other Persons or entities acting on its/their behalf.

(7)     "Rich Global" shall refer to defendant Rich Global, LLC and/or any of its present or former members, managers, successors, assigns, officers, employees, agents, consultants, attorneys, accountants, or personnel, representatives and all other Persons or entities acting on its/their behalf.

(8)     "CTI" shall refer to defendant Cashflow Technologies, Inc. and/or any of its present or former wholly or partially owned subsidiaries, affiliates, divisions, successors, assigns, officers, directors, partners, employees, agents, consultants, attorneys, accountants, or personnel, representatives and all other Persons or entities acting on its/their behalf.

(9)     "Rich Dad Defendants" shall collectively refer to Rich Global and/or CTI.

(10)     "Defendants" shall collectively refer to RDE, the Rich Dad Defendants and/or the Whitney Defendants.

(11)     "Parties" shall refer to Learning Annex, WEG, WIN, WIA, RDE, Rich Global, CTI, Wealth Intelligence Agency and The Rich Dad Company (each a "Party") in their individual and/or collective capacities.

(12)      "Business Relationship" shall refer to a connection, arrangement or affiliation, formal or informal, oral or written, potential or consummated, between two or more Persons to cooperate in a business activity and/or to act in furtherance of a common business goal, including but not limited to a business or legal entity, association, joint venture, partnership, limited liability company, corporation, proprietorship, alliance, organization or any other form of combination or collaboration.

(13)     "First MOU" shall refer to the Memorandum of Understanding dated September 7, 2005, between The Learning Annex Holdings, LLC and CTI, a copy of which is annexed hereto as <u>Exhibit A</u>.

(14)     "License Agreement" shall refer to and include (but shall not be limited to) the terms set forth in the First MOU and letter dated September 15, 2005, from the Rich Dad Defendants, by Sharon Lechter, to Learning Annex, to the attention of William Zanker, a copy of which is annexed hereto as <u>Exhibit B</u>.

(15)     "January 13, 2006 E-Mail" shall refer to a certain e-mail dated January 13, 2006, from the Whitney Defendants, by John F. Kane, to numerous representative individuals for the Parties, a copy of which is annexed hereto as <u>Exhibit C</u>.

(16)     "Second MOU" shall refer to the Memorandum of Understanding contained in the January 13, 2006 E-Mail, a copy of which is annexed hereto as <u>Exhibit C</u>.

(17)     "January 27, 2006 E-Mail" shall refer to a certain e-mail dated January 27, 2006, from the Whitney Defendants, by John F. Kane, to numerous representative individuals for the Parties, a copy of which is annexed hereto as <u>Exhibit D</u>.

(18)     "Amended Complaint" shall refer to the Amended Complaint dated April 3, 2009, filed by Learning Annex in this Litigation.

(19)     "Rich Dad Defendants' Answer" shall refer to the Answer dated June 18, 2009, filed by the Rich Dad Defendants in this Litigation.

(20)     "Pleadings" shall refer to the Amended Complaint, the Rich Dad Defendants' Answer and the Answer dated June 12, 2009 filed by the Whitney Defendants and RDE in this Litigation, each a "Pleading".

(21)    "Litigation" shall refer to the action pending in the United States District Court for the Southern District of New York captioned <u>Learning Annex Holdings, LLC, et ano</u>. v. <u>Whitney Education Group, Inc., et al</u>., 09 Civ. 4432 (SAS/GWG).

(22)    "Plaintiffs' First Set of Interrogatories" shall refer to a certain document entitled "Plaintiffs' First Set of Interrogatories to the Rich Dad Defendants" that is being served contemporaneously with these Requests in this Litigation.

(23)    "Pertaining to" shall refer to relating to, referring to, describing, evidencing or constituting.

(24)    "Archive" and/or "Back-Up," shall refer to all processes for copying and storage, whether temporary or permanent, Electronic Data in a Computer system, other than Active Files in on-tine storage.  "Archive" or "Archiving" refers to any system for maintaining Electronic Data offline, whether referred to as an Archive, dump, purge or by other terms, and also to any system for storage of Electronic Media which is not in current use on the system.  "Back-up" refers to all processes used with the purpose of maintaining a copy of Electronic Data so that it can be restored if the primary copies have been lost or "damaged," or with the purpose of keeping a record of the Electronic Data on the system or parts of the system or a given point or several given points in time.

