UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                            :
LEARNING ANNEX HOLDINGS, LLC                :
and LEARNING ANNEX, LLC,                    :
                                            :
                        Plaintiffs,         :
                                            :        **OPINION AND ORDER**
        - against -                         :
                                            :        **09 Civ. 4432 (SAS)**
WHITNEY EDUCATION GROUP,                     :
INC., WHITNEY INFORMATION                    :
NETWORK, INC., WEALTH                        :
INTELLIGENCE ACADEMY, INC.,                  :
WEALTH INTELLIGENCE AGENCY,                  :
RICH DAD EDUCATION, LLC.,                    :
RICH GLOBAL, LLC., THE RICH                  :
DAD COMPANY and CASHFLOW                     :
TECHNOLOGIES, INC.,                          :
                                            :
And John Does #1-10 and XYZ Corp.           :
#1-10, the said defendants consisting of    :
individuals and/or entities whose           :
identities are currently unknown and        :
who are believed to have committed          :
and/or derived from acts injurious to       :
the Plaintiffs,                             :
                                            :
                        Defendants.         :
------------------------------------------------------- X

SHIRA A. SCHEINDLIN, U.S.D.J.:

# I.    INTRODUCTION

        Learning Annex ("LA") brings this action against Rich Global, Rich

Dad, and CashFlow Technologies (collectively, "RD"), and Whitney Education

Group, Inc., Whitney Information Network, Inc., Wealth Intelligence Academy, Inc., and Rich Dad Education, LLC, (collectively, "Whitney"), following the collapse of their business relationship, alleging, *inter alia*, misappropriation of business opportunity, breach of fiduciary duties, breach of covenant to negotiate in good faith, breach of contract, promissory estoppel, equitable estoppel, unjust enrichment, quantum meruit, and fraud. LA subsequently stipulated to discontinue its action against Whitney with prejudice, and RD now moves for summary judgment. For the reasons stated below, summary judgement is denied as to Causes of Action 10, 11, and 14, and granted as to all other Causes of Action.

## II.    BACKGROUND[1]

In September of 2005, LA and RD met to discuss a business plan in which LA would promote and expand the RD brand in a number of ways, including implementing a free seminar program, creating a PBS show featuring RD, increasing RD's presence at Learning Annex Expos, and introducing RD to potential business partners, in exchange for a share of the resulting increase in

---

[1]    In a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

revenues.[2] Following this meeting, a number of material terms covering a potential

future business relationship between LA and RD were memorialized in a

Memorandum of Understanding dated September 7, 2005 ("MOU1") and signed

by both LA and RD.[3] One week later, RD enthusiastically confirmed its

expectation of working with LA in a follow-up letter ("License Agreement"),

which explicitly authorized LA to work with sub-licensees to develop and conduct

free Rich Dad seminars.[4]

Soon thereafter, LA began performing a number of its obligations

under MOU1.[5] However, in December of 2005, RD grew concerned with the

alleged conduct of the President and CEO of LA, William Zanker, on several

occasions, and wrote Zanker two letters demanding an apology and temporarily

halting the business relationship.[6] One week later, Zanker apologized in an email

---

[2]       *See* Affidavit of Morris Orens, Counsel to LA, in Opposition to
Motion for Summary Judgment ("Orens Aff.") ¶¶ 3-5.

[3]       *See* MOU1, Ex. A to Declaration of John Rapoport, Counsel for RD
("Rapoport Decl.").

[4]       *See* 9/15/05 Letter from Sharon Lechter, then-CEO of RD, to William
Zanker, President and CEO of LA, Ex. B to Rapoport Decl.

[5]       *See* Affidavit of William Zanker ("Zanker Aff.") ¶¶ 10-16; Affidavit
of Samantha Del Canto, Executive Vice President and Program Director of LA
("Del Canto Aff.") ¶¶ 9-14.

[6]       *See* 12/19/05 Letter from RD to Zanker, Ex. C to Rapoport Decl.
("Termination Letter 1"); 12/27/05 Letter from Robert Kiyosaki, joint owner of

3

and in person,[7] and RD accepted the apology,[8] allowing "the business relationship [to] continue[] uninterrupted."[9]

Indeed, on January 11, 2006, LA arranged an all-day meeting in which it formally introduced Whitney to RD, after which RD approved Whitney as its sub-licensee for the free seminar business.[10] The results of this meeting were memorialized in a second Memorandum of Understanding ("MOU2"), which outlined a number of general provisions.[11] Subsequently, on January 24, 2006, the three parties met to resolve a number of material issues and set forth a course of action for a joint business venture.[12]

For one reason or another, on February 2, 2006, RD sent an email to

---

LA, to Zanker, Ex. D to Rapoport Decl. ("Termination Letter 2") (collectively, the "December Termination Letters").

[7]     *See* 1/3/06 Email from Zanker to RD ("Apology Letter"), Ex. E to Rapoport Decl.

[8]     *See* Deposition of Sharon Lechter ("Lechter Dep."), Ex. 13 to Declaration of Eric Blaha, Counsel for LA ("Blaha Decl."), at 53:11-53:15.

[9]     Zanker Aff. ¶ 20.

[10]    *See* Orens Aff. ¶¶ 19-24; Zanker Aff. ¶¶ 21-23.

[11]    *See* MOU2, Ex. F to Rapoport Decl.

[12]    *See* Orens Aff. ¶¶ 27-31; 1/27/05 Email from John Kane, Executive VP of Whitney Education Groups, to RD and LA ("Confirmation Email"), Ex. 5 to Blaha Decl.

