17DZLEA1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LEARNING ANNEX HOLDINGS, LLC,
and LEARNING ANNEX, LLC,

                    Plaintiffs,

            v.                          09 Civ. 4432 (SAS)

WHITNEY EDUCATION GROUP, INC.,
et al.,


                    Defendants.

------------------------------x

                                        July 13, 2011
                                        10:50 a.m.

Before:

                    HON. SHIRA A. SCHEINDLIN

                                        District Judge

                          APPEARANCES

HARRIS, CUTLER & HOUGHTELING LLP
BY:   JON HARRIS
      JULIE WITHERS
      ALEX SAKIN
      Attorneys for Plaintiff

IFRAH LAW PLLC
BY:   DAVID DEITCH
      Attorneys for Plaintiff

LAROCCA HORNIK ROSEN GREENBERG & BLAHA LLP
BY:   ERIC BLAHA
      Attorneys for Plaintiff

JOHN D. RAPOPORT, P.C.
BY:   JOHN RAPOPORT
      JOHN MASCARI
      MATTHEW TAYLOR
      Attorneys for Defendants Rich Global LLC
      and Cash Flow Technologies, Inc.

17DZLEA1

THE DEPUTY CLERK:  All rise.

THE COURT:  Please be seated.

MR. RAPOPORT:  Good morning, your Honor.

MR. HARRIS:  Good morning, your Honor.

THE COURT:  Okay.  When we finished trial yesterday and I said good-bye to all of you, I realized we had an unfinished piece of business.  And that is on the unjust enrichment claim, as you know, that issue is really for the Court.

And since it's also, according to law of the case, a predicate for the finding of quantum meruit, there's really no verdict until the Court hears the non-jury portion of the case.

And as you also recall, there were three elements to unjust enrichment; two of them were for the jury, very simple questions, and they found both of those questions, not surprisingly, because they are so straight forward, and those questions were:  Has Learning Annex proven by a preponderance of the evidence that Rich Dad received services provided by Learning Annex?  They said yes.  Has Learning Annex proved by a preponderance of the evidence that Rich Dad benefited from the receipt of those services provided by Learning Annex?  They said yes.

But it's the third element that is for the Court, not for the jury.  I said I would take it as an advisory verdict, but as you know, I'm not bound by it.  And, that is, under

17DZLEA1

1    principles of equity and good conscience, should Rich Dad be

2    required to pay for these services?  And that's the issue today

3    for the Court.

4           We started to discuss this last Friday afternoon when

5    the defense made its motion for directed verdict.  I remember

6    Mr. Rapoport began his argument saying, there's no way that

7    Rich Dad had done anything wrong.  And then response, Mr.

8    Harris began to point to some piece of evidence in the record.

9    But I don't consider that a sufficient argument or proffer or

10   trial to the Court.  So I thought that's why we're here today.

11          That said, I thought I'd give it only an hour.  So I

12   thought -- I think, unless you think there's any additional

13   evidence that needs to be put before the Court that wasn't

14   before the jury.  In the absence of evidence, it's really

15   argument and pointing to the exhibits that you might want me to

16   look at.

17          You know, I gave one of the witnesses my first book

18   and -- the Zanker book, so I don't have that.

19          The Court Reporter says it's sitting right there.  Can

20   you get it off the witness stand?  He thinks it's right there.

21          MR. HARRIS:  Yes, your Honor.

22          THE COURT:  That was my copy.

23          MR. HARRIS:  Your Honor, we have a binder of the

24   exhibits in evidence, which may be better.

25          THE COURT:  All right.  You want to do that, that's

17DZLEA1

1     okay too.  That's okay too.

2                 (Handing)

3                 THE COURT:  Thank you.

4                 MR. HARRIS:  It's the plaintiff's exhibits in

5     evidence, your Honor.

6                 THE COURT:  All right.  So let me state for the

7     record, Mr. Harris or Mr. Deitch, do you want to offer any

8     further evidence --

9                 MR. DEITCH:  No, your Honor.

10                THE COURT:  -- to the Court on this issue?

11                MR. HARRIS:  No, your Honor.

12                THE COURT:  Mr. Rapoport?

13                MR. RAPOPORT:  No, your Honor.

14                THE COURT:  All right, so the evidence is the same

15    evidence that the jury heard.

16                That said, it's your burden of proof, as usual.  So

17    you want to explain the evidence?

18                MR. HARRIS:  Mr. Deitch will be doing the argument,

19    your Honor.

20                MR. DEITCH:  Good morning, your Honor.

21                Your Honor, there's overwhelming evidence in this case

22    of wrongful conduct.  We respectfully submit this is not a

23    showing that we need to make at this time, and that it is not

24    necessary to support the jury verdict, and I'll address --

25                THE COURT:  Wait, wait, wait a minute.  Haven't I

17DZLEA1

1    already ruled that unjust enrichment is a matter for the Court?

2    I sent you an opinion that said that over the weekend.  I think

3    I've since docketed it and it's filed.  So if you're saying,

4    despite your ruling we want to preserve for the record our

5    objection, we don't believe it's for the Court, despite the

6    explicit direction of the pattern jury instructions that a jury

7    may never decide enrichment, you want to take the position that

8    was an issue for the jury, not for the Court.

9            MR. DEITCH:  That's our position, your Honor, and for

10   the record.

11           THE COURT:  Record of what?  I've already clearly

12   ruled but -- and so has New York State, but go ahead.

13           MR. DEITCH:  But, your Honor, we are going to address

14   the evidence of wrongful conduct in detail as the Court has

15   asked us to.

16           In this case, your Honor, there were at least four

17   types of wrongful conduct.  And I'm going to review them now

18   and make reference to the particular exhibits and some of the

19   testimony that evidences that misconduct.

20           THE COURT:  Okay.  I've asked you to pause for a

21   minute, I want to take notes, I don't have the computer running

22   yet.

23           MR. DEITCH:  Okay.

24           THE COURT:  Just take a minute.

25           (Pause)

17DZLEA1

1          THE COURT:  Okay.  You were saying there were four?

2          MR. DEITCH:  Yes, your Honor, and I'll give them four

3     descriptive labels, and then I'll go through each them.

4          The first label is lies; the second, the cover up; the

5     third, pretext, and the last, the prime rose path.

6          First I'll talk about the lies.  And there were at

7     least, there are at least two lies that I want to talk about

8     with the Court today.  The first involves the two e-mails that

9     Ms. Lechter sent on February 2nd, 2006, the one that she sent

10    to Mr. Zanker at 11:15 p.m, that's Exhibit 132, and the one

11    that she sent eight minutes later to Whitney at 11:23 p.m.,

12    that's Exhibit 128.

13         In the first of those e-mails, your Honor certainly

14    recalls that Ms. Lechter stated unequivocally, everything is

15    off.  And she also stated, we are stopping negotiations with

16    Whitney.  This was a simple unequivocal statement that

17    everything, all of the discussions about forming the new free

18    seminar business was off.

19         It was also a simple and unequivocal statement that

20    Rich Dad was stopping its discussions with Whitney about

21    developing a new free seminar business, and those two

22    statements were simply a lie.

23         Eight minutes later, as the Court knows, Ms. Lechter

24    sent an e-mail in which she told John Kane that they love

25    Whitney, and asked Mr. Kane to call her ASAP, as soon as

17DZLEA1

1    possible in the morning and gave her cell phone.  This, your

2    Honor, is crystal clear unequivocal evidence that Rich Dad

3    affirmatively lied and misled Bill Zanker and the Learning

4    Annex as to whether Rich Dad intended to pursue the new

5    business that Mr. Zanker had developed with the new business

6    partner that he had recommended.

7          THE COURT:  All right.  So really you're saying this

8    is one lie.

9          MR. DEITCH:  It's one lie that is evidenced by the two

10    e-mails.

11          And that second e-mail, just in case I didn't say it

12    clearly, was exhibit 128.

13          THE COURT:  You did say that.

14          MR. DEITCH:  The second lie that I referenced when I

15    said there were two lies that I wanted to talk about, involves

16    the waiver e-mail on February 14th.  The Court will recall Mr.

17    Zanker gave uncontradicted testimony that on February 14th,

18    2006 he spoke with Ms. Lechter, and that Ms. Lechter said that

19    she needed Mr. Zanker to send an e-mail for housekeeping

20    purposes in which he gave up his claim for compensation for the

21    Whitney deal.  And, your Honor, that testimony appears in the

22    transcript from page 204, line 25, to 205, line 14.  And during

23    the conversation -- and this is unrebutted in this trial

24    testimony, in the trial testimony or in the documentary

25    evidence -- Ms. Lechter repeated the lie that the Whitney deal

17DZLEA1

1    was off.  She told him that Rich Dad was not negotiating with

2    Whitney.  And that testimony specifically is on page 205, line

3    eight and lines 12 to 14.

4            And, your Honor, the jury clearly believed Mr.

5    Zanker's testimony in this regard, in that it made a specific

6    finding on the special verdict sheet that Rich Dad had not

7    carried its burden of proof that the February 14th waiver was

8    knowing and voluntary.  And given the facts of this case, that

9    jury finding necessarily meant that the jury found that Rich

10   Dad at a minimum failed to inform Mr. Zanker that Rich Dad was

11   still negotiating with Whitney that there were something that

12   he was giving up by giving that waiver.  And, of course, it is

13   consistent with Mr. Zanker's testimony that Rich Dad did more

14   than that, that they lied to mislead Mr. Zanker and to

15   fraudulently procure the waiver.

16           THE COURT:  So, according to you, on the telephone

17   call Lechter specifically says Rich Dad is not negotiating with

18   Whitney.  She tells Zanker that on February 14th.

19           MR. DEITCH:  Yes.  Mr. Zanker testified to that, that

20   she told him that there was no Whitney deal, they weren't

21   talking to Whitney.

