UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LEARNING ANNEX HOLDINGS, LLC
LEARNING ANNEX, LLC and
LEARNING ANNEX, L.P.,

        Plaintiffs,

  - against -                                     09-CV-4432
                                                    (SAS/GWG)

RICH GLOBAL, LLC and
CASH FLOW TECHNOLOGIES, INC.,

        Defendants.
------------------------------------------------------------------ X

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF THEIR MOTION TO REINSTATE THEIR CLAIM FOR UNJUST ENRICHMENT
<u>AND FOR ENTRY OF JUDGMENT ON THAT CLAIM</u>**

Jonathan Harris
Julie Withers
Harris Cutler & Houghteling LLP
111 Broadway, Suite 402
New York, New York 10006
Tel. (212) 397-3370
Fax (212) 202-6206
Jon@harriscutler.com

Edwin G. Schallert
Michael Schaper
Megan K. Bannigan
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022

David Deitch
Ifrah PLLC
1627 Eye Street NW, Suite 1100
Washington DC 20006

*Attorneys for Plaintiffs*

The Learning Annex, L.P., Learning Annex Holdings, LLC and Learning Annex, LLC (together, "Learning Annex"), respectfully submit this Reply Memorandum in further support of their Motion To Reinstate Learning Annex's Claim for Unjust Enrichment and For an Entry of Judgment on that claim.

## PRELIMINARY STATEMENT

Learning Annex's claims for unjust enrichment and *quantum meruit* were independently pled, argued, and considered by the jury. Since the outset of this litigation, Learning Annex has pursued these claims separately as alternative causes of action, as New York law permits. The jury analyzed these distinct claims and returned a verdict on both in favor of Learning Annex (the unjust enrichment verdict being advisory).

The Court later dismissed the unjust enrichment claim on the ground that the *quantum meruit* verdict cured any unjust enrichment. Defendants' entire argument in support of dismissal rests on the fact that other courts have at early stages of the case under a variety of different circumstances combined unjust enrichment and *quantum meruit* claims. That is besides the point. In this case, the Court kept them separate and instructed the jury to analyze them separately. It was proper for the Court to do so, just as other courts in this Circuit and New York state have done. Indeed, that is the most logical approach given that the claims have distinct elements. *See* Aug. 12, 2011 Opinion (Dkt. #124) at 4 n.10 (noting four elements of *quantum meruit* and three elements of unjust enrichment). There is no bright line rule, as Defendants suggest, that *quantum meruit* and unjust enrichment claims must be combined. Now that the claims have proceeded separately through trial, however, and the jury has issued its verdict in favor of Learning Annex on both claims, the Court should not dismiss the unjust enrichment claim, depriving Learning Annex of an independent and consistent ground to support the jury's

1

award of damages. Defendants cite no cases in which a court, having allowed both claims to be tried to the jury, then dismissed one of them as duplicative after the jury rendered its verdict.

If the Court reinstates Learning Annex's unjust enrichment claim, it will find ample evidence in the record to conclude, as the jury did, that "equity and good conscience require restitution." Defendants' arguments to the contrary ignore large parts of the record, similar to their motion to overturn the jury's verdict on *quantum meruit*. In fact, the efforts undertaken by Learning Annex to bring Rich Dad into the free seminar business, coupled with Rich Dad's bad faith actions to cut Learning Annex out of the business that it developed, more than support this finding. The unjust enrichment claim should be reinstated and decided in Plaintiffs' favor.

## **ARGUMENT**

**I.    Learning Annex's Claim for Unjust Enrichment Should Be Reinstated and Analyzed Independently of *Quantum Meruit***

As Learning Annex established in its opening brief, it was an error of law to dismiss its unjust enrichment claim as duplicative because Learning Annex should be able to pursue until a judgment is satisfied multiple, consistent legal theories to support the jury's award of damages. Rich Dad (incorrectly) characterizes that elemental legal principle solely as an "election of remedies" point. Learning Annex is not, however, seeking to keep open (and later elect from) multiple remedies. Learning Annex seeks only one remedy, the damages awarded by the jury. It does so – and has the right do to do so – under two legal theories.