(25)    "Active File" shall refer to any Electronic Data file that can be utilized by an Electronic Data processing system in any manner without modification and/or re-construction.  An Active File is any Electronic Data file that has not been erased or otherwise destroyed and/or damaged and which is readily visible to the operating system and/or the software with which it was created.

(26)   "Computer" shall refer to, but is not limited to, personal computers, laptop computers, portable computers, notebook computers, palmtop computers, personal digital assistants, minicomputers, and mainframe computers.

(27)   "Deleted File" or "Deleted Record" refers to any Electronic Data file or record that has been erased or deleted from the Electronic Media on which it resided.  A Deleted File includes any file whose directory listings have been modified to indicate the file as being deleted and/or which is not readily visible to the operating system and/or the software with which it was created.  A Deleted Record includes any record which has been flagged or otherwise designated as deleted from an Electronic Data set or file, and/or which is not readily visible to the software or utilities with which it was created.

(28)   "Document" is used herein in the broadest sense permissible and refers to, without limitation, any kind of written, printed, typed, drawn, punched, taped, filmed, recorded, graphic, photographic or electronic matter, or sound reproduction, including earlier drafts or versions thereof; however stored, produced or reproduced, whether or not sent or received, which is in the Rich Dad Defendants' possession, custody, or control, including but not limited to, any accounting records; accountants' working papers; advertisements; agendas; affidavits; agendas; agreements (including but not limited to operating agreements, management agreements and royalty agreements); announcements; annual reports; applications; appointment calendars; audit manuals; bank statements; bills; books; bookkeeping entries; budgets; bulletins; brochures; cartridges; catalogs; cassettes; charts; check lists; checks (front and back); check stubs; compilations; contracts; correspondence; data sheets; desk calendars; diaries; disks; diskettes; documents of title; drawings; evaluations; files; financial records; financial statements;

graphs; indexes; instructions; inter- and intra-company communications; invoices; journals; ledgers; letters; logs; manuals; memoranda; messages; microfiche; minutes; minute books; newspapers and other periodicals (and/or written accounts appearing therein); notations; notes; notebooks; notices; opinions; orders; pamphlets; papers; photographs; plans; posters; press releases; printouts; proxy statements; publications; purchase orders; receipts; records of any sort; reports of any sort; sales letters; schedules; spread sheets; statements; statistical records; studies; summaries; surveys; tabulations; tickets; transcripts; travel records; trip reports; videotape; vouchers; wire transfer receipts; working papers; work papers; worksheets and writings; facsimiles or electronic transmissions; telegrams; telephone records and/or recordings of telephone conversations, conferences, interviews; meetings or other discussions; audio tape, sound recordings; voicemails; video tape; Archive disks and tapes; Back-Up disks and tapes; Computer records; Computer printouts; Computer disks, tapes and memory; Electronic Data processing input and output; Deleted Files; Email messages; instant messages; magnetic disks; microfilms; offline storage optical discs; Removable Storage Media and all other records kept by electronic, electromagnetic, photographic, or mechanical means, and things similar to any of the foregoing, however denominated, from which information can be obtained or translated.

For purposes of clarity "Documents" also include, but is not limited to, all information, in any form, on any Computers used by the Rich Dad Defendants, including desktops and workstations, minicomputers and mainframes used as file servers, application servers or mail servers; laptops, notebooks and other portable Computers such as Palm Pilots or Blackberries or other personal digital assistants, whether assigned to

individuals or in pools of Computers available for shared use; and home Computers used for work-related purpose and all other Electronic Media in the possession, custody and control of the Rich Dad Defendants.

This listing is intended to be illustrative and should not be construed as in any way limiting the scope of the definition of Document as called for in these Requests. All drafts, copies or preliminary materials which are different in any way from the executed or final Document shall be considered to be additional Documents as that term is used herein.  If copies, reproductions, or facsimiles are not identical by reason of handwritten notations, initials, identification marks, or any other modification, each such non-identical copy is a separate Document within the meaning of this definition.