4

LA stating that it "no longer want[ed] to be in business with [LA]" and that it was "stopping [] negotiations with Donald Trump and Russ Whitney."[13]  Almost immediately thereafter, and unbeknownst to LA,[14] RD sent an email to Whitney expressing its interest in continuing to work with Whitney.[15]

On February 14, 2006, Zanker, still believing that all business relationships between the three parties had ended,[16] wrote to RD acknowledging the termination of the business relationship, and stated that LA would "accept whatever [RD] deem[ed] appropriate . . . for the introduction of [] Whitney . . . to the Rich Dad Organization."[17]  RD declined to compensate LA[18] and continued business discussions with Whitney,[19] which culminated a few months later in a joint enterprise that ultimately generated an alleged $47.2 million profit in

---

[13]     2/2/06 Email from Lechter to Zanker ("Termination Email"), Ex. G to Rapoport Decl.

[14]     *See* Zanker Aff. ¶ 28.

[15]     *See* 2/2/06 Email from Lechter to Kane, Ex. 8 to Blaha Decl.

[16]     *See* Zanker Aff. ¶ 28.

[17]     2/14/06 Email from Zanker to RD ("Waiver Email"), Ex. H to Rapoport Decl.

[18]     *See* Zanker Aff. ¶ 30.

[19]     *See* 2/21/06 Kane Email, Ex. 9 to Blaha Decl.

licensing fees for RD.[20]

 Consequently, on December 29, 2008, LA filed a Complaint against RD and Whitney, alleging, *inter alia*, misappropriation of business opportunity, breach of fiduciary duties, breach of covenant to negotiate in good faith, breach of contract, promissory estoppel, equitable estoppel, unjust enrichment, quantum meruit, and fraud.[21]  On October 13, 2010, LA stipulated to discontinue its action against Whitney with prejudice, and withdrew all claims against Wealth Intelligence Agency, leaving only the RD defendants.[22]

## III. LEGAL STANDARD

 Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[23]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the

---

[20] *See* Affidavit of Clive Kabatznik, CEO of Biltmore Capital Group ("Kabatznik Decl.") ¶¶ 4, 6.

[21] *See generally* Amended Complaint ("Am. Compl."), Ex. O to Rapoport Decl.

[22] *See* 10/13/10 Stipulation of Partial Discontinuance (docket no. 60).

[23] Fed. R. Civ. P. 56(c).

governing law.'"[24]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[25]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[26]  To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[27] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[28]  However,

---

[24]  *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[25]  *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)). *Accord Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

[26]  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). *Accord In re September 11 Litig.*, No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug. 15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.") (quotation marks omitted).

[27]  *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[28]  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

"'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[29]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[30]  However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[31]  Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[32]

## IV.   APPLICABLE LAW

### A.   Type I/II Preliminary Agreement

Under New York Law, two types of preliminary agreements create

---

[29]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[30]    *Sledge*, 564 F.3d at 108 (citing *Anderson*, 477 U.S. at 247-50, 255).

[31]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).  *Accord Anderson*, 477 U.S. at 249.

[32]    *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

8

binding obligations.[33]  The first type, a Type I preliminary agreement, is fully

binding — "it is 'preliminary . . . only in the sense that the parties desire a more

elaborate formalization of the agreement.'"[34]  "A [Type I] preliminary agreement

binds both sides to their ultimate contractual objective in recognition that, 'despite

the anticipation of further formalities,' a contract has been reached."[35]  Thus, even

if the parties failed to produce a more formal agreement, a party to a Type I

preliminary agreement may demand performance of the transaction.[36]

        The second type of preliminary agreement, a Type II preliminary

agreement, is binding only to the extent that the parties are committed to "negotiate

together in good faith" to reach their ultimate contractual objective.[37]  However,

because a Type II preliminary agreement "does not commit the parties to their

ultimate contractual objective," a party to a Type II preliminary agreement has no

right to demand performance of the transaction.[38]  "Indeed, if a final contract is not

---

[33]    *See Adjustrite Sys., Inc. v. GAB Business Servs., Inc.*, 145 F.3d 543, 547-48 (2d Cir. 1998).

[34]    *Id.* at 548 (quoting *Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)).

[35]    *Id.* (quoting *Tribune*, 670 F. Supp. at 498).

[36]    *See id.*

[37]    *Id.* (quotation marks and citation omitted).

[38]    *Id.* (citation omitted).

agreed upon, the parties may abandon the transaction as long as they have made a good faith effort to close the deal and have not insisted on conditions that do not conform to the preliminary writing."[39]

To determine whether the parties have reached a Type I preliminary agreement, courts weigh four factors:

> (1) whether there has been an express reservation of the right not to be bound in the absence of writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.[40]

Of these four factors, the first is "the most important."[41] This factor "requires the Court to determine whether the language of the [document] discloses an intention by the parties to be bound to the ultimate objective," and "is frequently determined by explicit language of commitment or reservation."[42] "Indeed, if the language of the agreement is clear that the parties *did not* intend to be bound, the Court need

---

[39]    *Id.* (citation omitted).

[40]    *Id.* at 549 (quoting *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1986)).

[41]    *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005).