22           It's clear, your Honor, that at that point in time

23           THE COURT:  They were talking to Whitney then?

24           MR. DEITCH:  Yes, your Honor, I'm going to get to

25   that.  That's part of the cover up.

17DZLEA1

1      It's clear that Rich Dad, at a minimum, at that point

2  was highly concerned that it owed a fee to the Learning Annex

3  and that the Learning Annex had a reasonable expectation that

4  it was going to collect that fee or it was entitled to that

5  fee.  And to address those concerns, Rich Dad chose to lie.

6  And we believe that these two lies, taken either individually

7  or together, the two lies being the February 2nd lies and the

8  February 14th lie, are sufficient to satisfy the requirement

9  that the Court has said Learning Annex must satisfy in this

10  hearing.

11      This is consistent with New York law on unjust

12  enrichment, in that the courts have said that it is contrary to

13  equity and good conscience to permit a party to benefit from

14  its own misrepresentations.  And I direct the Court's attention

15  to the case of Waldman, W-a-l-d-m-a-n versus New Chapter,

16  citation is 714, 714, F. Supp. 2d, 398.  It's a case from the

17  Eastern District of New York in 2010.

18          THE COURT:  I'm sorry, that one was Waldman you said?

19          MR. DEITCH:  Waldman, W-a-l-d-m-a-n.

20          THE COURT:  Versus?

21          MR. DEITCH:  New chapter.

22      May I continue?

23          THE COURT:  One second.

24          MR. DEITCH:  Okay.

25          THE COURT:  Okay.

17DZLEA1

```
 1              MR. DEITCH:  Okay.  And the reason I mention the

 2    Waldman case and the principle that equity and good conscience

 3    do not allow a party to benefit from its misrepresentations, is

 4    because we believe that the law in New York requires an

 5    inequity that does not necessarily include wrongful conduct.

 6    While proof of wrongful conduct will show inequity --

 7              THE COURT:  Yeah, I think that's right.  I don't think

 8    that New York law requires wrongful conduct, per se.

 9              MR. DEITCH:  I'm sure your Honor is familiar with the

10    Simmons V. Simmons case and its progeny that basically stands

11    for that proposition.

12              THE COURT:  That's New York law, New York case.

13              MR. DEITCH:  Yes.

14              THE COURT:  Not a Federal case.

15              MR. DEITCH:  Correct.

16              THE COURT:  That's a New York case, yeah.

17              MR. DEITCH:  Your Honor, the second form or the second

18    category of wrongful conduct that I want to address has to do

19    with the cover up, and this will address the Court's question

20    about what was going on between Rich Dad and Whitney through

21    this period.  And this cover up extends over three consecutive

22    periods.  The first being from the February 2nd termination

23    through the February 14th waiver e-mail.  The second being from

24    that date, February 14th, to the execution of the letter of

25    intent March 26 between Whitney and Rich Dad, and then from --
```

17DZLEA1

1              THE COURT:  Hold on one second.

2              MR. DEITCH:  -- the execution of that letter -- I'm

3    sorry.

4              THE COURT:  That's okay.  Go ahead.

5              MR. DEITCH:  Then from the execution of that letter of

6    intent in late March until the announcement in the fall of

7    2006, the public announcement about the Whitney deal.

8              The first exhibit to which I would draw the Court's

9    attention is Exhibit 128.  And this is, this is Sharon

10   Lechter's -- this I referenced before, it's Sharon Lechter's --

11             THE COURT:  Right, the 11:23 e-mail.

12             MR. DEITCH:  Right, yes 11:23 p.m. e-mail, yes.  And

13   in that e-mail Ms. Lechter asked to speak to Mr. Kane as soon

14   as possible.  She also indicated that she was planning to go to

15   a Whitney seminar in Phoenix the following week.  And the

16   reason I bring that to the Court's attention is that Exhibit

17   141, which is a February 13th e-mail from Ms. Lechter to

18   Mr. Kane, Ms. Lechter writes to Mr. Kane and tells him how

19   pleased the Rich Dad personnel were who attended the Whitney

20   seminar.  And she specifically said, at the end of that e-mail,

21   that she was looking forward to furthering their discussions

22   that week.  Clear evidence that they were in fact having those

23   discussions.  And these, of course, are the discussions that

24   Rich Dad had told the Learning Annex that it stopped as of

25   February 2nd.  And these are the discussions that she denied

17DZLEA1

| | |
|---|---|
| 1 | were happening the following day, February 14th, when she |
| 2 | told -- when she asked Bill Zanker for the waiver e-mail. |
| 3 | THE COURT:  So he wrote the e-mail the same day as the |
| 4 | alleged telephone call between him and Lechter. |
| 5 | MR. DEITCH:  No.  I believe this e-mail was |
| 6 | February 13th, and that telephone call was the following day. |
| 7 | THE COURT:  I thought the waiver e-mail is |
| 8 | February 14th? |
| 9 | MR. DEITCH:  It is.  And this e-mail from Mr. Kane is |
| 10 | on February 13th. |
| 11 | THE COURT:  I don't mean that.  Sorry.  Lechter's |
| 12 | phone call with Zanker is the same day as he writes his |
| 13 | February 14th e-mail? |
| 14 | MR. DEITCH:  That's correct. |
| 15 | THE COURT:  Okay. |
| 16 | MR. DEITCH:  This is Mr. Kane writing on a previous |
| 17 | day, or Ms. Lechter. |
| 18 | THE COURT:  I know.  The phone call is the same day. |
| 19 | Okay. |
| 20 | MR. DEITCH:  Okay.  Now in that same e-mail, this is |
| 21 | exhibit, still exhibit 141. |
| 22 | THE COURT:  Yeah. |
| 23 | MR. DEITCH:  Ms. Lechter -- that e-mail was forwarded |
| 24 | to Russ Whitney, and his e-mail appears at the top of the first |
| 25 | page.  And Mr. Whitney notes that Robert Kiyosaki had called |

17DZLEA1

```
 1    him and left a message along with his cell phone -- left a what
 2    he describes as a very nice message.  And, again, further
 3    evidence that there are discussions and contacts going on
 4    between Rich Dad and Whitney during that period.
 5            Ms. Lechter also said, in that e-mail, that she would
 6    give Mr. Kane a call the next day, and this is a quote, to
 7    update you on our progress with Bill Zanker.  And of course
 8    this raises a question, progress with what with Bill Zanker?
 9    Bill Zanker had been terminated.
10            THE COURT:  Lechter tells who?
11            MR. DEITCH:  Mr. Kane.
12            THE COURT:  Oh, Kane, that she will update him on the
13    progress with Zanker?
14            MR. DEITCH:  She says I'll give you a call tomorrow,
15    quote, to update you on our progress with Bill Zanker.
16            THE COURT:  Is that in exhibit 141?
17            MR. DEITCH:  Yes.  That's a quote.
18            And I suggest, your Honor, that the Court may infer
19    that Rich Dad was specifically attempting to obtain that waiver
20    to wrongfully cut the Learning Annex out of its entitlement to
21    compensation for the deal.
22            Okay.  The next, the next document also supports that
23    inference.  This is Exhibit 223.  This was undated.  If you
24    recall, your Honor, there was one e-mail that was missing that
25    this is -- it's missing a header at the top.  But it's the
```

17DZLEA1

1    e-mail in which Ms. Lechter forwarded the waiver e-mail to Mr.

2    Kane.  And what she says she's forwarding is, quote, the

3    results -- she has the word results in quote marks.  The

4    results are from meeting last Friday with Mr. Zanker.

5            THE COURT:  What's the date of last Friday?

6            MR. DEITCH:  I'd have to look at a calendar.  If you

7    give me the exhibit, it may give the day of February 14th.

8            THE COURT:  Yeah, that's what you have to do.

9            MR. HARRIS:  Your Honor, if I turn my phone on, I may

10   be able to get that date for that year.

11           THE COURT:  Sure.

12           MR. DEITCH:  February 14th was a Tuesday, so that

13   following Friday would be February 17th.

14           MR. HARRIS:  No.

15           MR. RAPOPORT:  The 10th.

16           THE COURT:  Right.

17           MR. RAPOPORT:  It would be February 10th.  The

18   previous Friday.

19           MR. DEITCH:  No.  Bill Zanker's e-mail is sent on

20   Tuesday, the 14th.

21           THE COURT:  Right.  And he says I'm forwarding the

22   results of my meeting last Friday with Zanker.  So it's the

23   previous.

24           MR. DEITCH:  He may be referring to the previous

25   Friday, which would be the 10th.

17DZLEA1

1         THE COURT:  It says the results of my meeting last

2    Friday, okay.

3         MR. DEITCH:  Yes, that would be February 10th.

4         THE COURT:  Is there any testimony about that

5    February 10th meeting between Lechter and Zanker?

6         MR. HARRIS:  Your Honor, there is testimony that --

7         THE COURT:  Either of them -- two people testified

8    here, Lechter and Zanker, one by deposition.  Did either of

9    them mention a February 10th meeting?

10         MR. HARRIS:  Your Honor, I don't recall if it was

11    mentioned by date.

12         THE COURT:  Okay.

13         MR. HARRIS:  But there is a document in the record

14    from -- I can get you the exhibit number -- February 7th

15    talking about them doing things together about the Rich Woman

16    book, and there's testimony about how in that period they

17    talked about working on Expos and other things like that.