Rich Dad does not even attempt to distinguish the authority supporting Learning Annex's position. *See Fed. Deposit Ins. Corp. v. Bernstein*, No. 89-2080, 1990 WL 198738, at *8-*9 (E.D.N.Y. Nov. 2, 1990); McKinney's Consolidated Laws of New York Annotated, Book 7B, 2010, Practice Commentaries by Patrick M. Connors; *see also Ajax Hardware Mfg. v. Ind. Plants Corp.*, 569 F.2d 181, 185 (2d Cir. 1977) (allowing two claims sounding in negligence –

based upon the same facts – to be "submitted as alternatives to the jury, as a matter of both New York substantive law and federal procedural law"); *United Roasters v. Colgate-Palmolive Co.*, 649 F.2d 985, 990-91 (4th Cir.), *cert. denied*, 454 U.S. 1054 (1981) ("[T]he legal theories exemplified by Counts 1 and 3 of the complaint were not in the least inconsistent.  They were simply alternative theories based upon the same set of operative facts.  To the extent that each theory had legal validity as applied to the operative facts, the plaintiff was entitled to have both theories submitted to the jury, and should not have been required to make the election it did.").[1]

Instead, Rich Dad rests its entire argument on the notion that courts **must** treat unjust enrichment and *quantum meruit* claims as one claim where those claims relate to compensation for services.  None of the cases cited by Rich Dad, however, evaluated the issue presented here – whether claims for *quantum meruit* and unjust enrichment could both proceed if the elements of both were met.  Rather, in each of the cited cases, the unjust enrichment and *quantum meruit* claims were dismissed at early stages of the case due to the existence of a contract which prevented quasi-contractual relief.  *See Mid-Hudson Catskill Rural Migrant Ministry v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005); *Newman & Schwartz v. Asplundh Tree Expert Co.*, 917 F. Supp. 265, 270 (S.D.N.Y.) *aff'd* 102 F.3d 660 (2d Cir. 1996*); see also Seiden Assocs. v. ANC Holdings*, 768 F.Supp. 89, 96 (S.D.N.Y.1991).  In any event, the language Rich Dad pulled from these cases stands at most for the proposition that courts **may** evaluate unjust enrichment and *quantum meruit* together.  *Mid-Hudson Catskill*, 418 F.3d at 175 (Courts "*may* analyze quantum meruit and unjust enrichment as a single quasi contract claim") (emphasis added); *Newman & Schwartz*, 917 F. Supp. at 270 (two claims are "usually" analyzed together).

---

[1] "Election of remedies" cases (including some cited in Learning Annex's opening brief) make a similar point and, relevant here, confirm that "the choice of one will not operate as a bar until there has been a satisfaction of the judgment." *Lumber Mut. Cas. Ins. Co. of N.Y. v. Friedman,* 28 N.Y.S.2d 506, 508-509 (N.Y.S. Ct. 1941).

Defendants have presented no support for the proposition that the unjust enrichment and *quantum meruit* claims *must* be combined into a single cause of action.

Nor is there support (even in the cases it cites) for Rich Dad's suggestion that the two claims should both survive *only* in cases addressing both misappropriation of property and compensation for services. *Snyder v. Bronfman*, 893 N.Y.S.2d 800, 802 (N.Y. 2009) and *IMG Int'l Mktg. Grp. v. SDS Williams St. LLC*, 2011WL 3610789, at *5 (N.Y. Sup. Ct. Jun. 29, 2011), involved dismissal of both *quantum meruit* and unjust enrichment claims on Statute of Frauds grounds; neither case supports the proposition that one claim should be dismissed as duplicative of the other, let alone that dismissal of one claim is appropriate after both claims have been tried to a jury.[2] *John Anthony Rubino & Co. CPA, P.C. v Schwartz*, also cited in Rich Dad's brief, undermines Rich Dad's position. There, the court analyzed separately "essentially identical" claims for reasonable compensation of services, finding liability on both, and made a single award for damages supported by the alternate causes of action. 2010 WL 3529513, at *5-8 (N.Y. Sup. Ct. Aug. 10, 2010). The Second Circuit and this District have followed the same approach in analyzing claims for reasonable compensation under *quantum meruit* and unjust enrichment separately. *Argilus, LLC v. PNC Fin. Servs. Grp.*, 419 Fed. Appx. 115, 119-20 (2d Cir. 2011) (analyzing claims for unjust enrichment and *quantum meruit* independently); *Kidz Cloz v. Officially for Kids.*, 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004) (same).

There is good reason for courts to have discretion to analyze the two claims separately: they have different elements. *See, e.g., Gidatex v. Campaniello Imports, LTD.*, 49 F. Supp. 2d 298, 302-03 (S.D.N.Y. 1999) (Scheindlin, J.) (recognizing the distinct elements of unjust

---

[2] Similarly, the court in *Confold Pac. v. Polaris Indus.*, 433 F.3d 952, 957-58 (7th Cir. 2006), dismissed all quasi-contractual claims; it did not evaluate whether both unjust enrichment and *quantum meruit* could survive if the elements of both were met.