(29)   "Electronic Data" shall refer to all information of all kinds maintained by Electronic Data processing systems including all non-identical copies of such information.  Electronic Data includes, but is not limited to, Computer programs (whether private, commercial or work-in-progress), programming notes or instructions, and input and/or output used or produced by any software program or utility (including Email messages and all information referencing or relating to such messages anywhere on any and all Computers used by the Rich Dad Defendants, word processing documents and all information stored in connection with such documents, electronic spreadsheets, and Electronic Databases, including all records and fields and structural information, charts, graphs and outlines, arrays of information and other in-formation used or produced by any software), operating systems, source code of all types, programming languages, linkers and compilers, peripheral drivers, PIF files, batch files, any and all ASCII file, and any and all miscellaneous files and/or File Fragments, regardless of the media in

which they reside and regardless of whether said Electronic Data exists in an Active File, Deleted File or File Fragment. Electronic Dam includes any and all information stored on computer memories, hard disks, floppy disks, CD-ROM drives, Bernoulli Box drives and their equivalent, magnetic tape of all types, microfiche, punched cards, punched lope, computer chips, including, but not limited to EPROM, PROM. RAM and ROM, or on or in any other vehicle for Electronic Data storage and/or transmittal.  The term Electronic Data also includes the file, folder tabs, and/or containers and labels appended to, or associated with, any physical storage device associated with the information described above.

(30)    "Electronic Media" or "Media" means any magnetic, optical, or other storage media used to record Electronic Data. Electronic/Media devices may include, but are not limited to, computer memories, hard disk drives, floppy diskettes, CD-ROM disks, Bernoulli Box drives and their equivalent, magnetic tape of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to EPROM, FROM, RAM and ROM, or on or in any other vehicle for Electronic Data storage and/or transmittal.

(31)    "Email" shall refer to current, backed-up and archived programs, accounts, unified messaging, server-based email, Web-based email, dial-up email, user names and addresses, domain names and addresses, email messages, attachments, manual and automated mailing lists and mailing list addresses.

(32)    "File Fragment" or "Fragmentary File" shall refer to any Electronic Data file that exists as a subset of an original Active File.

(33)    "Removable Storage Media" shall refer to any device that can be used to store Electronic Data which can be detached from a personal Computer or server, including but not limited to diskettes, floppy discs, CD-ROMs, DVD-ROMs, DVD-RAMs, tapes, Back-Up tapes, Jaz/Syjet/Zip/SuperDisks, or USB keys.

(34)    The terms "describe," "state," and "set forth" mean provide a narrative statement or description, phrased in specifics of the facts or matters to which the interrogatories have reference, including, but not limited to, an identification of all Persons, communication, acts, transactions, events, acts, recommendations and documents necessary to make such statement or description complete.

B.      If any of these interrogatories cannot be answered in full, answer to the extent possible, specifying the reasons for the Rich Dad Defendants' inability to answer the remainder and stating whatever information, knowledge or belief the Rich Dad Defendants have concerning the unanswered portion.

C.      If it is claimed that any interrogatory is, in whole or part, beyond the scope of permissible discovery, specify in detail each and every ground on which such claim rests.

D.      When referring to, identifying or describing any communication, set forth the date of the communication, its type (e.g., letter, telephone call, or face-to-face meeting), the identity of each Person who participated in or witnessed the communication, the identity of all parties of the communication, the substance of the communication and the identity of the document constituting or reflecting the communication.

E.      Whenever an interrogatory asks for the identity of any document, the Rich Dad Defendants may in lieu of giving the document identity, produce the document for inspection

and copying by Plaintiffs, together with a statement indicating the interrogatory to which it responds.

F.      Whenever an interrogatory calls for the identity of a document or communication claimed by the Rich Dad Defendants to be privileged, set forth the identity of such document or communication and the bases asserted for such claim.

G.      Unless otherwise stated, these Interrogatories cover the time period from January 1, 2005 to the present.

H.      These interrogatories are continuing in nature; if, after answering the interrogatories, the Rich Dad Defendants obtain or become aware of any further information responsive to these interrogatories, the Rich Dad Defendants are required to make a supplemental interrogatory answer.