[42]    *Id.*

10

look no further."[43]

On the other hand, to determine whether the parties have reached a Type II preliminary agreement, courts weigh five factors: "(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions."[44]  Though some of these factors are the same as those applied to determine whether a document is a Type I preliminary agreement, "they 'have a somewhat different significance . . . .'"[45]  For example, with regard to the first factor, the language of the document need only evidence "an intention to be bound to the [document] as a general framework in which the parties will *proceed in good faith toward* the [contractual] goal."[46]  Similarly, while "the existence of open terms creates a presumption against finding a binding contract, . . . these same omissions may actually support finding a binding Type II agreement."[47]

---

[43]     *Cohen v. Lehman Bros. Bank F.S.B.*, 273 F. Supp. 2d 524, 528 (S.D.N.Y. 2003) (citations omitted) (emphasis added).

[44]     *Arcadian Phosphates, Inc. v. Azuelos*, 884 F.2d 69, 72 (2d Cir. 1989) (citing *Tribune*, 670 F. Supp. at 499-503).

[45]     *Brown*, 420 F.3d at 157 (quoting *Tribune*, 670 F. Supp. at 499).

[46]     *Id.* at 158 (emphasis added).

[47]     *Id.* (citations omitted).

11

### B.    Joint Venture

To demonstrate the formation of a joint venture pursuant to New York law, a party must establish five elements:

> (1) two or more persons must enter into a specific agreement to carry on an enterprise; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses.[48]

"The ultimate inquiry in determining whether a joint venture exists is whether 'the parties have so joined their property, interest, skills and risks that for the purposes of the particular adventure their respective contributions have become as one and . . . made subject to each of the associates on the trust and inducement that each would act for their joint benefit.'"[49]  Because the creation of a joint venture imposes significant duties and obligations on the parties involved, "the parties must be clear that they intend to form a joint venture, which is a fiduciary relationship, and not a simple contract."[50]   Therefore, "[t]he absence of any one of

---

[48]    *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 67-68 (2d Cir. 2003).

[49]    *Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 445 (S.D.N.Y. 2006) (quoting *Independent Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1201 (S.D.N.Y. 1996)).

[50]    *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004).

12

these elements is fatal to the establishment of a joint venture."[51]

## C.     Misappropriation of Business Opportunity

Under New York law, a claim for tortious interference with a prospective business relationship requires the plaintiff to show that: (1) the defendant interfered, (2) with a business relationship between the plaintiff and a third party, (3) using means that were dishonest, unfair, or improper, or for the sole purpose of harming the plaintiff, (4) causing an injury to that relationship.[52]

The court in *Carvel Corp. v. Noonan* clarified that the third element requires the plaintiff to show "more culpable" and "egregious" conduct.[53] This requirement means that, as a general rule, "the defendant's conduct must amount to a crime or an independent tort."[54] The one exception to this general rule is where "a defendant engages in conduct for the sole purpose of inflicting intentional harm on [the] plaintiffs."[55] However, if the defendant is motivated by legitimate

---

[51]     *Zeising v. Kelly*, 152 F. Supp. 2d 335, 347-48 (S.D.N.Y. 2001).

[52]     *See, e.g.*, *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002); *Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000).

[53]     3 N.Y.3d 182, 191 (2004) (quotation marks and citations omitted).

[54]     *Id.*

[55]     *Id.* (quotation marks and citation omitted).

13

economic self-interest, this exception does not apply.[56]

### D.   Promissory Estoppel

Under New York law, the doctrine of promissory estoppel has three principle elements: "[1] a clear and unambiguous promise; [2] a reasonable and foreseeable reliance by the party to whom the promise is made; and [3] an injury sustained by the party asserting the estoppel by reason of his reliance."[57]

### E.   Equitable Estoppel

Under New York law, the doctrine of equitable estoppel requires a showing of:

> (1) [a]n act constituting a concealment of facts or a false misrepresentation; (2) [a]n intention or expectation that such acts will be relied upon; (3) [a]ctual or constructive knowledge of the true facts by the wrongdoers; [and] (4) [r]eliance upon the misrepresentations which causes the innocent part to change its position to its substantial detriment.[58]

---

[56]   *See id.* (finding that the third element exception did not apply because "[plaintiff's] motive in interfering with the [business] relationships . . . was normal economic self-interest . . . .").

[57]   *Cyberchron Corp. v. Calldata Sys. Develop.*, 47 F.3d 39, 44 (2d Cir. 1995) (quotation marks and citations omitted). *Accord Esquire Radio & Elec., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir. 1986).

[58]   *General Electric Cap. Corp. v. Eva Armadora, S.A.*, 37 F.3d 41, 45 (2d Cir. 2004).

Importantly, this doctrine cannot be used to "create rights otherwise nonexistent."[59] Rather, it may be invoked only where a right legally and rightfully obtained would otherwise be defeated,[60] and "is to be invoked sparingly and only under exceptional circumstances."[61]

### F.   Quantum Meruit/Unjust Enrichment

Quantum meruit and unjust enrichment may be analyzed together as a single quasi-contract claim.[62]  This is because "unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit . . . is one measure of liability."[63]  It therefore stands to reason that a plaintiff must show unjust enrichment before it can recover under quantum meruit.

Under New York law, a plaintiff seeking relief under a theory of unjust enrichment must show "(1) that the defendant benefitted; (2) at the

---

[59]   *Coggins v. County of Nassau*, 615 F. Supp. 2d 11, 23 (E.D.N.Y. 2009) (emphasis added) (quotation marks and citations omitted).

[60]   *See id.*

[61]   *Morgan Stanley High Yield Sec., Inc. v. Seven Circle Gaming Corp.*, 269 F. Supp. 2d 206, 221 (S.D.N.Y. 2003) (quotation marks and citation omitted).

[62]   *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).