18         THE COURT:  You can look in the transcripts of both

19    Lechter and Zanker and see if they said anything about the

20    Friday meeting, February 10th.  Okay, go ahead.

21         MR. HARRIS:  It's Zanker specific.

22         THE COURT:  Okay, go ahead.

23         MR. DEITCH:  In that same e-mail, Exhibit 223, in

24    which Ms. Lechter forwarded the February 14th Bill Zanker

25    e-mail, she says that she's looking forward to seeing Mr. Kane

17DZLEA1

1    in Dallas.  And that was the Expo to be held on February 18th

2    and 19th of that year, so that following weekend.  And she

3    says, she's looking forward to seeing him in Dallas, quote, to

4    discuss next steps.  Again, further interest -- further

5    evidence that while Rich Dad continued to hide its ongoing

6    discussions with Whitney from the Learning Annex, they were in

7    fact discussing the next steps in the development of their

8    business relationship.

9            And Mr. Kane testified, and this was uncontradicted,

10   that he and Russ Whitney had --

11           THE COURT:  I'm sorry, who testified?

12           MR. DEITCH:  This is Mr. Kane who testified.

13           THE COURT:  Kane.

14           MR. DEITCH:  By deposition.

15           THE COURT:  Right.  And he said?

16           MR. DEITCH:  He said that he and Russ Whitney had

17   dinner with the Kiyosakis on the night of February 18th in

18   Dallas, and that the discussion at dinner was fairly -- what he

19   called fairly positive, and that they discussed the fact that

20   they were looking forward to working with each other.  And this

21   appears in the trial transcript pain 544, line six through page

22   545, line six.

23           THE COURT:  Okay.

24           MR. DEITCH:  So that's mid February.  And, of course,

25   your Honor knows -- and this is exhibit 231 -- that a letter of

17DZLEA1

 1    intent was signed between --

 2              THE COURT:  Did you say 241?

 3              MR. DEITCH:  231.

 4              THE COURT:  Thank you.

 5              MR. DEITCH:  Was signed between Whitney and Rich Dad,

 6    signed by Whitney on March 22, and signed by Ms. Lechter for

 7    Rich Dad on March 26.  And this was seven days and three weeks

 8    after Sharon Lechter had told Mr. Zanker that everything was

 9    off.

10              THE COURT:  Well --

11              MR. RAPOPORT:  Excuse me, seven weeks and three days.

12    I misspoke.

13              THE COURT:  What?

14              MR. DEITCH:  Seven weeks and three days after

15    February 2nd.

16              THE COURT:  No, it's not that.  She said everything is

17    off with you and we are stopping negotiations with Whitney.

18              MR. DEITCH:  Yes.

19              THE COURT:  All right.

20              MR. DEITCH:  The next exhibit to which I bring the

21    Court's attention is Exhibit 151, 151.  This is a March 29th

22    e-mail from Mr. Lechter -- excuse me -- from Mr. Kane to Ms.

23    Lechter.  And Mr. Kane, among other things, specifically asked

24    Ms. Lechter if there was anything specific that she wanted them

25    to present when she was coming to Whitney headquarters the

17DZLEA1

following -- on April 14th.  And this is further evidence that

the discussions were continuing between Whitney and Rich Dad,

despite the fact that there was -- had been no disclosure, no

one had told Bill Zanker about this.

         And I note, your Honor, that Mr. Zanker testified --

and this again was completely uncontradicted in this trial --

that between February 14th and March 22nd, 2006, in other

words, between the waiver and the signing of the letter of

intent, he had seen Ms. Lechter and the Kiyosakis at Expos and

other events, and none of them had ever told him that Rich Dad

was continuing its discussions with Whitney.  And this appears

in the transcript during Mr. Zanker's testimony on page 209,

lines eight through 19.

         THE COURT:  Could you say the pages again?

         MR. DEITCH:  Page 209, line eight to line 19.  It's

all on 209.

         THE COURT:  Okay.

         MR. DEITCH:  Then of course, your Honor, you know

Exhibit 259, 259 was the Whitney amended 10-K for the year

2007, and this included a number of agreements signed on

July 18th, 2006 between Rich Dad and Whitney formalizing their

business relationship.

         And then Exhibit 181 was the press release that was

released in the fall of 2006.  And Mr. Zanker testified -- and

again this also was completely uncontradicted -- that until he

17DZLEA1

1   saw this announcement, he did not know that Rich Dad and

2   Whitney had in fact formed a business, a new free seminar

3   business from which the Learning Annex had been eliminated in

4   February.  And that testimony appears on page 358, 358, line

5   nine through 19.

6          And why didn't Mr. Zanker know?  He didn't know

7   because no one had told him.  And the overwhelming -- the

8   overwhelming and undisputed evidence is that having lied to Mr.

9   Zanker affirmatively about stopping their negotiations with

10  Whitney, Rich Dad then covered it up.

11         And the law is clear, your Honor, that where the

12  failure to disclose material facts creates an inequity, that

13  omission is sufficient to support an unjust enrichment claim.

14  And I refer your Honor's attention to the case of Labajo, which

15  is L-a-b-a-j-o, versus Best Buy stores.  The citation is 478 F.

16  Supp. 2d, 523, and this is a case from this District in 2007.

17         If I can go back for one moment.  Mr. Harris has

18  handed me exhibit 18, and this is a -- this is a February 7

19  e-mail from Christina -- Christina Porter.  She has a

20  hyphenated name, but the last name is Porter.  And I believe

21  there was testimony that she worked for Mr. Kiyosaki or for

22  Rich Dad.  And it's addressed to Ms. Del Canto and to Mr.

23  Zanker, with copies to Ms. Stanton and to the Kiyosakis.  The

24  subject is Kim breakout session.  And it says, "Hi, Samantha

25  and Bill.  Kim asked me to check with you.  She would like to

17DZLEA1

1    do a woman and investing breakout session on Saturday

2    afternoon.  Can you help me with that?  Appreciate your help."

3    And this -- excuse me.  And as we mentioned before, the day of

4    the document is February 7, which shows that in fact during

5    that period between February 2nd, February 2 and February 14th,

6    they were still having interaction with Rich Dad.

7            THE COURT:  I'm sorry, I lost that entirely.  Who was

8    still having contact with?

9            MR. HARRIS:  The Learning Annex, your Honor.

10           THE COURT:  So what does that prove?

11           MR. HARRIS:  Your Honor, it was the -- your Honor, it

12   was the exhibit I mentioned before.  I was just trying to refer

13   you to -- you had asked about the conversation Ms. Lechter had

14   with Mr. Zanker, and I had mentioned an exhibit and I just

15   wanted to refer you to that.

16           THE COURT:  But that doesn't answer my question,

17   that -- that would be sort of legitimate continued meetings --

18           MR. HARRIS:  I understand.

19           THE COURT:  -- for purpose, not the results we got to

20   do a waiver.

21           MR. HARRIS:  Your Honor, I wasn't making argument.  I

22   was just trying to addressed -- I mentioned the exhibit.  You

23   had asked if there was testimony about the conversation.  I

24   said I thought it had come in in connection with an exhibit.  I

25   don't have -- we don't have the transcripts in front of us of

17DZLEA1

1    that conversation right here.

2              THE COURT:  All right.

3              MR. HARRIS:  I was just trying --

4              THE COURT:  So what happened on February 7?

5              MR. HARRIS:  On February 7, there was a communication

6    from the assistant for the Kiyosakis talking about how Kim

7    Kiyosaki would like to do a woman invest --

8              THE COURT:  Talking about Zanker.

9              MR. HARRIS:  This goes to Mr. Zanker on Saturday

10   afternoon.  Saturday afternoon, you know, would have been

11   fairly close to the 10th or the 11th.  I'm just trying to get

12   the dates to your Honor.

13             THE COURT:  All right.  Okay.  All right.

14             MR. DEITCH:  Okay.  So I talked about the lies, I

15   talked about the cover up.  The third category of wrongful

16   conduct is the pretext.  And, your Honor, this relates

17   specifically to the juxtaposition of Ms. Lechter's February 2nd

18   termination e-mail, if I can call it that, sent to Mr. Zanker

19   and the drafts dated January 31, 2006 that were found on her

20   computer of letters terminating the Learning Annex.  And that,

21   those drafts were Exhibit 124A and --

22             THE COURT:  I'm not inclined to pay any attention to

23   her drafts, I must say.  What does that mean to you?

24             MR. DEITCH:  Let me explain why I think that they're

25   highly relevant for the Court's consideration.

17DZLEA1

1          THE COURT:  But I'm offended.  People do drafts and

2    drafts you tear up and throw away.  What's the difference?  I

3    do draft opinions.  They don't look like the final.  Should

4    anybody even know about them, much less attribute them to me?

5          MR. DEITCH:  Well, they certainly reflect your

6    thoughts at the time that you set those words on paper.

7          THE COURT:  And nothing I care to issue, because three

8    drafts later it didn't look anything like the draft.  I mean,

9    it's like thinking to yourself.  Are you allowed to read my

10   thoughts?  Because they change.  I have one thought now, I'll

11   listen to him, I'll have of another thought, I'll listen, I'll

12   have another thought.  It's not till I say so that it's a final

13   thought, so to speak.

14         MR. DEITCH:  Well, I suggest to your Honor that's

15   exactly the point, which is that Ms. Lechter was trying to come

16   up with reasons why Rich Dad could terminate the Learning

17   Annex.  And the reason she came up with within these drafts was

18   the completely false claim that the Learning Annex had not

19   performed.

20         THE COURT:  But how can that -- I still wonder how her

21   thinking out loud, so to speak, can bind Rich Dad.  That's very

22   troubling.  I mean, generally her statements do, I understand

23   that the statement of a high level partner binds the

24   corporation, for sure, but this is a draft -- which she never

25   issued.  She was thinking on her computer, doesn't issue it.