4

enrichment and *quantum meruit*); *Monex Fin. Svcs. v. Dynamic Currency Conversion*, 878 N.Y.S.2d 432, 433 (2d Dep't 2009) (unjust enrichment and *quantum meruit* actions require pleading different elements); *Pulver Roofing Co. v. SBLM Architects*, 884 N.Y.S.2d 802, 804 (4th Dep't. 2009) ("plaintiff is not required to establish that defendant received a benefit in order to recover in quantum meruit"); *Eber-NDC, LLC v. Star Indus.*, 839 N.Y.S.2d 650, 653 (4th Dep't. 2007) (same). Rich Dad dismisses that distinction, but the post-trial briefing in this case (including in Rich Dad's opposition brief) proves Learning Annex's point. The briefing on Rich Dad's motion regarding *quantum meruit* has focused, in part, on whether Learning Annex had a "reasonable expectation of compensation." That makes sense because it is an element of a claim for *quantum meruit*. The briefs on Learning Annex's motion regarding unjust enrichment, however, are essentially silent on that issue. Instead, the parties' unjust enrichment papers have focused on whether "equity and good conscience require restitution" because that is an element of a claim for unjust enrichment, not an element of *quantum meruit*.[3] For example, evidence regarding Lechter's "8-minute" email, *see infra*, is most relevant to the equity and good conscience element of unjust enrichment – and thus addressed at length by both parties in their unjust enrichment briefs – while less relevant to the elements of *quantum meruit*.

      The post-trial briefing reflects what is perhaps the most important point, again one ignored by Rich Dad: in *this* case Learning Annex always has pursued *quantum meruit* and unjust enrichment as alternative theories and the case was tried on that basis. Thus, the Court instructed the jury that it "must analyze these claims separately." Tr. at 989:18. The Court then

---

[3] Nothing in the *Confold Pacific* case quoted at length by Rich Dad suggests that the two claims have the same elements, even where both claims are for compensation for services. See Defs. Br. (Dkt. #136) at 5-7. Indeed, there can be no dispute that the elements required to prove unjust enrichment are different than those necessary to prove quantum meruit. *See* Defs. Br. (Dkt. #136) at 9 (reciting the three-part test for unjust enrichment); *compare to* Defs. Opening Br. (Dkt. #131) at 4 (citing different standard for quantum meruit).

5

presented the jury with a special verdict form that clearly delineated the two independent causes and required precise findings as to the elements of each. *See* Special Verdict Form (First Claim: Quantum Meruit, pg. 1-3; Second Claim: Unjust Enrichment, pg. 4-5). Rich Dad is now trying to re-write the verdict form to read after Question 9 (as to whether the jury awarded damages for *quantum meruit*) "If YES, proceed to question 10 [regarding interest] and you are done." That is not what the verdict form said; it of course required the jury to "Proceed to Part II" and consider the unjust enrichment claim regardless of its verdict on *quantum meruit*. Learning Annex would have objected to this re-writing if Rich Dad had asked for it at trial, and the Court should now reject Rich Dad's attempt to second-guess the questions the jury considered. In responding to the verdict form *as written*, the jury found in favor of Learning Annex on each element of both *quantum meruit* and unjust enrichment that it was tasked with deciding. From start to finish, this case has proceeded with two separate claims. There is no reason to now lump them together.

As Learning Annex established in its opening papers, there is a simple, practical reason why it should be able to continue to pursue both claims: it should have the opportunity to defend its recovery on the alternative theory of unjust enrichment. Rich Dad has no answer as to why Learning Annex should suffer the prejudice of defending only one part of the jury's verdict. The Court should reinstate Learning Annex's unjust enrichment claim and rule on it on the merits.

**II.     Learning Annex Has Established That Equity and Good Conscience Require Restitution**

As Learning Annex showed at trial and in its opening brief, there is abundant evidence to support a finding that equity and good conscience require restitution. In its opposition brief, Rich Dad once again ignores significant portions of the record, insisting that Learning Annex merely "arrange[d] initial meetings" between Rich Dad and Whitney and "encourage[d] the parties" to pursue a new business. Defs. Br. (Dkt. #136) at 2. The record shows (as the jury

6

found) that Learning Annex performed services to develop the free seminar business beyond the mere introduction of Rich Dad and Whitney.[4]  The record also reflects Rich Dad's bad faith in cutting Learning Annex out of that business.