## INTERROGATORIES

1.      Identify all Persons with knowledge or information concerning the subject matter of the allegations contained in the Pleadings.

2.      Identify for each Rich Dad Defendant, its parent corporations, subsidiaries, affiliates, entities under its common control, members, officers and/or principal management personnel, including their title, description of duties and dates of service.

3.      Identify all Persons having knowledge concerning the negotiation, execution or performance of any letters of intent, memoranda of understanding, contracts, licenses, subcontracts, agreements and any modifications thereto entered into between any Rich Dad Defendant and any Person concerning the subject matter of the allegations contained in the Pleadings.

4.      Identify all Persons having knowledge concerning Business Relationships

between Learning Annex, the Rich Dad Defendants, the Whitney Defendants and/or RDE.

5.      Identify all Persons having knowledge concerning conversations or meetings between the Rich Dad Defendants and any other Person pertaining to the subject matter of the allegations contained in the Pleadings.

6.      Identify all Persons having knowledge concerning the introduction of any of the Rich Dad Defendants to any of the Whitney Defendants.

7.      Identify all Persons having knowledge of Learning Annex's introduction of Robert Kiyosaki to Donald Trump.

8.      Identify all Persons having knowledge concerning the negotiation, execution or performance of any letters of intent, memoranda of understanding, contracts, licenses, subcontracts, agreements and any modifications thereto pertaining to the Rich Dad Defendants' Business Relationship(s) with the Public Broadcasting Service, Educational Broadcasting Corporation and/or WLIW, LLC.

9.      Identify all Persons having knowledge concerning the conduct, including business activities, of any Party concerning the subject matter of the First MOU, License Agreement, Second MOU and/or January 27, 2006 E-Mail, as defined above.

10.     Identify all Persons having knowledge concerning the termination of any Business Relationship between Learning Annex, the Rich Dad Defendant, the Whitney Defendants and/or RDE.

11.     Identify all Persons having knowledge of the organization, establishment, capitalization, management, operation, promotion, marketing and finances of RDE.

12.     If the Rich Dad Defendants have obtained a statement from any Person not a Party to this action concerning the subject matter of the allegations contained in the Pleadings, indentify such Person.

13.     If the Rich Dad Defendants claim that any Party to this action or any representative of any Party to this action made any admission or declaration against interest concerning the subject matter of the allegations contained in the Pleadings, indentify such Party (or Party representative).

14.     Identify all Persons who assisted in any way or contributed any information whatsoever in answering any of these Interrogatories and/or Plaintiffs' First Request for Production of Documents to the Rich Dad Defendants, and identify each numbered interrogatory, request and/or response to which such Person contributed.

Dated: New York, New York
      July 24, 2009

LAROCCA HORNIK ROSEN
GREENBERG & BLAHA LLP

By: _Eric P. Blaha_
Eric Peter Blaha (#8756)
40 Wall Street, 32nd Floor
New York, New York 10005
(212) 530-4838
*Attorneys for Plaintiffs*
*Learning Annex Holdings, LLC*
*and Learning Annex, LLC*

TO:     Deborah E. Lans, Esq.
      Cohen Lans LLP
      885 Third Avenue
      New York, NY 10022
      (212) 980-4500
      *Attorneys for Defendants*
      *Whitney Education Group, Inc.,*

*Whitney Information Network, Inc.*
*Wealth Intelligence Academy, Inc.*
*and Rich Dad Education, LLC*

John D. Rapoport, Esq.
John D. Rapoport, P.C.
c/o Marulli, Lindenbaum, Edelman & Tomaszewski, LLP
5 Hanover Square, 4th Floor
New York, NY 10004
(914) 588-3415
*Attorneys for Defendants*
*Rich Global, LLC and Cashflow Technologies, Inc.*

# EXHIBIT A

# Memorandum of Understanding

This Memorandum sets out the understandings reached on 9/7/05 between the Rich Dad Organization ("Rich Dad") and The Learning Annex Holdings LLC ("LAH"). It is intended by the parties that this Memorandum is not a binding legal obligation but rather it represents the good faith intentions of the parties and will be followed up by the drafting of appropriate and legally binding agreements consistent with its terms. The Memorandum is also intended to allow LAH to commence negotiations with third parties to facilitate the businesses described below with final approval by Rich Dad.