[63]   *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 768 F. Supp. 89, 96 (S.D.N.Y. 1991) (*rev'd on other grounds*, 959 F.2d 425 (2d Cir. 1992)).  *Accord Industrial Acoustics Co., Inc. v. Energy Servs., Inc.*, No. 93 Civ. 2865, 1995 WL 274432, at *7 (S.D.N.Y. May 9, 1995).

plaintiff's expense; and (3) that equity and good conscience require restitution."[64] In order to recover in quantum meruit, the plaintiff must then establish "(1) the performance of services in good faith[;] (2) the acceptance of the services by the person to whom they are rendered[;] (3) an expectation of compensation therefore[;] and (4) the reasonable value of the services."[65]

### G. Fraud

To prove a claim for fraud under New York law, a plaintiff must show, by clear and convincing evidence, that: (1) the defendant made a representation, (2) as to a material fact, (3) that was false, (4) and known to be false by the defendant, (5) for the purpose of inducing reliance by the plaintiff, (6) who rightfully relied upon the representation, (7) and who was ignorant of the representation's falsehood, (8) to the plaintiff's injury.[66]

## V.   DISCUSSION

### A.   MOU1

#### 1.   MOU1 Is Not a Type I Preliminary Agreement

LA argues that MOU1 is a Type I preliminary agreement that should

---

[64]   *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 (2d Cir. 2009).

[65]   *Mid-Hudson*, 418 F.3d at 175 (quotation marks and citation omitted).

[66]   *See Apex Oil Co. v. Belcher Co. of New York, Inc.*, 855 F.2d 997, 1008 (2d Cir. 1988) (citations omitted).

be treated as an enforceable contract.[67]  However, the "most important" first factor

of the four-factor test — the language of the document — is dispositive of this

question.  MOU1 states, in clear, unambiguous language that "*this Memorandum is*

*not a binding legal obligation . . . .*"[68]  There can be no clearer evidence, and no

other possible interpretation, of what the parties intended by these words.[69]

       LA's attempts to introduce ambiguity into this phrase are without

merit.  *First,* LA argues that MOU1 is binding because this phrase is followed by

the statement that the Memorandum "*will be* followed up by the drafting of

appropriate and legally binding agreements."[70]  However, the contemplation of

future "appropriate and legally binding agreements" actually reinforces, not

undermines, the non-binding nature of MOU1.  *Second*, LA argues that certain

terms in MOU1 specifying term and geographical limitations would have "no

point" if MOU1 were not legally binding.[71]  However, this argument is logically

---

    [67]    *See* Plaintiff's Memorandum of Law in Opposition to Motion for
Summary Judgment ("Pl. Opp.") at 5.

    [68]    MOU1 at 3 (emphasis added).

    [69]    *See Greenfield v. Philles Records*, 98 N.Y.2d 562, 570 (2002) (noting
that "[e]xtrinsic evidence of the parties' intent may be considered only if the
agreement is ambiguous.").

    [70]    Pl. Opp. at 7-8. (emphasis in original).

    [71]    *Id.* at 8.

17

unsound — there is no reason why the inclusion of these terms negates the express language disclaiming the binding effect of the agreement. *Third,* LA argues that the phrase was "legal boilerplate, left in by mistake."[72]  However, a finding of mutual mistake is "appropriate only in those limited instances where some absurdity has been identified."[73]  There is nothing inherently absurd about this phrase; rather, the inclusion of such a phrase makes perfect sense to parties contemplating future negotiations.

LA also argues that MOU1 should be read in conjunction with the License Agreement to form a binding contract.[74]  While it is true that a written contract may be formed from more than one writing, the ultimate question is still one of the parties' intent.[75]  Here, neither of the documents references the other, and Zanker testified that he only requested the License Agreement so that he would not have to show potential sub-licensees MOU1.[76]  Thus, even if these documents were read together, the License Agreement adds nothing to the terms of MOU1,

---

[72]     *Id.*

[73]     *Wallace v. 600 Partners Co.,* 86 N.Y.2d 543, 547-48 (1995).

[74]     *See* Pl. Opp. at 9.

[75]     *See TVT Records v. Island Def Jam Musicgroup,* 412 F.3d 82, 89 (2d Cir. 2005).

[76]     *See* Deposition of William Zanker ("Zanker Dep. 1"), Ex. N to Rapoport Decl., at 124:1-124:21.

and cannot transform the non-binding MOU1 into a binding contract.

Because MOU1 is neither a contract nor a Type I preliminary agreement, its terms are unenforceable, and LA's cause of action for breach of MOU1 as a contract must be dismissed. Further, LA's causes of action arising from the assumption that MOU1 is a valid, enforceable contract must also be dismissed. Therefore, summary judgment as to Causes of Action 13, 15, 16, 17, and 18 is granted in favor of RD.

### 2.   MOU1 May Be a Type II Preliminary Agreement

On the other hand, LA has raised a genuine dispute as to whether MOU1 is a Type II preliminary agreement. Indeed, if the evidence is construed in the light most favorable to LA, MOU1 is a Type II preliminary agreement. To begin with, the first factor, the language of the document, favors the finding of a Type II preliminary agreement. *First*, the phrase "this Memorandum is not a binding legal obligation" is not dispositive here because Type II preliminary agreements are not binding legal obligations. *Second*, the immediately following phrase describing the Memorandum as representing "the good faith intentions of the parties"[77] indicates the parties' intent to proceed in good faith toward the contractual goal. *Third*, even RD concedes that "MOU1 is a summation of points

---

[77]   MOU1 at 3.

for *future contract negotiations*."[78]

The second factor, the context of the negotiations, may also support the finding of a Type II preliminary agreement.  LA argues that the parties had "had dealings for years,"[79] and that MOU1 was "the culmination of several months of discussions and negotiations between [the parties]."[80]  The parties' history of past business relationships and extended business discussions prior to MOU1 implies that future discussions to reach the ultimate contractual goals were contemplated.  Therefore, the context from which MOU1 arose may also favor the finding of a binding good faith obligation to proceed towards the goals stated in MOU1.