17DZLEA1

```
 1   Can such a statement be attributed to a corporation?  It's not
 2   even a statement.
 3           MR. DEITCH:  I think it's certainly -- recall, your
 4   Honor, that Ms. Lechter is the one is going to send the
 5   termination e-mail to --
 6           THE COURT:  Then she said what she said, but the
 7   drafts are kind of offensive.
 8           MR. DEITCH:  Well, I suggest to the Court that it
 9   reflects her thought process.  And that given the --
10           THE COURT:  So it's not a statement that binds the
11   corporation.  It shows one partner's thoughts or something, or
12   her state of mind?  I guess you call it state of mind?
13   Reflects her state of mind at a point in time?
14           MR. DEITCH:  Your Honor, I suggest that Ms. Lechter
15   was acting on behalf of the corporation.
16           THE COURT:  She was acting.  So it reflects her state
17   of mind on January 31st.  Okay, with that in mind, what was her
18   state of mind according to these drafts, because that's the
19   most it reflects.
20           MR. DEITCH:  According to these drafts, she was
21   thinking about -- she was thinking about terminating the
22   Learning Annex on January 31st based on the claim that Learning
23   Annex had not performed.  And I don't think I need to go
24   through the evidence in this trial, your Honor.  It's pretty
25   much the body of the evidence that the Learning Annex performed
```

17DZLEA1

```
1      the obligations of the Memorandum of Understanding between

2      September 7th and February 2nd.

3             And I suggest, your Honor, that on February 2nd --

4             THE COURT:  Well, any other drafts, anything else

5      you're going to attribute to her state of mind, what else was

6      she thinking aloud?

7             MR. DEITCH:  I suggest, your Honor, when she testified

8      in her deposition --

9             THE COURT:  You mentioned several drafts.  What else

10     was she thinking besides what you just said?  She was thinking

11     of terminating Learning Annex on the basis that it had not

12     performed.  Anything else from those?

13            MR. DEITCH:  There's more in the drafts.

14            THE COURT:  I know.  Is there anything else you want

15     to mention from the drafts?

16            MR. DEITCH:  That's what I wanted to mention, your

17     Honor.

18            THE COURT:  Okay.  That's not what she though, that's

19     not the statement that's eventually made.

20            MR. DEITCH:  It's not what she did, and I suggest to

21     you it's because she couldn't, because --

22            THE COURT:  That's what she said.  When she did send

23     the termination e-mail February 2nd, it said?

24            MR. DEITCH:  It said that they were terminating the

25     Learning Annex based on a complaint about a communication from
```

17DZLEA1

1    Ms. Del Canto to a PBS station.  And that claim was also

2    incorrect.  But it was a completely different basis --

3              THE COURT:  Right, the actual termination --

4              MR. DEITCH:  -- than what she had been thinking about

5    two days earlier.

6              THE COURT:  The actual termination said you're being

7    terminated because of what?

8              MR. DEITCH:  The termination says because we haven't

9    been able to communicate well enough.  But it forwards, it

10   forwards an e-mail that deals with another issue with the PBS

11   station.  And it's at the bottom of that page, which is Exhibit

12   132.  That's the actual termination e-mail.

13             THE COURT:  So what was this complaint from the PBS

14   station?  What was the complaint?

15             MR. DEITCH:  The complaint was that, was that the

16   assertion that Rich Dad -- excuse me -- that the Learning Annex

17   was telling this PBS station not to sell or not to provide Rich

18   Dad products.  And, in fact, what the message says when you

19   look at it, is that the Learning Annex believed it was in PBS's

20   interest for a variety of reasons not to proceed that way, but

21   if that's what they wanted to do, that's what they should do.

22             THE COURT:  Okay.

23             MR. DEITCH:  And our suggestion to the Court, your

24   Honor, is that the juxtaposition of these two documents, the

25   drafts and the February 2nd, shows a pretextual reason for the

17DZLEA1

termination of the Learning Annex.

          And Mr. Rapoport argued I believe on Friday, his view

that the Court has to find a pretext in order to support a

verdict.  In any case, whether or not that's his position,

that's certainly not the law.

          But having said that, we believe that it is a pretext

and that a pretext is sufficient, particularly when it results

in an inequity to support an unjust enrichment claim.

          The last, the last category of wrongful conduct is

what I referred to as the prime rose path.  This comes from

Mr. Kiyosaki's testimony.  And the Court certainly recalls that

Mr. Kiyosaki testified repeatedly, both in his deposition,

which I believe was referenced, and also in his trial

testimony, that after December 27th, 2005, he wanted nothing to

do with Mr. Zanker or the Learning Annex in terms of doing

business with them.  And I can give your Honor a couple of

citations to the record if you like.  Page 695, line 23 through

page 696, line four, and also page 699, line two through eight

I believe there are other instances, but those are two

examples.

          And, of course, the evidence is undisputed in this

case that Rich Dad continued to use the Learning Annex's

services to develop a new free seminar business together with

Whitney throughout the month of January; that there were

critical meetings on January 11th in Phoenix and January 24th

17DZLEA1

1    in Coral Gables, Florida, the Whitney headquarters.

2             THE COURT:  What was the first one, Phoenix and then

3    Coral Gables.

4             MR. DEITCH:  January 11th and January 24th, and --

5             THE COURT:  One second.  Okay, go ahead.

6             MR. DEITCH:  And Ms. Lechter so testified, Mr. Kane so

7    testified, Mr. Zanker so testified.  And I can provide -- I can

8    provide citations, but I think that's undisputed that all of

9    them said that these meetings occurred.

10            THE COURT:  And why is that a prime rose path?

11            MR. DEITCH:  Well, it's a prime rose path because --

12   well, let me just -- there's also two documents that also make

13   clear the existence of the meetings, so let me just reference

14   them; exhibit 113, which was the e-mail that included the MOU

15   two, which describes or recaps the January 11th meeting.  And

16   also -- I don't have the other exhibit number -- Mr. Kane's

17   January 27th e-mail.  This was the one that had the numbered

18   list, I believe there were 11 items.  And it starts with the

19   phrase, so here's what we decided to do.  And the first one was

20   form a company owned by these three entities.  And Mr. Harris

21   is going to get me that exhibit number which I omitted from my

22   notes.

23            THE COURT:  All right.  The first one was what, first

24   e-mail before the January 27th e-mail was what?

25            MR. DEITCH:  Exhibit 113.  This is Mr. Kane's e-mail

17DZLEA1

1    that includes -- that we've referred to as MOU two, and the

2    other exhibit is 122A.

3            MR. RAPOPORT:  That's the January 27th.

4            MR. DEITCH:  Yes.

5            And here's the point, your Honor.  I'll wait until --

6            THE COURT:  What's the 113 again?

7            MR. DEITCH:  113 is Mr. Kane's January 13th, 2006

8    e-mail that includes the MOU two, says he's recapping the

9    January 11th meeting.

10           THE COURT:  Okay.

11           MR. DEITCH:  And then one -- you said 122A?

12           THE COURT:  Yes.

13           MR. DEITCH:  Is the January 27th e-mail.

14           THE COURT:  All right.

15           MR. DEITCH:  That describes what they decided at the

16   January 24th meeting at Whitney.

17           THE COURT:  I see.  Okay, got it.

18           MR. DEITCH:  And here's the point.  If Mr. Kiyosaki

19   truly did not intend to do any further business with Mr. Zanker

20   and the Learning Annex after or as of December 27th, what was

21   he doing?

22           THE COURT:  You said the 27th.  Did you say 27th or

23   22nd?

24           MR. DEITCH:  December 27th is when he sent his letter

25   and that was his testimony.  And I'll tell you what he was

17DZLEA1

1   doing in January.  He was taking unfair advantage of the

2   Learning Annex's services to continue to develop the deal with

3   Whitney with no intention of compensating the Learning Annex.

4   And that's why I say he was leading the Learning Annex down the

5   prim rose path.

6            THE COURT:  What was the expression on 12/27; what did

7   he say?  That was an e-mail?

8            MR. RAPOPORT:  That was the letter, your Honor, the

9   five page letter that Mr. Kiyosaki sent to Mr. Zanker, which is

10   exhibit 96, your Honor.

11            THE COURT:  Thank you.  All right.

12            MR. DEITCH:  And you'll recall Mr. Kiyosaki said very

13   strongly, several times --

14            THE COURT:  Oh.

15            MR. DEITCH:  -- I wanted nothing to do with them.

16            THE COURT:  Oh, yeah.

17            MR. DEITCH:  That was pretty clear.

18            So they're leading him down the prime rose path

19   suggesting to the Learning Annex that this is going to be a

20   deal that they're going to make a lot of money on, so that

21   they'll continue to help with their relationship with Whitney,

22   to cement the deal throughout January.  And if, in fact,

23   Mr. Kiyosaki did not intend after December to include the

24   Learning Annex in that deal, that is inequitable.  And if

25   that's not inequitable, conduct I don't know what is.

17DZLEA1

1          On the other hand, your Honor, just to kind of put the

2     end on this.  If, contrary to his testimony, Mr. Kiyosaki did

3     not have that intention, then I suggest to the Court that you

4     can infer from that testimony consciousness of guilt about what

5     followed.

6          THE COURT:  I'm sorry, I don't understand that.

7          MR. DEITCH:  On the one hand, if Mr. Kiyosaki did not

8     intend -- if his testimony was truthful, that he did not intend

9     to have business with the Learning Annex --

10          THE COURT:  Right.

11          MR. DEITCH:  -- then it's simply unfair conduct taking

12     their services without intention to compensate them.

13          THE COURT:  Okay.

14          MR. DEITCH:  On the other hand, if he was lying about

15     it here, that that lie shows consciousness of guilt because he

16     knows that he continued to take the services of Learning Annex

17     throughout that ensuing period.

18          THE COURT:  Okay.

19          MR. DEITCH:  Now, your Honor, when I first stood up I

20     told you that I wanted to address some of the legal issues to

21     make our record, and I'll do it, I'll do it relatively briefly.

22     And I understand that the Court has already ruled on these

23     issues.

24          First, as the Court knows, the jury returned an award

25     in favor of the Learning Annex on the quantum meruit claim, and

17DZLEA1

1    we believe that award stands without any further showing.