As described in our opening brief, Learning Annex worked tirelessly for Rich Dad in developing the free seminar business.  Pls.' Br. (Dkt. #129) at 13-15.  Mr. Zanker introduced the business to the Kiyosakis as a way of expanding the Rich Dad Brand while accommodating the Kiyosakis' interest in spending less time on the road.  Tr. at 60:10-18, 133:11-134:6.  With Rich Dad's authorization, Mr. Zanker sought suitable sublicensees and identified Whitney as the best candidate.  Exs. 47, 55, 58; Tr. at 127:2-129:7, 142:4-24, 154:25-160:22, 289:19-290:12, 398:5-21.  With Zanker's urging, Whitney submitted a proposal that led to an introductory meeting, which led to further business development meetings with Whitney, Rich Dad and Learning Annex.  Ex. 70; Tr. at 185:11- 187:25, 409:3-8, 518:21-519:17.  After these meetings, the three parties outlined a framework for moving forward and did so, Exs. 113, 122A, until Learning Annex was abruptly cut out.  Rich Dad's ultimate earnings in the business – a 10% royalty – were exactly what Learning Annex had pushed for in negotiations with Whitney.  *See* Tr. at 132:24-134:8; Ex. 212.  Contrary to Rich Dad's assertions that "Learning Annex was not involved" in the free seminar business, Defs. Br. (Dkt. #136) at 2, Learning Annex did precisely what a licensing agent is paid to do – it monetized Rich Dad's brand.  *See* Tr. at 562.

Rich Dad's only attempt to deal with the facts is to recast its bad faith in terminating Learning Annex.  In its opposition brief, Rich Dad (for the first time) refers to the "natural reading" of Sharon Lechter's February 2, 2006 "8-minute" e-mail as providing that Rich Dad was ceasing *joint* negotiations with Learning Annex, Trump and Whitney.  Defs. Br. (Dkt. #136)

---

[4]  Learning Annex will not repeat here the substantial evidence showing Learning Annex's performance in developing the free seminar business.  *See* Pls.' Opp. Brief (Dkt. #137).

7

at 10. That reading is far-fetched – and was *never* even presented to the jury. The email clearly reads "[w]e are stopping our negotiations with Donald Trump and Russ Whitney." Ex. 132. The natural, common sense reading of that language – and surely the one the jury adopted in finding that equity and good conscience require restitution – is that negotiations were ending, period. But just eight minutes later, Ms. Lechter e-mailed John Kane (of Whitney) stating that "[w]e love your organization" and asking to speak with him "as soon as possible in the morning." Ex. 128. Clearly, negotiations were not over. *See* Tr. at 1075:19-1076:1 (Judge Scheindlin stating, "I'm sorry, but when somebody says we love your company, please call, they're opening negotiations. They are certainly not stopping negotiations; they are opening negotiations. . . . I think you're stuck."). This misrepresentation alone is sufficient to make a finding that equity and good conscience require restitution. *See Waldman v. New Chapter*, 714 F.Supp. 2d 398, 404 (E.D.N.Y. 2010) ( "under New York law, it is contrary to equity and good conscience to enable a party to benefit from misleading misrepresentations") (internal citations omitted).[5]

The next portions of the record Rich Dad attempts to reconcile are Mr. Kiyosaki's testimony that (1) he was "finished" with Learning Annex in December 2005, and (2) his (and others from Rich Dad's) attendance at January 2006 meetings between Learning Annex, Rich Dad and Whitney where the parties planned the free seminar business. To credit Rich Dad's recasting of the record would require interpreting "finished" to mean something other than finished, or an upside-down reading like Rich Dad's reading of the 8-minute e-mail – stating "we

---

[5] Rich Dad does not attempt to explain Ms. Lechter's initial draft termination letters, dated January 31, 2006, which accused Learning Annex of failing to perform under the terms of MOU1, a completely different pretext than the February 2 email sent only days later. *See* Pls.' Br. (Dkt. #129) at 6; Ex. 124A. These letters add to the weight of evidence supporting a finding that equity and good conscience require restitution.

8

are stopping negotiations" – as meaning something other than stopping negotiations.[6] It is unsurprising that the jury, in finding that equity and good conscience require restitution, rejected Rich Dad's attempts to explain away its bad acts. This Court should do the same.