The mutual understandings of the parties are as follows:

LAH has expertise in promotion and marketing, specifically in the seminar business. Rich Dad has built the Rich Dad Brand and owns all intellectual property related to the Rich Dad brand. Rich Dad desires that LAH use its expertise to assist Rich Dad in the expansion of the Rich Dad business

All benefits that accrue out of this agreement will inure to Rich Dad, except as specifically provided herein.

1. Rich Dad will license LAH to develop and conduct the "free seminar" business with follow up fee-based courses. Rich Dad will cooperate in developing and have final approval over the content of such courses but will not be required to be physically present at such seminars and courses. Revenues derived from this business (which will be sublicensed to a firm specializing in such activities) will be split 60% to LAH and 40% to Rich Dad. LAH will be responsible for the initial and on-going management of those courses (and any sub-licensee) and for maintaining the quality control aspects of the courses and instructors.

2. Subject to termination of Rich Dad's existing obligations to AMS, Rich Dad will license LAH to create radio infomercials and sell products developed with the assistance of Rich Dad through such infomercials. LAH may conduct this business directly or through sub-licensees. Revenues of this business will be split 70% to LAH and 30% to Rich Dad but only after LAH has fully recouped its direct out-of-pocket expenses including travel expenses for Rich Dad personnel, associated with this business.

3. It is anticipated that LAH's various promotional efforts will result in an increase in revenues received by Rich Dad for coaching services over those received in calendar 2005. The parties will share such increase in coaching revenues in subsequent years on a 50-50 basis over the annual base amount determined.

4. Similarly increases in website sales by Rich Dad will be shared on a 50-50 basis after deduction for the cost of goods sold. The annual benchmark for calculating

the base from which to measure the increase will be mutually agreed to by Rich Dad and LAH. LAH will also assist Rich Dad in improving the website to facilitate sales as well as assist in improving the infrastructure of the website.

5. Sales from Webinars or conference calls organized by LAH will be split 70-30 by LAH and Rich Dad, respectively.

6. LAH has agreed to secure third party sponsorship of $200,000 for a new PBS program featuring Rich Dad.

7. Rich Dad will continue to participate in LAH's Real Estate and Wealth Expos on the same basis as previously (Product sales to be 90% Rich Dad and 10% LAH) for 2006. LAH will pay for first class air travel for up to 5 individuals for flights of 2 hours or more and will arrange private planes for shorter flights.

8. LAH will use its best efforts in its promotional efforts in support of this agreement. LAH respects and agrees to maintain the brand integrity of the Rich Dad brand. LAH recognizes that third party endorsements and sponsorships must first be approved by Rich Dad. LAH and Rich Dad will define the minimum annual promotional dollars anticipated to be spent by LAH or through sublicensees.

9. The initial term of this agreement will be three years with renewable terms if mutually agreed upon.

The foregoing relates only to sales of services and products in the US and Canada (the "Territory"). The foregoing also only relates to sales of the products and services described above and LAH will not participate in other sources of Rich Dad revenue (e.g. book sales); however, if Rich Dad believes LAH's promotion of its brand has enhanced sales of such other products and services it may at its option award LAH additional compensation. LAH will continue to assist Rich Dad in promoting its brand through a new PBS program and other means.

The parties have indicated their approval of these terms by executing the Memorandum below.


_____          _____
CASHFLOW Technologies, Inc.              The Learning Annex Holdings LLC
"The Rich Dad Organization"

# <u>EXHIBIT B</u>

*Rich Dad* 

September 15, 2005

William Zanker
President and CEO
The Learning Annex Holdings LLC
16 East 53rd Street, 4th Floor
NY, NY  10022

Dear Bill,

We are delighted to authorize you and The Learning Annex to assist us in our efforts to expand the Rich Dad Company and to share the Rich Dad message with as many people as possible.