The third factor, the existence of open terms, favors neither party.  RD contends that "MOU1 contains many essential open terms, such as sharing of losses, consequences for failure to maintain the brand integrity, and remedies for breach of contract . . . ."[81]  However, the existence of open terms does not necessarily create a presumption against finding a binding Type II agreement;

---

[78]     Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem.") at 10 (emphasis added).

[79]     Pl. Opp. at 13.

[80]     Plaintiffs' Counterstatement of Disputed Facts ("Pl. 56.1") ¶ 12.

[81]     Def. Mem. at 7.

rather, the existence of open terms may actually support a finding that the parties were bound to proceed in good faith toward finalizing these terms.[82]  Thus, with regard to MOU1's status as a Type II preliminary agreement, this factor favors neither party.

Partial performance, the fourth factor, may strongly favor the finding of a Type II preliminary agreement.  LA asserts, and supports with evidence, that it performed many of the enumerated "obligations" listed in MOU1 and "relentlessly promoted the RD brand."[83]  Indeed, even RD essentially concedes that "partial performance [] favors the plaintiffs."[84]

Finally, the fifth factor, "the necessity of putting the agreement in final form, as indicated by the customary form of such transactions,"[85] may also favor the finding of a Type II preliminary agreement.  RD argues that "[t]his transaction was believed by all parties to have the potential to be a multi-million dollar venture . . . . These types of transactions are usually committed to written contracts."[86]  However, "the customary form of such transactions" also includes a

---

[82]   *See Brown*, 420 F.3d at 157.

[83]   Pl. Opp. at 9-10.

[84]   Def. Mem. at 7.

[85]   *Arcadian Phosphates*, 884 F.2d at 72.

[86]   *Id.*

consideration of the custom of dealings between the parties, and LA counters that "[t]hough RD and LA had dealings for years, they had only one other written contract. All other dealings among the parties had been based on oral agreements."[87] Thus, although the custom of the business may favor putting the agreement in final form, the disputed custom between the parties may undermine this argument and support a conclusion to the contrary.

In sum, because four of the five factors in the Type II preliminary agreement analysis may favor LA, there is a genuine dispute as to whether MOU1 is a Type II preliminary agreement giving rise to a duty to negotiate in good faith.

### 3. LA Has Raised a Genuine Dispute of Material Fact as to Whether the Duty to Negotiate in Good Faith Was Breached

RD further argues that even if MOU1 imposes a duty to negotiate in good faith, it did not breach its duty as a matter of law because "[it] continued discussions with LA for a reasonable time" and only "terminated the discussions because of differences in business philosophies and opinions . . . ."[88] Indeed, the duty to negotiate in good faith does not guarantee that a final contract will be

---

[87]   Pl. Opp. at 13.

[88]   Def. Mem. at 11.

reached if good faith differences prevent the formation of a final contract.[89] However, LA has raised a genuine dispute as to whether RD acted in good faith throughout the course of their business negotiations.

Importantly, the circumstances leading up to and surrounding the final termination of the business relationship in February remain in dispute. To begin with, the February 2, 2006 Termination Email merely states that RD "no longer want[ed] to be in business with [LA]" because of LA's email to PBS, in which LA purportedly urged PBS to eliminate RD's DVD and book and to only support LA.[90] When viewed in isolation, this email sheds very little light on RD's good faith efforts, either past or present, to clarify any misunderstandings or to work toward the formation of a binding contract.

To justify its unilateral termination of the business negotiations, RD points also to the events culminating in the December Termination Letters to show that LA acted unreasonably and that LA and RD had fundamentally different business philosophies. However, LA has raised a genuine dispute as to whether RD's reactions to these events truly reveals incompatible good faith differences, or whether RD was unreasonably insisting on conditions to which it was not entitled.

---

[89]     *See Adjustrite Sys., Inc.*, 145 F.3d at 548.

[90]     Termination Email, at p. 27 of Rapoport Exhibits.

*First*, RD argues that it was concerned with the "unprofessional" and "abusive" conduct of Zanker towards PBS on one occasion, and that it was "concerned that [Zanker] [would] damage [RD's] business."[91]  RD further adds that its business philosophy was incompatible with LA's because it "cannot allow [LA] to dictate how [RD] [is] run."[92]  Although LA does not deny that certain conduct occurred, it counters that RD "misconstrued" Zanker's conduct.[93]  LA maintains that Zanker's conduct on that particular occasion, though unfortunate, was neither improper nor related to RD, because PBS had violated a separate contractual agreement between LA and PBS.[94]  LA further supports its argument with evidence that its business relationship with PBS did not deteriorate as a result of Zanker's conduct.[95]  Finally, LA also contests, and there is little evidence to show, that it ever tried to "run" RD or its shows.[96]

*Second*, RD argues that LA acted dishonestly with regard to a potential book deal with Donald Trump, and that as a result, it "could no longer

---

[91]    Defendants' Statement of Facts ("Def. 56.1") ¶¶ 26-27.

[92]    *Id.* ¶ 26.

[93]    Pl. 56.1 ¶ 33.