2            THE COURT:  The problem is I've said in this case that

3    it's the law of the case that one of the elements of quantum

4    meruit is unjust enrichment.

5            MR. DEITCH:  I understand, your Honor.  Our position

6    is that to the extent that there are four elements required for

7    quantum meruit, that this is effectively adding elements to

8    quantum meruit, and we believe that's not required by the law.

9            The second issue is that with respect to unjust

10   enrichment claim, we believe the jury is the proper fact finder

11   the proper body to decide.

12           THE COURT:  How can you say that in the face of the

13   New York State Court saying explicitly the jury must never,

14   must never make an award for unjust enrichment?  And I quoted

15   it to you from the PJI, so can you take that decision?  I'm

16   just curious.  How can you close your eyes to New York law?

17   It's quoted in the opinion.

18           MR. DEITCH:  Your Honor, Ms. Withers is more familiar

19   than I am.

20           Our view is that while we acknowledge that it's in the

21   petit jury instructions, we believe --

22           THE COURT:  That a Court must -- a jury must never --

23   okay, go ahead.

24           MR. DEITCH:  We believe there are other lines of case

25   law that suggest otherwise, and we're preserving the issue

17DZLEA1

because we believe that's the proper view of the law.

THE COURT:  Okay.

MR. DEITCH:  The third issue, your Honor, is to the --
to the extent that the element of equity and good conscience is
an issue for the Court to decide, we think that this is a
narrow mandate; that the jury determines the facts as to
credibility of witnesses and what inferences.

THE COURT:  True.

MR. DEITCH:  I'm sure, your Honor, that you take the
position as well that you can consider what -- whether those
facts meet the proper character of what is required for unjust
enrichment, but not to decide contrary to the jury's findings
as to the facts.  We believe that that was for the jury.

THE COURT:  I can't find contrary to the jury's
findings of fact.

One second.  I just want to cite exactly, I want to
cite for the record from two, volume two of the New York
Pattern Jury Instructions comment to instruction number four
point two.  "It should never be left to the jury to say the
defendant has been unjustly enriched nor should in equity and
good conscience repay."  I'm just saying that particular
committee wrote that.

MR. DEITCH:  Your Honor, the fourth issue is one I've
already addressed, which was simply the question of whether bad
faith is required as opposed to simply showing inequity -- yes,

17DZLEA1

```
 1    or wrongful conduct.  And I just -- two cases to draw the
 2    Court's attention to one.  Is Rosensweig, which is
 3    R-o-s-e-n-s-w-e-i-g versus Friedland, F-r-i-e-d-l-a-n-d.  It's
 4    a slip opinion from the Second Department, 924, New York State
 5    Second, 99, and it's dated May 10 of this year.
 6              And the other case -- I'll let you catch up.
 7              THE COURT:  I got it.
 8              MR. DEITCH:  Okay, is Ultramar Energy Limited.  That's
 9    U-l --
10              THE COURT:  I know now to spell it.
11              MR. DEITCH:  You got it.  Okay, versus Chase manhattan
12    Bank, that's 179, Appellate Division Second, 592, that's from
13    the First Department, 1992.  And, your Honor, for the reasons
14    that we've described, we submit that the Court should --
15              THE COURT:  I'm sorry, what do these two cases stand
16    for?
17              MR. DEITCH:  These stand for the proposition that
18    unjust enrichment does not require a showing of wrongful
19    conduct, but rather based on showing that principles of equity
20    and good conscience require --
21              THE COURT:  Right, I think that's right.
22              MR. DEITCH:  And for the reasons that we've described
23    in the record, that we described, we believe that there's
24    overwhelming evidence, and the Court should make a finding from
25    this hearing in accord with the jury's verdict.  Thank you.
```

17D7LEA2

1    THE COURT:  Mr. Rapoport?

2    MR. RAPOPORT:  Your Honor, just to go over a couple of

3    things that I know we have mentioned in the past, but unjust

4    enrichment damages are not available for activities that

5    otherwise further the plaintiff's own economic interest.  It is

6    from Abrams v. Unity Mutual Life, 237 F.3d 866, citing Song

7    Bird.

8    THE COURT:  Is that Second Circuit?

9    MR. RAPOPORT:  This is Seventh Circuit.  Finding that

10   plaintiff's services were designed to promote their own

11   interests, thus they were not unjust.

12   THE COURT:  Yes, that's the problem here.  I wrote the

13   same thing in a case that I found when I was researching this

14   issue over the weekend called Gidatex v. Campanello, and I

15   cited all the case law ten years ago that said the same thing.

16   OK.

17   MR. RAPOPORT:  Now, your Honor, we have been through

18   the factual grounds with Mr. Deitch, but the factual grounds

19   with respect to looking at what truly is bad faith here I

20   believe are not as they have been put to you just moments ago,

21   and so I want to go through a few things just in response a

22   little bit to Mr. Deitch.  I do have my own notes as well, but

23   in response to Mr. Deitch there is one thing that I think is

24   left out, and I think is crucial.

25   THE COURT:  You think it's crucial?

17D7LEA2

```
 1              MR. RAPOPORT:  Crucial for the court.  And that is in
 2     almost -- in all cases a contemporaneous writing is certainly
 3     better than a recollection of a conversation six years later.
 4              THE COURT:  True, OK.
 5              MR. RAPOPORT:  We have those three contemporaneous
 6     writings:  December 19, 2005 signed by Robert and Kim Kiyosaki
 7     and Sharon Lechter.
 8              THE COURT:  Is that an exhibit number?
 9              MR. RAPOPORT:  Yes, it's 94, your Honor.
10              THE COURT:  Thank you.
11              MR. RAPOPORT:  Then we have the December 27th e-mail
12     from Robert Kiyosaki to Bill Zanker, which is 96, Judge.
13     That's December 27th.
14              THE COURT:  I got that.
15              MR. RAPOPORT:  Then you also have, which was not
16     mentioned earlier, the apology letter from Mr. Zanker, which is
17     Exhibit 99.
18              THE COURT:  And it is dated?
19              MR. RAPOPORT:  That is dated January 3, 2006.  But,
20     Judge, aside from this the one really important thing that has
21     been overlooked I think by the plaintiffs in this case when
22     they cite Ms. Lechter's conduct and when they site
23     Ms. Lechter's transcript, I don't think this court can forget
24     Mr. Zanker's own words saying that the lawsuit between the
25     Lechters and the Kiyosakis was a vicious one.
```

1          So, I think that special notice has to be paid and

2  special weight given to Sharon Lechter's testimony because it's

3  clear while there is no love loss between Mr. Zanker and the

4  Kiyosakis, clearly there is no love loss between Sharon Lechter

5  and the Kiyosakis either.

6          But when Sharon Lechter was called upon to testify,

7  after she had settled with the Kiyosakis, after there was no

8  more financial interest whatsoever, all she had to do was just

9  simply -- I mean Mr. Deitch is talking about her state of mind

10 on the 31st when she was writing drafts -- all she had to do at

11 any point in time was to say, listen, you know, we used him, we

12 through them away because this is what bad people like -- I

13 didn't want to do it, but Robert and Kim are bad people and

14 this is what they did.

15         It is crucial to listen to the testimony of Sharon

16 Lechter on a few different points, but clearly when she is

17 talking about the termination itself, and when she is talking

18 about the December 19th, the December 27th letters and the

19 issues that arose, and when she is talking about something

20 else -- Mr. Deitch mentioned the January 24th meeting in

21 Florida, I think that Mr. Deitch -- while Mr. Kane wrote an

22 e-mail at the end of it, the real key to that meeting takes

23 place with Sharon Lechter in the bathroom.

24         Sharon Lechter testified -- and it was read into the

25 record here -- Sharon Lechter testified that she was so shocked

17D7LEA2

1    by the changes in the nature of the business that were being

2    suggested to her that day, that because -- and if you also

3    remember, Judge, she testified she had been unplugged for a

4    while because her father had died.

5              THE COURT:  I do remember that.

6              MR. RAPOPORT:  OK.  So, she testified that after being

7    unplugged she went to this meeting, which means that she hadn't

8    really paid attention to anything.  She goes to the meeting.

9    They are talking to her about different -- what she considers

10   to be different terms.

11             THE COURT:  Who is they?

12             MR. RAPOPORT:  The Learning Annex and Whitney.

13             THE COURT:  Learning Annex and Whitney.

14             MR. RAPOPORT:  Yeah.  And she's so -- her word was

15   shocked -- I will get to it eventually, but her word was that

16   she was shocked at what had happened.  And she called Robert,

17   and she said to Robert did you do anything to change what we

18   were talking about here?  And Robert said no.  She went back,

19   she told everybody that.  And at the end of the day while John

20   Kane sent out action points, all you have left is Sharon

21   Lechter's testimony that when she left there she was shocked

22   that things had been changed in a way that she didn't recognize

23   them.  And the one person in the world who you wouldn't expect

24   to stand up and help our case --

25             THE COURT:  Right.

17D7LEA2

1          MR. RAPOPORT:  -- is Sharon Lechter, but at every step

2     she ratifies what we were saying about good faith.

3          And now I will sort of go through what I had.

4          One of the first things I wanted to talk to the court

5     about is Exhibit AA, and that was the limited partnership which

6     your Honor said I could not argue to the jury.  And I think

7     this agreement is very important because -- I mean I can cite

8     you through it, but the end result of this agreement is on

9     Exhibit 4.9 to the agreement, and the end result here is that

10    for consideration Learning Annex LLC transferred to this new

11    entity -- in order to get financing or whatever it wants, but

12    we don't know because it was all redacted and blacked out --

13    Learning Annex transferred for consideration their rights to

14    this lawsuit.