      Rich Dad's bad faith is further reflected in its efforts to conceal the planning of the free seminar business and use that concealment to acquire a (clearly ineffective) waiver from Mr. Zanker. After the February 2, 2006 email, Mr. Zanker continued to work with Rich Dad at the Learning Annex expos throughout 2006. At no point prior to the press release in September 2006 did Rich Dad mention that it had agreed to a license for the free seminar business with Whitney. Instead, Rich Dad exploited its silence to procure an email from Mr. Zanker stating that Learning Annex would leave it to Rich Dad's discretion whether to compensate Learning Annex for arranging the relationship with Whitney. Ex. 143. Rich Dad attempts to dismiss this so-called "waiver" email from Mr. Zanker by stating that Learning Annex "gave up nothing by that waiver" because it had no rights in the first place. Defs. Br. (Dkt. #136) at 12. Ms. Lechter's conduct, however, shows just the opposite. To obtain the "waiver" she repeated the lie that Rich Dad had stopped negotiations with Whitney and then touted this so-called "waiver" to Whitney as the "result" of discussions with Learning Annex. Ex. 223. Clearly, Rich Dad understood that Learning Annex had a right to compensation for its role in developing the free seminar business. In fact, Rich Dad offered no testimony or argument supporting an explanation *other* than that Rich Dad was trying to avoid its obligation to compensate Learning Annex.

---

[6]    Moreover, Mr. Kiyosaki's testimony is contrary to Defendants' assertion that "the parties resumed negotiations in the wake of Zanker's apology, but ultimately did not reach an agreement." Defs. Br. (Dkt. #136) at 11. At trial, Mr. Kiyosaki – the one time he actually admitted to having read Mr. Zanker's apology letter – was adamant that, as of December 2005 and prior to the January 2006 meetings, Mr. Kiyosaki "absolutely [did] not" intend "to do business with [Zanker] again." Tr. at 661:21-662:1; *see also* Tr. at 661, 691 (Mr. Kiyosaki's contrary testimony about whether he even received or read the apology letter).

9

Rich Dad's most fundamental concern about the Court reinstating Learning Annex's unjust enrichment claim appears to be that it provides an additional basis for supporting the jury's award of damages. That award, Rich Dad complains, "compensates [Learning Annex] as if it were an *equal partner* with Rich Dad and Whitney in their joint venture." Defs. Br. (Dkt. #136) at 3 (emphasis in original). Equal shares, however, would suggest one-third of the nearly $450 million in revenues earned on the business Learning Annex helped develop with Whitney (before Rich Dad even participated in the talks). The jury awarded Learning Annex no such thing. Nor did the jury give Learning Annex an "equal [*i.e.,* 50/50] share" of the $41,966,269 million in royalties Rich Dad earned on the free seminar business. Instead, the jury awarded Learning Annex precisely 35% of Rich Dad's share of the audited royalties – $41,966,269 – a figure supported by uncontradicted expert testimony about the industry standard for compensating a licensing agent. This is not the "massive windfall" Rich Dad suggests, Defs. Br. (Dkt. #136) at 12; rather, it is a reasonable conclusion amply supported by expert evidence as to the industry standard and factual evidence as to the services Learning Annex performed.

In short, the record reflects an array of time, effort, and expense incurred by the Learning Annex in developing the free seminar business for Rich Dad, and also shows a string of incidents reflecting Rich Dad's bad faith in cutting Learning Annex out of the free seminar business that Learning Annex initiated and developed for Rich Dad. This provides the Court ample support to make a finding, as the jury did, that equity and good conscience require restitution.

## CONCLUSION

For the reasons set forth above and in Learning Annex's opening brief, Learning Annex's claim for unjust enrichment should be reinstated and decided in Learning Annex's favor.

| | |
|---|---|
| October 27, 2011 | Respectfully submitted: |
| | \_\_\_\_\_/s/ Edwin G. Schallert_____ |
| | Edwin G. Schallert |
| | Michael Schaper |
| | Megan K. Bannigan |
| | Debevoise & Plimpton LLP |
| | 919 Third Avenue |
| | New York, New York 10022 |
| | |
| | Jonathan Harris |
| | Harris Cutler & Houghteling LLP |
| | 111 Broadway, Suite 402 |
| | New York, New York 10006 |
| | Tel. (212) 397-3370 |
| | Fax (212) 202-6206 |
| | Jon@harriscutler.com |
| | |
| | David Deitch |
| | Ifrah PLLC |
| | 1627 Eye Street NW, Suite 1100 |
| | Washington DC 20006 |
| | |
| | *Attorneys for Plaintiffs* |

11