Specifically we authorize you to develop and conduct free Rich Dad seminars with follow up courses in the United States and Canada. Rich Dad will cooperate in developing such courses and have final approval and will assist in training the instructors. Rich Dad personnel will not be required to be physically present at such seminars and courses. We recognize that you may work with sub-licensees to realize this objective. We do request approval of the sub-licensee.

We appreciate your support of the Rich Dad message and brand and thank you for agreeing to maintain the integrity of the Rich Dad brand in all your efforts.

Thank you for your enthusiasm for Rich Dad.   We look forward to a great future working together.

Best wishes

Sharon Lechter
CEO

# EXHIBIT C

**From:** John Kane [mailto:johnkane@russwhitney.com]
**Sent:** Friday, January 13, 2006 2:13 PM
**To:** sharon@richdad.com; phil@richdad.com; Billzanker@aol.com; Samantha Del Canto; morrisorens@yahoo.com
**Cc:** Ronald S. Simon; Nicholas Maturo; Thomas Mc Elroy; Rance Masheck; Tim Lin; Anil Singh; Marie Code
**Subject:** Rich Dad – Learning Annex – Whitney Education (Rich Dad Education)

All,

I have recapped our meeting below. Also, expect over the next week a few charts and explanations to further convey our model and marketing philosophy.

Thanks to everyone for the meeting and for the support you have for this venture

John

Recap of meeting with Rich Dad (Cashflow Technologies), Phoenix, Jan 11, 2005

**For Rich Dad:** Robert Kiyosaki, Sharon Lechter – CEO, Phillip Lechter – Chief Communications Officer

**For Learning Annex:** Bill Zanker – President and CEO, Samantha Del Canto – Senior VP, Morris Orens – General Counsel

**For Whitney Education Group:** Russ Whitney – Chairman and CEO, John Kane – Executive VP

## Memorandum of Understanding

We agreed to begin the process to license the Rich Dad brand for the purpose of creating wealth workshops in the areas of real estate investment, financial market investment and personal/business development/entrepreneurship.

WEG – with Rich Dad's assistance – will create front-end free presentations (two hour long) where students will be invited to attend a follow up, three day overview of the genre (real estate; financial markets; personal/business development/entrepreneurship). There, WEG will offer to enroll students into its Wealth Intelligence Academy (WIA)/Rich Dad Eductaion advanced training classes. We intend to make heavy use of the Cashflow game in the training and teaching process.

WEG will initially concentrate its marketing efforts to coincide with the upcoming Learning Annex Expos to generate greater interest and provide all attending students at the WEG/Rich Dad/Learning Annex (Rich Dad Education) previews the opportunity to meet Robert Kiyosaki at the LA Expos through free tickets to those events.

At LA events, Rich Dad Education will do the Rich Dad presentations for both real estate and stock in the break out rooms, feeding into follow up three day presentations and WIA/Rich Dad Education classes.

Rich Dad Education will recognize through contract the value of the Rich Dad brand, the value of WEG's marketing expertise and student acquisition model, and the value of the Learning Annex events for promoting the Rich Dad Brand and bringing WEG and CFT together to develop the synergies.

The Rich Dad brands will be accounted for separately by WEG as the coordinator of the implementation, with the potential of creating NewCo (Rich Dad Education) for possible future spin off or market leverage.

**Timelines**
Initially, during the week of Jan. 23, 2006, Sharon Lechter and Morris Orens will visit WEG's Cape Coral headquarters to work out the details of the contract and meet with the various departments for presentations on how we will implement the Rich Dad seminar strategy.

Early estimates are RD presentations -- with approved speakers and presentations -- to begin early 2nd quarter at LA events break out rooms. WEG's marketing should be finalized during that period for a late 2nd quarter or early 3rd quarter roll out with one tea on Real Estate, to be followed within six weeks with a stock team. By the end of 2006, two teams on Real Estate and two teams on stock will be deployed for front end presentations each week.

**Action steps**

Create project team for week of Jan 23 presentation -- done
Identify potential speakers for RD WEG events and LA events -- already 21 potentials identified
Create front end presentation for front end sales -- meeting Monday, Jan 16

John F. Kane
Wealth Intelligence Academy
Whitney Education Group, Inc.
1612 Cape Coral Pkwy, East
Cape Coral, FL 33904

office: 239.542.0643  |  fax: 801.340.5075  |  email: johnkane@wiacademy.com

This e-mail, and any attachments to it, contains CONFIDENTIAL and PROPRIETARY information intended only for the use of the addressee(s) or entity named on the e-mail. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any reading, dissemination or copying of this e-mail in error is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from the system. Thank you.