[94]    Del Canto Aff. ¶ 19.

[95]    *See id.*; Pl. 56.1 ¶ 26(d).

[96]    *See* Del Canto Aff. ¶ 19.

24

trust [LA]."[97]  However, LA explains that RD's concerns arose from an honest

misunderstanding on LA's part, and that it sincerely apologized for any perceived

underhanded dealings.[98]  Indeed, it appears that RD accepted LA's apology and

explanation, and allowed the business relationship to continue uninterrupted.[99]

*Finally*, despite RD's argument that it had different business

philosophies from those of LA, RD made a number of statements indicating that it

appreciated LA's efforts and enjoyed working with LA.[100]  Drawing all reasonable

inferences in LA's favor, these statements undermine RD's argument that it

terminated the business relationship as a result of good faith differences in business

philosophies.

In sum, if the evidence is construed in the light most favorable to LA,

there is a genuine dispute over whether RD made good faith efforts to enter into a

contract with LA, or whether it unreasonably "insist[ed] on conditions that [did]

---

[97]    Def. 56.1 ¶¶ 28-29.

[98]    *See* Apology Letter, at 3 (explaining that "I never thought you would have a problem with me sharing in the book.  It seemed obvious that . . . it was not an issue. . . . when the corporate attorney asked should he send it also to Rich Dad, I said . . . [l]et's make sure Donald agrees first.").

[99]    *See* Zanker Aff. ¶ 20.

[100]    *See* Pl. 56.1 ¶ 26.  *See, e.g.,* Termination Letter 2, at p. 18 of Rapoport Exhibits ("We are in the same business . . . learning.  I love having [LA] as part of our team and family.  You guys are brilliant.").

25

not conform to the preliminary writing," before it finally terminated the business relationship in February 2006.[101]  Therefore, summary judgment as to Cause of Action 14 is denied.

### 4.    If RD Breached Its Duty to Negotiate in Good Faith, LA May Be Entitled to Damages

Finally, RD argues that even if it breached its duty to negotiate in good faith, "LA is not entitled to damages, including lost profits and reliance damages."[102]  Although it is true that lost profits are generally not available where no agreement is reached,[103] out-of-pocket costs may still be appropriate.[104] Therefore, if LA prevails on its claim of a breach of duty to negotiate in good faith, it may be able to recover the out-of-pocket costs it incurred in its good faith partial performance of MOU1.

### B.    MOU2

### 1.    MOU2 Did Not Create a Joint Venture or Any Contractual Obligations

Contrary to LA's assertion, MOU2 did not create a joint venture because it fails to satisfy the second element, an intent to be joint venturers, the

---

[101]    *Adjustrite Sys., Inc.*, 145 F.3d at 548.

[102]    Def. Mem. at 12.

[103]    *See Goodstein Constr. Corp. v. New York*, 80 N.Y.2d 366, 374 (1992).

[104]    *See Arcadian Phosphates*, 884 F.2d at 74 n.2.

fourth element, joint control over the venture, and the fifth element, a provision for profit and loss sharing. LA summarily argues that the second element is satisfied because "LA, Whitney, and RD agreed that RDE would be owned equally," that the fourth element is satisfied because "[t]he parties agreed that each of them would have [a] one-third ownership interest with corresponding joint control of the business," and that the fifth element is satisfied because "[w]here there is anticipated equal ownership of a venture . . . sharing of profits and losses is inferred."[105]

These arguments lack merit. *First*, it is wholly unclear that the parties intended to create a joint venture. Importantly, MOU2 itself only states that "[w]e agree[] to begin the process to *license* the Rich Dad brand . . . ."[106] Nowhere does it mention or use the term "joint venture." Further, although the parties eventually agreed that the proposed entity would be jointly owned, "the ownership and relationship between the three companies" remained unclear.[107] Even LA concedes that it did not know the nature and type of relationship that would be formed

---

[105]   Pl. Opp. at 20.

[106]   MOU2 (emphasis added).

[107]   Confirmation Email.

27

following MOU2.[108]  In the absence of clearer language of intent, it is improper to

bind the parties to the obligations created by a joint venture.

*Second*, there is no evidence of an agreement regarding joint control

of the proposed entity.  Although the record is not entirely clear, it tends to suggest

that Whitney would control the operations of the proposed entity.[109]  Nowhere are

the roles of LA or RD in controlling the proposed entity specified, and LA's bare

assertion that "corresponding joint control of the business" would somehow

automatically arise out of equal ownership lacks support.

*Finally*, LA's argument that an implied sharing of profits and losses

necessarily arises from contemplated equal ownership is simply incorrect, both as a

matter of law and as applied here.  To begin with, it is unclear that LA ever

intended to equally share profits — in its Complaint, LA asserts, contrary to its

position here, that it was entitled to sixty percent of the revenues under MOU1.[110]

---

[108]	*See* Deposition of Morris Orens ("Orens Dep."), Ex. 2 to Declaration of Deborah E. Lans ("Lans Decl."), counsel for Whitney, at 150:19-152:24.

[109]	*See* Orens Dep. at 122:20-123:9 ("I think Whitney . . . said that they would be . . . running it because it would really be their back end so they would be managing the back end . . . ."); Confirmation Email (memorializing the parties' agreement to "[c]reate a management agreement naming Whitney as the party responsible for the day to day operations of [the entity].").

[110]	*See* Am. Compl. ¶ 267.