15         I believe that at any point in time this jury should

16    have known, or you as the arbitrator now of unjust enrichment

17    should know that if I've already gotten my consideration for

18    something, how is it that I am entitled to get my consideration

19    twice for the same thing, which is this lawsuit?

20         THE COURT:  Can I look at the exact language of

21    transferring the rights of this lawsuit to whom?

22         MR. RAPOPORT:  To Learning Annex LP, the new entity.

23         THE COURT:  So, who is Learning Annex LP?

24         MR. RAPOPORT:  That's the whole point, Judge.  It's

25    some new entity that they transferred all their assets to.

17D7LEA2

1         THE COURT:  Yes, but isn't it all Zanker anyway?

2         MR. RAPOPORT:  No, this is their new -- this is a

3    financing partner who came in and provided whatever amounts of

4    money.  We don't know; it's all blacked out.

5         THE COURT:  But I am asking the plaintiffs lawyers.

6    If indeed Learning Annex LLC transferred its rights to this

7    lawsuit to Learning Annex LP, shouldn't you have added Learning

8    Annex LP as a party plaintiff?

9         MS. WITHERS:  Your Honor, I have spoken briefly with

10   the corporate lawyer who handled this.  My understanding is

11   that this was part of a financing transaction that was a merger

12   and that we can discuss further with that corporate attorney in

13   case there are other implications, but there is no reason that

14   I know of that we can't just add them under Rule 25.

15        THE COURT:  Who has an interest in Learning Annex LP?

16   Who has the financial interest in that company?

17        MR. HARRIS:  Your Honor, Mr. Zanker testified about

18   his ownership interest in Learning Annex.

19        THE COURT:  Don't say Learning Annex.  I am trying to

20   distinguish Learning Annex LLC from Learning Annex LP.

21        MR. HARRIS:  I am trying to be clear.  Mr. Zanker --

22   it is not an identical group of owners between the plaintiffs

23   in this case and Learning Annex LP, but it's very similar

24   owners, and Mr. Zanker has a material interest in that company.

25        THE COURT:  Well, who is Learning Annex LP?  Who is

17D7LEA2

1    the owner?

2              MS. WITHERS:  It's Mr. Zanker and another investor,

3    CMS.

4              THE COURT:  Yes.  And who else?  That's it?

5              MS. WITHERS:  That's what Mr. Zanker is able to

6    remember off the top of his head.  We would have to refer to

7    the corporate records to be detailed.

8              THE COURT:  So, you don't know the percentages right

9    now.  Right?

10             MR. ZANKER:  I don't know.

11             THE COURT:  What's this exact language of at

12   agreement?

13             MR. RAPOPORT:  Your Honor, in this agreement, it's

14   page 10 --

15             THE COURT:  I don't have a copy.

16             MR. RAPOPORT:  Sorry.

17             THE COURT:  Because I have the book called Plaintiff's

18   Admitted Trial Exhibits.

19             MR. RAPOPORT:  Right, it's in that.

20             THE COURT:  Plaintiff's admitted?

21             MR. RAPOPORT:  Sorry.  Defendants.

22             THE COURT:  I wasn't given a defendants book.

23             MR. RAPOPORT:  You don't have it?

24             THE COURT:  I was given the plaintiff's book.

25             MR. RAPOPORT:  We gave it to the court, it went to the

17D7LEA2

1    jury.  I thought you got it back.  We didn't receive it back.

2              THE COURT:  So, maybe it's sitting in the jury room

3    right now.  Could one of my clerks go in there to see if

4    anything is in there?  See if any of these black notebooks are

5    in there.  Thank you.

6              Anyway.

7              MR. RAPOPORT:  Your Honor, I mean I have another copy.

8              THE COURT:  OK, hand it up.

9              MR. RAPOPORT:  It has yellow post-its in it, but if

10   you look at page 10, your Honor.

11             THE COURT:  Page 10 of the agreement?

12             MR. RAPOPORT:  That's correct.  It's marked at the

13   bottom LA for Learning Annex 18071.

14             THE COURT:  OK.

15             MR. RAPOPORT:  2.1 is the contribution and acquisition

16   of acquired assets.

17             THE COURT:  OK.

18             MR. RAPOPORT:  And so that in 2.1 it refers to --

19   within are referred --

20             THE COURT:  Well, who is the seller?

21             Oh, look what we found, notebooks.  OK.

22             MR. RAPOPORT:  I apologize, Judge.

23             THE COURT:  That's OK.  So, that's probably the

24   plaintiff's and defendants' exhibits.

25             MR. RAPOPORT:  Right.

17D7LEA2

1          MR. DEITCH:  May we use the defendant's copy so we can

2     see this agreement as well?

3          THE COURT:  Oh, you don't have it?  Yes, you can.  I

4     was going to let my law clerk follow along, but go ahead.

5          So, you need to look at page 10.  He is referring to

6     page 10.

7          MR. RAPOPORT:  Right.

8          THE COURT:  Well, give him a minute.  They have to

9     find it.

10          MR. RAPOPORT:  Under the --

11          THE COURT:  Hold on.  Wait until the plaintiffs get to

12     page 10.

13          2.1 at the bottom of the page it says contribution and

14     acquisition of acquired assets.

15          MR. RAPOPORT:  And then you see the schedule.

16          THE COURT:  Before that, before that I see the seller

17     is LA LLC.

18          MR. RAPOPORT:  Correct.  And, Judge, if you go down on

19     page 11 you will see under xii is "All seller's claims, causes

20     of action and other legal rights and remedies, whether or not

21     known on the closing date, relating to seller's ownership of

22     acquired assets and/or the operation of seller's business,

23     including the claims and causes of action and legal rights set

24     forth in schedule 2.1A."

25          Now, schedule 2.1A then is on page -- it's on page

17D7LEA2

1    18137, Judge, Learning Annex marked page 18137.

2                THE COURT:  OK.

3                MR. RAPOPORT:  And there it says, "Acquired assets

4    claimed against Rich Dad and Whitney Education, detailed on

5    attached schedule 4.9A."  And then when you go to schedule

6    4.9A, which is virtually all blacked out and redacted except

7    for a small part, that's Learning Annex 18180.  It refers to

8    this lawsuit filed December 29, 2008.

9                Now, one other page, Judge, that wasn't in that chain

10   but that I would refer the court to is page 14 of the agreement

11   itself.  The bottom is blacked out, but before the bottom it

12   says "the consideration provided by partnership to seller for

13   acquired assets shall be as follows..."  So, clearly they got

14   consideration for selling this claim.

15               So, as far as the argument that we make is that they

16   have already been paid once what they consider fair

17   consideration for this claim, and when you are talking about

18   equity injustice, to be paid twice obviously is inequitable.

19               THE COURT:  Well, look, the long and short is the

20   plaintiffs have a real problem.  The cause of action was

21   transferred to the partnership.  If you look at page 1 of the

22   agreement it says, "Asset contribution agreement parties.  The

23   Learning Annex LP (herein after known as the partnership),

24   Learning Annex LLC, (herein after the seller)."  And it does

25   say seller transfers all this to the partnership, explicitly

17D7LEA2

1    naming this claim.  So, this claim doesn't belong to The

2    Learning Annex LLC, which is the seller, it belongs to The

3    Learning Annex LP, without a doubt.

4              MR. HARRIS:  Your Honor, two things about that.  One

5    is they have the economic interest in the claim but Learning

6    Annex Holdings is still entitled to continue as the plaintiff

7    in the case.

8              THE COURT:  What are you talking about?  They sold

9    this claim.

10             MR. HARRIS:  Your Honor, my understanding of the law

11   is that if I transfer -- if I bring a claim and I transfer an

12   economic interest in that claim --

13             THE COURT:  Not an economic interest.  You sold the

14   entire claim.  It's gone, you sold it.

15             MR. HARRIS:  I understand that.  If I sell the claim

16   --

17             THE COURT:  You sold the claim, it's no longer yours,

18   you gave it away.

19             MR. HARRIS:  Then I am still the proper plaintiff.

20             THE COURT:  Why is that?  You gave away the claim.

21   It's not your claim.  You sold it to somebody else.  A sold the

22   claim to B.  B can bring the lawsuit.

23             MR. HARRIS:  I am still the person that has been hurt

24   by the conduct of Rich Dad.

25             THE COURT:  You sold the claim.  There is no point in

17D7LEA2

1   our arguing.  You sold the claim.  You've got a problem.  You

2   sold the claim to somebody else.

3           MR. HARRIS:  And then the second thing, your Honor, is

4   that we believe that we could add Learning Annex LP as a proper

5   party under the rules.

6           THE COURT:  I think that's probably the only way out,

7   not pretty but the only way out.

8           MR. RAPOPORT:  Your Honor, I mean obviously it's after

9   the trial.

10          THE COURT:  I realize that.  But judgment hasn't been

11  entered.  In fact the trial is continuing as we speak.  This

12  trial is not over because it has a nonjury component, so you

13  can't say it's after the trial has ended.  It hasn't ended.  At

14  your own request there is a nonjury component.  So, the trial

15  is not over until I --

16          MR. RAPOPORT:  I understand.  I misspoke.  A

17  apologize.

18          THE COURT:  So, probably the first motion to consider

19  is your motion under Rule 25 to add Learning Annex LP as a

20  party plaintiff.  Are you making the motion?

21          MR. HARRIS:  Yes.  Yes, your Honor.

22          MR. RAPOPORT:  Your Honor, in August --

23          THE COURT:  August of?

24          MR. RAPOPORT:  -- of I believe 2010 at a conference

25  before the court the request was made to amend when we were

17D7LEA2

talking about the summary judgment motion.  I don't know if you

recall it.

THE COURT:  I do not recall it.

MR. RAPOPORT:  OK.  In that there was a request made

to amend, and the request was already denied.

THE COURT:  So add this party plaintiff?

MR. RAPOPORT:  Well, they said they wanted to amend

the complaint, and that was denied at that time.