# EXHIBIT D

| | |
|---|---|
| From: | John Kane [johnkane@russwhitney.com] |
| Sent: | Friday, January 27, 2006 3:58 PM |
| To: | sharon@richdad.com; morrisorens@yahoo.com |
| Cc: | Billzanker@aol.com; Samantha Del Canto; Russ Whitney; Thomas Mc Elroy; Ronald S. Simon; Nicholas Maturo; Rance Masheck |
| Subject: | Tuesday's meeting |

Sharon and Morris,

Thanks so much for spending the day with us Tuesday and allowing us to show off our staff a bit. It was a good session, I thought, and I hope both of you agree. Outlined below are the agreements reached, rejected, some going forward steps, and an idea that I hope we can all get behind.

Sharon, we clearly understand your motivation for even considering Rich Dad seminars/free previews/regionals. Since Rich Dad is the brand -- and not Robert Kiyosaki -- you want a system that doesn't rely on Robert to present the Rich Dad concepts. At the same time, you want to avoid any confusion among Rich Dad devotees by being clear that Robert will NOT be at the previews, but free tickets to see Robert at an upcoming Learning Annex event given to each attendee would obviate the need for Robert at the previews.

We also heard your concerns that while at some point we might want to look at holding Rich Dad free preview presentations at Learning Annex Expos, since it wasn't supporting the original goal, it wasn't something that you were interested in pursuing first. You also expressed concerns that it might effect sales of Rich Dad products at the events, and compete in other ways with Robert's appearance at those events.

We get it.

So here is what we decided to do.

1. Establish a company named Rich Dad Education (RDE) that is owned in equal parts by Cash Flow Technologies, Learning Annex and Whitney.
2. All principals equally fund RDE
3. Create contracts that outline the ownership and relationship between the three companies as it applies to RDE
4. Create a management agreement naming Whitney as the party responsible for the day to day operations of RDE
5. Ensure CFT is comfortable with the trainings offered by Wealth Intelligence Academy
6. Potentially rebrand Wealth Intelligence Academy as Wealth Intelligence Academy/Rich Dad Education
7. Create new front end presentations that enroll students into a 3-day fulfillment
8. Create 3-day fulfillment presentations that enroll students into the WIA/RDE advanced trainings
9. In June, one RE front end team will roll out; in July, one stock team will roll out; in August a second RE team will roll out and in September, a second stock team will roll out
10. RDE Free Previews will be held to coincide with upcoming LA expos; starting with Chicago (November), New York (November), and Boston (December). RDE Free Previews will be in those areas the months before the actual expo to promote the expose with free ticket giveaways
11. Send to Sharon all advanced training manuals, Star Trader front end training, user name and password for WIA on demand training, class list for live classroom training, and class list for WebEx live internet based advanced trainings.

Many of the requested items are being sent out. Advanced training manuals will follow early next week (the latest revisions are due today from the printers).

Here is the idea I came up with following our conversations Wednesday. Learning Annex has at least a half dozen expos scheduled this year, beginning in February in Dallas. And while Sharon prefers not to have a free preview sales presence at the event, Bill and Samantha have offered us a Saturday one month after each event to schedule follow up sales and training events. We could use these stand alone events that follow by one month each expo as a testing ground for the RDE RE and Stock previews we plan to launch in the summer. What say you?

Thanks again

1

John F. Kane
Wealth Intelligence Academy
Whitney Education Group, Inc.
1612 Cape Coral Pkwy, East
Cape Coral, FL 33904

office: 239.542.0643 | fax: 801.340.5075 | email: johnkane@wiacademy.com

This e-mail, and any attachments to it, contains CONFIDENTIAL and PROPRIETARY information intended only for the use of the addressee(s) or entity named on the e-mail. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any reading, dissemination or copying of this e-mail in error is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from the system. Thank you.