Likewise, even though loss provisions may be implied in certain situations,[111]

Zanker testified that he thought that each party would be subject only to the loss of

its investment, and that he did not know how losses beyond the initial contribution

would be funded.[112]  This alone defeats the requirement that "joint venturers must

be subject to more than just the loss of their investment in the venture."[113]

Further, not only did MOU2 not create a joint venture, it also did not

create any other separate binding contractual obligations.  LA does not contest

RD's argument that MOU2 is not a contract.[114]  Moreover, in an MOU2 follow-up

email, Whitney explicitly states that the parties needed to "[c]reate contracts . . .

."[115]

Because MOU2 did not create a joint venture and was not in any way

a binding contract, LA's cause of action for breach of contract must be dismissed.

Further, LA's causes of action arising from the assumption that MOU2 created a

---

[111]    *See, e.g., SCS Comm'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d
Cir. 2004); *Cosy Goose Hellas v. Cosy Goose USA, Ltd.*, 581 F. Supp. 2d 606, 622
(S.D.N.Y. 2008).

[112]    *See* Deposition of William Zanker ("Zanker Dep. 2"), Ex. 1 to Lans
Decl., at 262:10-262:18; 263:3-267:20.  *See also* Orens Dep. at 127:24-128:12.

[113]    *Cosy Goose Hellas*, 581 F. Supp. 2d at 622.

[114]    *See generally* Pl. Opp. at 19-23.

[115]    Confirmation Email.

29

joint venture must also be dismissed.  Therefore, summary judgment as to Causes of Action 2, 4, 5, 6, and 7 is granted in favor of RD.

### 2.   MOU2 Is Not a Type II Preliminary Agreement

Further, MOU2 is not a Type II preliminary agreement.  Although the language of the agreement favors the finding of a Type II preliminary agreement,[116] LA has failed to raised a genuine dispute with regard to the other four elements.

*First*, MOU2 was written as a summary of the results of the first official meeting between all three parties, in which Whitney was formally introduced to RD.  Though LA may have had prior longstanding business relationships with RD and/or Whitney, RD and Whitney did not have any relationship prior to LA's introduction.  In light of the fact that RD and Whitney first met just two days prior to the issuance of MOU2, the context of the negotiations does not support a finding of any binding, good faith obligations.

*Second*, there is no genuine dispute over the existence of open terms in MOU2.  Even though the existence of open terms does not necessarily create a presumption against the finding of a Type II preliminary agreement, MOU2's glaringly vague language and complete lack of definite terms indicate that at the

---

[116]   *See, e.g.*, MOU2 at 24 (stating that the parties "*agreed* to begin the process to license the Rich Dad brand . . . .") (emphasis added); MOU2 at 25 ("Rich Dad Education *will recognize through contract* the value of the [parties] . . . .") (emphasis added).

time MOU2 was written, the parties were not yet even aware of which terms they needed to finalize in future discussions. Indeed, MOU2 appears to be nothing more than a broad outline of goals for a future business enterprise.

*Third*, there is no genuine dispute over the partial performance of MOU2. LA argues that it "contributed its introduction of Whitney" and that "[t]he parties commenced work on final agreements."[117] However, LA introduced Whitney to RD before MOU2 was written, and the mere fact that the parties commenced work on the final agreement, without more, is not partial performance of one of the ultimate contractual goals of MOU2. Moreover, it is undisputed that RD terminated the agreement less than a month later, so the window for partial performance by LA was extremely narrow.

*Finally*, there is no genuine dispute as to the need to draft additional documents. LA concedes this point, and only argues that "the other factors are sufficient to bind the parties."[118] However, to the contrary, three of the other four factors fail to support the finding of any binding obligations.

In sum, although the first element favors LA, there is no genuine dispute that the other four elements favor RD. Accordingly, MOU2 is not a Type

---

[117]   Pl. Opp. at 22.

[118]   *Id.*

II preliminary agreement, and summary judgment as to Cause of Action 3, for breach of a duty to negotiate in good faith, is granted in favor of RD.

### C.    Misappropriation of Business Opportunity

LA has failed to raise a genuine dispute that RD misappropriated LA's business opportunity.  *First*, LA points to no evidence whatsoever that RD engaged in "dishonest, unfair, or improper" means as defined by New York law, or that alternately, RD acted "for the sole purpose of harming [LA]."[119]  Even if RD breached its duty to negotiate in good faith with LA, this is not the type of "egregious" and "more culpable" conduct that rises to the level of a crime or an independent tort, but is rather merely a breach of a contractual obligation.

*Second*, LA has failed to even show the existence of a third party business relationship with which RD interfered.  Although Whitney is a third party with regard to the dealings between LA and RD, Whitney cannot be considered a third party to the proposed *joint* business enterprise because had it entered into a contractual relationship with LA, it would perforce also have entered into a contractual relationship with RD.

Therefore, because RD did not interfere, and could not have interfered, with LA's business opportunity, Causes of Action 1 and 12 are

---

[119]     *Lombard*, 280 F.3d at 214.

32

dismissed.

### D.    Promissory Estoppel

LA argues that RD made a "clear and unambiguous" promise to compensate LA for introducing Whitney to RD and promoting the RD brand through the free seminar business.[120]  LA also argues that RD promised it that LA would be an equal owner in the proposed entity and share profits.[121]  However, LA points to no evidence whatsoever to support its argument that RD ever clearly and unambiguously promised this alleged compensation.  Rather, Zanker's testimony reveals that even if such promises were made, they were unclear as to what and how LA would be compensated for its services.[122]  Therefore, because LA has failed to satisfy the first element of promissory estoppel, Cause of Action 8 is dismissed.