THE COURT:  I have no idea what that request was.  I

don't know what they wanted to add.  Maybe there is

correspondence, maybe a motion.  I don't know what they wanted

to add in August 2010.

MR. RAPOPORT:  Your Honor, I maintain obviously

though, regardless, I mean if your Honor agrees at this late

time to amend the complaint, it still doesn't change the fact

that Learning Annex LLC has received consideration already for

its claim in the first place.

THE COURT:  Well, I don't think that's entirely fair.

This is a package of a lot of things being transferred to

Learning Annex LP, a lot of things.  One of those things is

whatever Learning Annex LP might recover.  So it's a claim that

essentially at that point can't be valued.  The claimants

transferred that to that party; that party can then sue.  I had

this case already.  It's just another case, but I had it.  Do

you want to know the name of that case that took ten years to

17D7LEA2

1     resolve too?

2              MR. RAPOPORT:  I would be happy to look.

3              THE COURT:  Oh, boy.  Load funding.  I don't remember

4     the rest of the details, but it was exactly that, the claim was

5     sold and somebody else brought the claim.

6              MR. RAPOPORT:  Does your Honor happen to have the name

7     handy?  Is that a nightmare you remember that you could give

8     me?

9              THE COURT:  You wouldn't want to know.  It was such a

10    complex case.  One of the interesting issues in the case was

11    champerty, because champerty actually was raised because they

12    were selling a claim.  It was interesting solely for the

13    purpose of bringing a lawsuit, which is not true here.  That

14    was the sole purpose of the transfer, to be able to bring a

15    lawsuit.  It was very interesting because in the end it went

16    from the Second Circuit to the New York Court of Appeals, and

17    the New York Court of Appeals I think was worried about

18    mortgage foreclosures.  It's when the markets started to fall

19    apart, and everybody was selling claims.  It's more than you

20    wanted to know, but they had to reject champerty, or the

21    financial crisis would have been worse than it was.

22             MR. RAPOPORT:  Always happy to learn, Judge.

23             THE COURT:  It was really fascinating how this played

24    out.

25             The good news in the case, however -- this may be

17D7LEA2

worth saying on the record -- after an endless trial, after

endless appeals with the Second Circuit and the New York Court

of Appeals case, it settled.  It settled.  S-e-t-t-l-e-d.

MR. HARRIS:  Your Honor, Mr. Rapoport and I have

already spoken to your clerk.

THE COURT:  So I hear.  My clerk suggests 10:30 on

July 28.  Whatever she says is usually right.  So, if she says

so.

MR. RAPOPORT:  Your Honor, as I mentioned through

Ms. Simonson, I need to confirm that date and time for sure.

We believed that was going to be OK, but I still have parties I

can't reach, so that's why I said that.

MR. HARRIS:  And plaintiffs are available, your Honor.

THE COURT:  Look, continue to work with Ms. Simonson

in getting us a date.  So we can do that promptly.

MR. HARRIS:  Thank you, your Honor.

Anyway, you made the motion right now to add the party

plaintiff.  If you want to oppose it in writing, I guess I

can't stop you, but do it very promptly.  I would say today is

Wednesday.  Next Wednesday?  If you are going to oppose it in

writing, you have to do it by next Wednesday.

Then you don't need to do in writing on the moving

papers, you can do it all in the reply.  You have made the

motion orally.  If they do submit a writing by next Wednesday,

let's make sure this all happens before the settlement -- next

17D7LEA2

1    Wednesday is the 20th?  So, hopefully if you could respond by

2    the 25th, which will be before we meet.

3            MR. HARRIS:  Thank you, your Honor.

4            THE COURT:  It's an important point.  I understand.  I

5    think we're done with it.

6            MR. RAPOPORT:  Yes, I'm going on to something else.

7            THE COURT:  Oh, good, OK, OK.

8            MR. RAPOPORT:  Now, your Honor, basically the heart --

9            THE COURT:  Let me hand this back to you.  Go ahead.

10           MR. RAPOPORT:  The heart of my argument -- which I

11   sort of started out of sequence but I'll go back to it -- goes

12   back again to those letters on December 19 and December 27, and

13   it goes to what has been claimed to be the bad faith of my

14   clients, but the evidence hasn't really showed that, and I will

15   tell you why.

16           Those two letters are the only contemporaneous

17   writings, along with Mr. Zanker's apology letter.  So, anything

18   else is something you could talk about five or six years later,

19   but the reality of it is that these are the writings we have.

20           THE COURT:  Why do you say those are the only

21   contemporaneous writings?  He started his presentation I think

22   by talking about the two February 2nd writings.

23           MR. RAPOPORT:  These are the substantive writings that

24   exist to show what was in the minds of my clients.

25           THE COURT:  In December.

17D7LEA2

 1          MR. RAPOPORT:  In December.  And these two letters,

 2    while your Honor has heard painstaking detail about them, there

 3    are a couple of things in there that we keep repeating.  One is

 4    there was a three-way deal that Mr. Zanker tried to get Donald

 5    Trump to sign first and then go to Mr. Kiyosaki.  There is no

 6    question but that anybody in Mr. Kiyosaki's position or Sharon

 7    Lechter's position or Kim Kiyosaki's position would have the

 8    right to believe at that point they were trying to be leveraged

 9    into a deal they never agreed to.

10          THE COURT:  OK.

11          MR. RAPOPORT:  But the key to these -- and also you

12    will have to remember Mr. Deitch was talking about Mr. Kiyosaki

13    going to the meeting of January 11.  In Mr. Kiyosaki's letter

14    on the 27 he said this is not to say that we will never be

15    partners.  It was a personal letter where he believed that Bill

16    Zanker had gone off the rails.  He wasn't saying in this letter

17    I'm never going to speak to you again, I'm never going to meet

18    you again, I'm never going to talk to you again.  He didn't say

19    it.

20          So, the fact that he spoke to him again or even tried,

21    even if he tried to work out a way to bring Mr. Zanker back

22    into the fold, if you will, while in his own mind he believed

23    that wasn't going to happen as of the 27.  You can't now come

24    to him and say because you went to a meeting on the 11th --

25          THE COURT:  Well, it's more than that.  When he

17D7LEA2

1   testified at the trial he basically said I never want to do

2   business with this man again.  He was very definitive.

3              MR. RAPOPORT:  Right.

4              THE COURT:  But then they point out the two meetings

5   in January.

6              MR. RAPOPORT:  No, the one meeting.  He went to one.

7              THE COURT:  But there were two meetings with Rich Dad,

8   with Rich Dad the company.

9              MR. RAPOPORT:  Right, keeping in mind that there were

10  three principals.

11             THE COURT:  Yes, of course.

12             MR. RAPOPORT:  And that one principal doesn't decide

13  for all.

14             THE COURT:  Except the first letter was from Robert

15  and Kim, Exhibit 94.

16             MR. RAPOPORT:  Right.

17             THE COURT:  Maybe it was all three; I don't really

18  know.

19             MR. RAPOPORT:  And that terminated the MOU.

20             THE COURT:  And then Exhibit 96 is from Robert only.

21             MR. RAPOPORT:  Right.  And that terminated the MOU

22  again.

23             THE COURT:  There is none from Robert, Kim and

24  Lechter?

25             MR. RAPOPORT:  No.  The first was from Robert, Kim and

17D7LEA2

1    Sharon on December 19.  The second was just a personal letter,

2    as Robert testified, from Robert to Bill Zanker.

3               THE COURT:  OK.

4               MR. RAPOPORT:  But the key to these letters, your

5    Honor, when you are seeking to determine what was the good

6    faith or lack of good faith on the part of people, one of the

7    keys s to these letters aside from the fact that they're

8    contemporaneous, they explain exactly situations that are

9    reasonable to them, was that Bill Zanker in his own apology

10   letter not only did he acknowledge that all of their claims

11   were correct, but he also said a couple of things in that

12   apology letter that were also very important, and he said in

13   the transcript:

14   "Q. Do you see in the second sentence with it starts "but I

15   can't.  I can apologize, and I can explain what I saw.  I

16   messed up thought, so I'm not sure an explanation helps, but I

17   think our relationship deserves it, I understand it doesn't

18   cure the ills."

19               Even Bill Zanker -- and that's his transcript page

20   342?

21               THE COURT:  I don't understand what that means to you.

22               MR. RAPOPORT:  It's simple.  What it means is that

23   Bill Zanker is acknowledging at this trial he knew a mere

24   apology wasn't enough.  There have been arguments made that

25   simply which by apologizing and by going to a meeting on the

17D7LEA2

1    11th that Robert was now saying everything is fine.  But Zanker

2    himself acknowledged that an apology alone doesn't cure all

3    ills.

4           And Mr. Zanker further in that letter, it goes on, he

5    basically goes on in his apology letter to acknowledge all the

6    claims that were made by Mr. Kiyosaki, by Mr. and Mrs. Kiyosaki

7    and Sharon Lechter in the two letters.  So, at that point in

8    time you have Mr. Zanker himself confirming that what they've

9    said is correct.  You then have the parties meeting again and

10   meeting again on the 11th and the 24th of January.

11          THE COURT:  Right.

12          MR. RAPOPORT:  So, an effort by the parties there to

13   do something together is not -- is not -- I don't see how you

14   say that's bad faith by saying, OK, let me try and see if we

15   can't work something out.  Mr. Kiyosaki went to one meeting.

16          THE COURT:  At most the point would be that you would

17   knock out the fourth of Mr. Deitch's argument, the primrose

18   path argument, because I noted all the dates there.  That

19   started with after 12/27 Kiyosakis says I don't want to do

20   business with you, and then lo and behold there are two

21   meetings.  So, at most you have gotten rid of the fourth of his

22   three, but that still leaves his other three points which he

23   calls lies, cover-up and pretext.