### E.    Equitable Estoppel

LA has similarly failed to point to any evidence that RD affirmatively

---

[120]    *See* Am. Compl. ¶ 205; *see also* Pl. Opp. at 19.

[121]    *See* Am. Compl. ¶ 206.

[122]    *See* Zanker Dep. 1, at 419:10-421:4 (testifying with regard to an alleged introduction fee that "[i]t was my recollection that somebody was going to figure out if it was not the same for a period of time so my idea was a two million . . . . Then the idea was a royalty which would be a royalty stream off the top and we were trying to figure out, we talked about it briefly, . . . I think they — people wanted to think about it . . . ."); *see also* Zanker Dep. 1, at 488:2-490:2.

concealed or misrepresented facts, the truth of which it knew or should have known.  LA alleges that "[RD] . . . represented to Learning Annex that it would be compensated for the value of introducing Whitney to Rich Dad, as well as for the value of Learning Annex's promotion of the Rich Dad brand," but that "[d]espite their representations, . . . [RD] did not intend to compensate Learning Annex."[123] LA also alleges that "[RD] . . . represented to Learning Annex that it was an equal owner of the joint venture," but that "[d]espite their representations, . . . [RD] did not intend to give Learning Annex its equal share . . . ."[124]

However, LA has failed to offer any evidentiary support for these allegations.  The evidence reveals that at most, RD made some vague oral promises regarding compensation and/or joint ownership of the proposed entity.[125]  LA points to no evidence whatsoever showing that at the time RD made its oral promises, RD did not intend to compensate LA or give LA a share of the proposed entity, or that RD knew or should have known it did not intend to do so. Therefore, because elements one and three are not met, LA does not have a claim for equitable estoppel, and Cause of Action 9 is dismissed.

---

[123]     Am. Compl. ¶¶ 212, 215.

[124]     *Id.* ¶¶ 211, 214.

[125]     *See, e.g.*, Zanker Dep. 1 at 419:10-421:4.

34

## F.    Quantum Meruit/Unjust Enrichment

RD has failed to show the absence of a genuine dispute as to whether

LA should be able to recover under quantum meruit/unjust enrichment for actions

LA performed pursuant to MOU1.  In its motion for summary judgment, RD

simply joins Whitney's arguments[126] that LA should not be able to recover under

quantum meruit/unjust enrichment because it "performed no services connected to

the putative joint venture, at all."[127]  However, this argument fails to address LA's

contention that it "recommended that RD enter the free seminar business, located

and conducted due diligence of potential licensees ultimately identifying Whitney,"

and tirelessly promoted RD, resulting in "significant revenues to RD based on

increased coaching services and product sales" that would be "unjust for RD to

retain . . . ."[128]  Indeed, if the evidence is viewed in the light most favorable to LA,

LA performed valuable services for RD pursuant to MOU1 that RD encouraged

and accepted, and for which LA expected to be but was not compensated.

Therefore, there is a genuine dispute as to whether and for how much LA may

recover under quantum meruit/unjust enrichment, and summary judgment as to

---

[126]    *See* Def. Mem. at 20.

[127]    Whitney's Memorandum of Law in Support of Motion for Summary
Judgment at 25.

[128]    Pl. Opp. at 17.

35

Causes of Action 10 and 11 is denied.

### G.     Fraud

Although LA has raised a genuine dispute with regard to the legal effect, if any, of its Waiver Email, it cannot prevail on a claim of fraud because it has failed to show an injury aside from the potential harm to its ability to recover under its quasi-contract claims.  LA argues that as a result of RD's Termination Email, "[it] was damaged by not pursuing and thus not receiving its share of license fees paid to RD and by not participating in the RDE business formed by RD and Whitney excluding LA."[129]  However, LA has failed to show by "clear and convincing evidence" how it suffered this injury as a result of its reliance on the Termination Email.  Indeed, MOU2 is neither a contract, nor a Type I or Type II preliminary agreement, so regardless of the alleged false statements contained in RD's Termination Email, RD could have unilaterally terminated the joint venture talks had it decided that it no longer wanted to work with LA.  At most, LA can show that as a result of the Termination Email, it was induced to send the Waiver Email and not pursue the alleged joint venture with RD and Whitney, but this injury is purely speculative.  Therefore, summary judgment as to Cause of Action 19 is granted in favor of RD.

---

[129]     *Id.* at 24.

## VI.   CONCLUSION

For the foregoing reasons, RD's motion is denied as to Causes of Action 10, 11, and 14 and granted as to all other Causes of Action.  The Clerk of the Court is directed to close this motion [Docket Nos. 51 and 54].  A conference is scheduled for February 14, 2011 at 4:30 PM.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             January 25, 2011

37

**-Appearances-**

**For Plaintiffs:**

Eric P. Blaha, Esq.
LaRocca Hornik Rosen
Greenberg & Blaha, LLP
40 Wall Street, 32nd Floor
New York, New York 10005
(212) 530-4838

John A. Coleman, Jr., Esq.
Friedberg Cohen
Coleman & Pinkas, LLP
767 Third Avenue, 31st Floor
New York, New York 10017
(212) 829-9090

**Counsel for Defendants:**

John D. Rapoport, Esq.
John D. Rapoport, PC
c/o Marulli, Lindenbaum, LLP
5 Hanover Square, 4th Floor
New York, New York 10022
(914) 588-3415

Deborah E. Lans, Esq.
Ryan Weiner, Esq.
Cohen Lans LLP
885 Third Avenue
New York, New York 10022
(212) 980-4500