24          MR. RAPOPORT:  We're not done.  We're not done yet.

25   The other thing about Mr. Zanker's e-mail from page 302 of the

17D7LEA2

 1   trial is you asked him, the court:

 2            "THE COURT:  If you were considering going in business

 3   with someone whose ethics were questioned, would that be good

 4   for you?

 5            "THE WITNESS:  No."

 6            Mr. Zanker knew if you were going into business with

 7   somebody and you thought they were dishonest, it's not a good

 8   thing.  Even he acknowledged it.

 9            So, what happened was there were legitimate questions,

10   and it's uncontroverted that there were legitimate questions on

11   the part of the Kiyosakis as to whether or not this was the

12   right person to get into this kind of business with.

13            They had been doing the expo forever.  They both --

14   for a year.  They both made money on the expos.  They had

15   agreed without question to continue to do the expos, and they

16   did it.  Somehow that has become evidence somehow of bad faith

17   because they agreed to do the expos and they did them.  So, I'm

18   not quite certain how that plays out.

19            The reality of it is that by doing the expos they

20   continued what was a benefit to both parties, and, you know,

21   that's all the business that they were doing,.  For certain the

22   other business they were doing was to try and determine if they

23   could get into business together, and because of the issues

24   raised in the 19th, on the 27th and the rest, the Kiyosakis and

25   Ms. Lechter decided not to.

17D7LEA2

1      But, again, Judge, when you get to the issue of bad

2  faith, aside from the fact that Mr. Zanker ratified everything

3  the Kiyosaki said and Ms. Lechter said about why they no longer

4  trusted him and wanted to do business with him, aside from that

5  you must take into consideration, even as we now get to the

6  February 2 e-mail -- which is the third time they terminated

7  this relationship.  The third time -- but when you get to that

8  e-mail again you have to remember that Sharon Lechter testified

9  in this case.  At no point in time did Sharon Lechter ever say

10  anything about the fact that the Kiyosakis, you know, wanted

11  her to go down the road and try and somehow take advantage of

12  Mr. Zanker.  Sharon Lechter was the one who said that on the

13  25th when she went to a meeting she was shocked.

14      This is not evidence of bad faith.  This is evidence

15  of good faith and trying to make a deal happen.  But then after

16  a while you just realize you can't deal with these people

17  anymore, and you just decide not to do it.

18      Now, if you go and you write a draft of a letter and

19  decide not to send it, I don't see what that does either, but I

20  will tell you that by sending an e-mail on the 2nd of February

21  and for the third time saying we're done, everything is off, we

22  no longer want to be in business with you --

23      THE COURT:  Well, that would be OK if it stopped at

24  that.  But then it said we are stopping negotiations with

25  Whitney.

17D7LEA2

1          MR. RAPOPORT:  Right, of course.  Now we are going to

2     talk about this.  Why she threw that in, I don't know.

3     However, I will tell you that stopping doesn't mean never

4     starting again.

5          THE COURT:  Never, but we are talking about eight

6     minutes.

7          MR. RAPOPORT:  Well, that would be nice if the eight

8     minute e-mail -- which everybody loves so much and which people

9     think is so funny -- had anything to do with negotiations other

10    than saying we love your company.

11         THE COURT:  No, it said more.

12         MR. RAPOPORT:  Let's talk.

13         THE COURT:  No, no, it's an invitation.  It's an

14    overture.  It says we love your company, please call.  If

15    that's not an opening of negotiations --

16         MR. RAPOPORT:  Your Honor, it doesn't say we love your

17    company so please call because we want to talk about points

18    one, two, three, four.

19         THE COURT:  But you can read that into it.  I'm sorry,

20    but when somebody says we love your company, please call,

21    they're opening negotiations.  They are certainly not stopping

22    negotiations; they are opening negotiations.

23         MR. RAPOPORT:  Well, they are opening them again eight

24    minutes later, which is if you want to call it opening -- and I

25    don't believe that --

17D7LEA2

1      THE COURT:  Well, I do.  I think you're stuck.

2      MR. RAPOPORT:  But it's still eight minutes later.

3  And the other thing is there is something that I don't think we

4  are taking into consideration at all when it has to do with

5  Mr. Deitch's cover-up.

6      First of all, we had the right to terminate this

7  agreement anytime we wanted to.  But, secondly, when it comes

8  to this cover-up that Mr. Deitch is talking about, this isn't a

9  cover-up.  This is business.  We have no obligation to go to

10  anyone and talk to them.

11      THE COURT:  No, you're mixing up -- he was very

12  organized.  I was in the lie column; I wasn't up to the

13  cover-up.  The cover-up he says is that there is all this going

14  back and forth between Whitney and Rich Dad, of which Zanker

15  doesn't know.  That's all.  That's what he calls the cover-up,

16  that he doesn't know until there is a public announcement.

17      I have a jury selection scheduled for noon, and I knew

18  that.  Did you start at 11:30; I know you don't believe it.

19      MR. RAPOPORT:  I'm sorry.  Judge, there are just a

20  couple of points I have to make quickly, I guess.

21      One of the most important points also, aside from

22  Ms. Lechter in effect ratifying all of the acts of herself and

23  the Kiyosakis when she didn't have to, comes from what happens

24  next.  If you want evidence of good faith and the fact that we

25  were the ones dealing in good faith, then forget about people

17D7LEA2

1    talking.  Take a look at the fact that, one, Bill Zanker, who

2    is I think if nothing else proved to be voluble at some point,

3    Bill Zanker finds out in September -- regardless of what

4    primrose path -- finds out in September and doesn't say a

5    thing.  He has lawyers, he has everybody.  The day after he

6    finds out in September, or when he finds out in June and says

7    he's got a gut feeling, no lawyer writes anything.

8         What is the next contact?  The next contact is Bill

9    Zanker in June of 2007 telling the Kiyosakis in an e-mail I

10   have boat loads of money for you, we can make boat loads of

11   money.  And if you want more evidence of good faith, Judge, and

12   more evidence of what the state of mind of the Kiyosakis was,

13   remember that their response to Bill Zanker offering them boat

14   loads of money is to do exactly what they said they were doing

15   in February of 2006, and that is not to do business with him

16   anymore.  They didn't even respond.  They didn't even seek to

17   look and see how much of this boat loads of money that they

18   could have.

19        And somehow you are being asked to decide that it is

20   fair and just that The Learning Annex should wait for two years

21   and nine months or ten months before it says boo.

22        THE COURT:  The problem with that argument is that I

23   didn't write the statute of limitations.

24        MR. RAPOPORT:  It's not a statute of limitations

25   argument.

1        THE COURT:  I understand.  It's equity.

2        MR. RAPOPORT:  Right.

3        THE COURT:  We are talking about an equitable claim,

4   so equitable remedy.  So, if it's not a statute of limitations,

5   it's laches.  Do I think it's laches that he waited for two

6   years?  That's the equitable equivalent of the statute of

7   limitations.

8        MR. RAPOPORT:  Right.  But what we are doing here is

9   you are trying to go back to February of 2006 and decide what

10  is in people's minds.

11       THE COURT:  I have to do that.

12       MR. RAPOPORT:  And I am telling you it's clear that

13  there was no foul in Bill Zanker's mind in 2006, 2007 when he

14  wrote the e-mails, 2008 until December.

15       When Bill Zanker found out that the February 14th

16  waiver e-mail supposedly that was just asked for for

17  housekeeping reasons, supposedly was such an evidence of bad

18  faith, he still didn't say a thing, nor did his lawyers who

19  were copied on it.

20       When they found out that the February 2 --

21       THE COURT:  What happened in December of '07?

22       MR. RAPOPORT:  December of '08 they filed a complaint.

23       THE COURT:  Sorry, '08.  What happened?  Why did he

24  suddenly wake up?  You don't know.

25       MR. RAPOPORT:  No.  But what I will say is that all of

17D7LEA2

his actions are consistent with the fact that Mr. Kiyosaki,
Mrs. Kiyosaki and the Lechters did nothing wrong, that they
terminated him.  But, you know, you have to believe here that
Bill Zanker didn't scream foul in 2006.  2007 he not only
doesn't scream foul but he says, hey, lets do more business
together.  2008 he doesn't scream foul until December.  And he
does all of this because he believes on February 2 they somehow
cut him out of this deal unlawfully, or he believes on February
14th that they somehow tried to get him to sign this letter by
fraud.

        The real fraud here is Mr. Zanker himself whose
affidavit in the motion for summary judgment spells out some
completely different story about how it was that he was, he
said, coerced into signing the February 14 e-mail, that he
never testified to here, never testified to in his original
deposition.

        His original deposition the only thing he said -- he
didn't testify to the one conversation he supposedly had.  The
only thing he said was Sharon Lechter called me and said she
wanted it for housekeeping purposes.  And that's it.

        But I think that the best evidence here of the fact
that in the mind of Bill Zanker and in the mind of Learning
Annex nothing was wrong, there was no deceit, there was no
fraud, is that they never so much as said a word.  Not one
word.  The only thing they wanted to do was more business with

17D7LEA2

1    the Kiyosakis.  And the only thing the Kiyosakis wanted to do

2    was say that their letters from December were correct, they

3    didn't want to do business at all.

4            THE COURT:  OK, I think I must stop.  I scheduled a

5    jury selection for 12, and we are way past that.  I've got to

6    move on.

7            So, I think I've got the gist of everybody's argument,

8    and I reserve decision.

9            MR. RAPOPORT:  Thank you, your Honor.

10           MR. HARRIS:  Thank you, your Honor.

11           THE COURT:  But please get back to my clerk on that

12   date.

13           MR. RAPOPORT:  Yes, Judge.

14           THE COURT:  Thank you.  All right.  Thanks, everybody.

15                            – – –

16

17

18

19

20

21

22

23

24

25