UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ X
                                :

LEARNING ANNEX HOLDINGS, LLC, :
LEARNING ANNEX, LLC, and :
LEARNING ANNEX, L.P., :
                                 :

                  **Plaintiffs,** :

                                 :

         - against - :

                                   :

RICH GLOBAL, LLC, and :
CASHFLOW TECHNOLOGIES, INC., :
                                 :

                **Defendants.** :
------------------------------------------------------ X
SHIRA A. SCHEINDLIN, U.S.D.J.:

**OPINION AND ORDER**
09 Civ. 4432 (SAS)

## I.    INTRODUCTION[1]

        Learning Annex Holdings, LLC, Learning Annex, LLC, and Learning

Annex, L.P. (collectively, "Learning Annex" or "LA") bring this action against

---

       [1]    This Opinion assumes familiarity with the background and procedural posture of this case, as described in *Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403 (S.D.N.Y. 2011) ("Summary Judgment Opinion") (granting defendants summary judgment on all claims except for breach of duty to negotiate in good faith, *quantum meruit*, and unjust enrichment); *Learning Annex Holdings, LLC v. Rich Global, LLC*, No. 09 Civ. 4432, 2011 WL 2732550 (S.D.N.Y. July 11, 2011) ("Rule 50(a) Opinion") (denying defendants' motion for judgment as a matter of law); *Learning Annex Holdings, LLC v. Rich Global, LLC*, No. 09 Civ. 4432, 2011 WL 3423927 (S.D.N.Y. Aug. 3, 2011) ("Rule 25(c) Opinion") (granting plaintiffs' motion to join Learning Annex, L.P. as a plaintiff); *Learning Annex Holdings, LLC v. Rich Global, LLC*, No. 09 Civ. 4432, 2011 WL 3586138, at *2 (S.D.N.Y. Aug. 12, 2011) ("Unjust Enrichment Opinion") (dismissing plaintiffs' unjust enrichment claim).

Rich Global, LLC and Cash Flow Technologies, Inc. ("CTI") (collectively, "Rich Dad" or "RD") following the collapse of their business relationship.  This relationship began in 2001 when Robert Kiyosaki – now the owner, along with Kim Kiyosaki, of the Rich Dad entities – became a featured speaker at Learning Annex expositions.[2]  In the hopes of expanding their relationship, Learning Annex and Rich Dad entered into a Memorandum of Understanding ("MOU") on September 7, 2005, in which the parties agreed to "develop and conduct the free seminar business with follow up fee based courses."[3]  The MOU stated that it was not intended to be binding on the parties.[4]  Shortly thereafter on September 15, 2005, Sharon Lechter, then a member of Rich Dad's management team, sent an email to William Zanker, the principal owner and President of Learning Annex, authorizing Learning Annex "to develop and conduct free Rich Dad seminars with follow up courses in the United States and Canada."[5]  Ultimately, Rich Dad broke off the relationship on February 2, 2006 by means of an email from Lechter to Zanker.[6]  On July 18, 2006, Rich Dad entered into formal agreements to form a

---

[2]       *See* Trial Transcript ("Tr.") at 154, 634.

[3]       Trial Exhibit ("Ex.") 41A; Tr. at 136-37.

[4]       *See* Ex. 41A.

[5]       Ex. 47; *see also* Tr. at 142-43, 397-98.

[6]       *See* Ex. 132; Tr. at 420:2-13.

2

business relationship with Whitney Education Group, Inc. (collectively with related entities, "Whitney") to pursue the free seminar business.[7]  From 2007 to 2010, this free seminar business brought in total cash sales of $437.8 million, of which Rich Dad received nearly $45 million in royalties.[8]

On July 13, 2011, a jury awarded plaintiffs approximately $14.6 million in damages on a *quantum meruit* claim for uncompensated "services related to the development of the free seminar business."[9]  On August 12, 2011, I dismissed plaintiffs' remaining claim for unjust enrichment because "the Court need not, and should not, separately decide [the unjust enrichment] claim, which should have been 'analyze[d] . . . as a single quasi contract claim' alongside Plaintiffs' *quantum meruit* claim."[10]

Rich Dad now moves for judgment as a matter of law or, in the alternative, a new trial.  Rich Dad argues that (1) the evidence is legally insufficient to satisfy the elements of *quantum meruit*; (2) there is no basis for a

---

[7]      *See* Exs. 231, 259; Tr. at 544.

[8]      *See* Tr. at 473:11-14, 484:2-10.

[9]      Tr. at 1014:14-1015:3.

[10]     Unjust Enrichment Opinion, 2011 WL 3586138, at *2 (quoting *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)).

3

judgment against CTI; (3) the verdict is contrary to the clear weight of the evidence and manifestly unjust; and (4) the jury's damage award is excessive. Learning Annex now moves to reinstate their claim for unjust enrichment and for entry of judgment on that claim, arguing that (1) dismissal of the unjust enrichment claim was an error of law; and (2) equity and good conscience require restitution. Learning Annex's motion is effectively a motion to reconsider the Unjust Enrichment Opinion. For the reasons discussed below, Rich Dad's motion is granted in part to the extent I grant judgment as a matter of law to CTI and a new trial on damages to Rich Global, LLC. In addition, Learning Annex's motion to reinstate the unjust enrichment claim is denied.

## II.   LEGAL STANDARD

### A.   Motion for Judgment as a Matter of Law Under Rule 50 and Motion for a New Trial Under Rule 59

A court may render judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."[11] The standard for granting judgment as a matter of law "mirrors" the

---

[11]     Fed. R. Civ. P. 50(a)(1).

standard for granting summary judgment.[12]  Accordingly, in ruling on such a

motion, the trial court is required to

> consider the evidence in the light most favorable to the party
> against whom the motion was made and to give that party the
> benefit of all reasonable inferences that the jury might have drawn
> in his favor from the evidence.  The court cannot assess the weight
> of conflicting evidence, pass on the credibility of the witnesses, or
> substitute its judgment for that of the jury.[13]

A jury verdict cannot be set aside lightly.  A court may not grant judgment as a

matter of law unless (1) there is such a "'complete absence of evidence supporting

the verdict that the jury's findings could only have been the result of sheer surmise

and conjecture'" or (2) there is "'such an overwhelming amount of evidence in

favor of the movant that reasonable and fair minded [persons] could not arrive at a

verdict against [it].'"[14]

A "court may, on motion, grant a new trial on all or some of the issues

. . . after a jury trial, for any reason for which a new trial has heretofore been

_____

[12]     *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150
(2000) (quotation marks and citations omitted); *Kerman v. City of New York*, 374
F.3d 93, 118 (2d Cir. 2004).

[13]     *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (quotation
marks and citation omitted).

[14]     *United States v. Space Hunters, Inc.*, 429 F.3d 416, 429 (2d Cir. 2005)
(quotation marks and citation omitted).  *Accord Doctor's Assocs. v. Weible*, 92
F.3d 108, 111-12 (2d Cir. 1996).

granted in an action at law in federal court."[15]  The legal test for granting a new

trial is less stringent than for granting judgment as a matter of law.  "Unlike a

motion for judgment as a matter of law, a motion for a new trial may be granted

even if there is substantial evidence to support the jury's verdict."[16]  Nevertheless,

in practice courts do not grant new trials as freely as the language suggests.  "'A

motion for a new trial ordinarily should not be granted unless the trial court is

convinced that the jury has reached a seriously erroneous result or that the verdict

is a miscarriage of justice.'"[17]

       Under Federal Rule of Civil Procedure 50(b), "[n]o later than 28 days

after the entry of judgment . . . the movant may file a renewed judgment as a matter

of law and may include an alternative or joint request for a new trial under Rule

59." "In ruling on the renewed motion, the court may: (1) allow judgment on the

verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct entry of

judgment as a matter of law."

### B.    Motion for Reconsideration

---

[15]    Fed. R. Civ. P. 59(a)(1)(A).

[16]    *See Caruolo v. John Crane, Inc.*, 226 F.3d 46, 54 (2d Cir. 2000)
(quotation marks and citation omitted).

[17]    *Tesser v. Board of Educ.*, 370 F.3d 314, 320 (2d Cir. 2004) (quoting
*Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 623-24 (2d Cir.
2001)).

Motions for reconsideration are governed by Local Rule 6.3 and are committed to the sound discretion of the district court.[18]  A motion for reconsideration is appropriate where "'the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'"[19]  A motion for reconsideration may also be granted to "'correct a clear error or prevent manifest injustice.'"[20]

The purpose of Local Rule 6.3 is to "'ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.'"[21]  Local Rule 6.3 must

---

[18]     *See Patterson v. United States*, No. 04 Civ. 3140, 2006 WL 2067036, at *1 (S.D.N.Y. July 26, 2006 ) ("The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court.") (citing *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir. 1983)).

[19]     *In re BDC 56 LLC*, 330 F.3d 111, 123 (2d Cir. 2003) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)), *abrogated on other grounds by In re Zarnel*, 619 F.3d 156 (2d Cir. 2010).

[20]     *RST (2005) Inc. v. Research in Motion Ltd.*, No. 07 Civ. 3737, 2009 WL 274467, at *1 (S.D.N.Y. Feb. 4, 2009) (quoting *Virgin Atl. Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

[21]     *Grand Crossing, L.P. v. United States Underwriters Ins. Co.*, No. 03 Civ. 5429, 2008 WL 4525400, at *3 (S.D.N.Y. Oct. 6, 2008) (quoting *SEC v. Ashbury Capital Partners*, No. 00 Civ. 7898, 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001).

be "narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the Court."[22]  Courts have repeatedly been forced to warn counsel that such motions should not be made reflexively, to reargue "'those issues already considered when a party does not like the way the original motion was resolved.'"[23]  A motion for reconsideration is not an "opportunity for making new arguments that could have been previously advanced,"[24] nor is it a substitute for appeal.[25]

## III.  *QUANTUM MERUIT*[26]

"In order to recover in quantum meruit under New York law, a claimant must establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the

---

[22]     *United States v. Treacy*, No. 08 Cr. 0366, 2009 WL 47496, at *1 (S.D.N.Y. Jan. 8, 2009) (quotation omitted).

[23]     *Makas v. Orlando*, No. 06 Civ. 14305, 2008 WL 2139131, at *1 (S.D.N.Y. May 19, 2008) (quoting *In re Houbigant, Inc.*, 914 F. Supp. 997, 1001 (S.D.N.Y. 1996)).

[24]     *Associated Press v. United States Dep't of Defense*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005).

[25]     *See Grand Crossing, L.P. v. United States Underwriters Ins. Co.*, No. 03 Civ. 5429, 2008 WL 4525400 (S.D.N.Y. Oct. 6, 2008).

[26]     This Opinion assumes familiarity with the law of the case as stated in prior Opinions.  *See supra* note 1.

services."[27]  *Quantum meruit* damages are based on the value of services rendered

by the plaintiff.[28]  Accordingly, damages are generally given based on an hourly

rate, except for limited exceptions where there is a "clear and accepted marketplace

convention"[29] establishing compensation on a percentage basis.

## IV.   DISCUSSION

### A.   The Jury's Verdict on *Quantum Meruit* Must Be Set Aside

Rich Dad argues that Learning Annex presented insufficient evidence

to support a verdict on *quantum meruit*.  Specifically, Rich Dad argues that there is

insufficient evidence (1) that Learning Annex reasonably expected compensation

for the services it rendered; (2) that Learning Annex provided "services related to

the development of the free seminar business"; and (3) to establish the reasonable

value of the services at issue.[30]  In addition, defendants argue that there is no basis

for a judgment against CTI.[31]  In the alternative, Rich Dad argues that a new trial is

required because the verdict is a "'seriously erroneous result'" and "'a miscarriage

---

[27]    *Mid-Hudson Catskill*, 418 F.3d at 175.

[28]    *See Carlino v. Kaplan*, 139 F. Supp. 2d 563, 564 (S.D.N.Y. 2001).

[29]    *Id.* at 565.

[30]    Memorandum in Support of Defendants' Motion for Judgment as a
Matter of Law or, in the Alternative, for a New Trial ("Def. Mem.") at 1-2.

[31]    *See id.* at 15-16.

of justice.'"[32]

Initially, I note that plaintiffs raise an argument about the procedural propriety of defendants' first two arguments. Plaintiffs argue that because these defendants did not raise these arguments in their Rule 50(a) motion, they may not raise these arguments in a Rule 50(b) motion. Defendants argue that there was no procedural impropriety because plaintiffs were on notice of these arguments and suffered no prejudice.[33] Ultimately, I consider these arguments because (1) plaintiffs have identified no additional evidence they would have offered if apprised of these arguments; and (2) defense counsel attacked the reasonableness of Learning Annex's expectation of compensation and the lack of services Learning Annex provided throughout the course of the trial, apprising plaintiffs of the likelihood of these arguments.[34] In any event, these two arguments do not

---

[32]    *Tesser*, 370 F.3d at 320 (quoting *Hugo Boss Fashions*, 252 F.3d at 623-24).

[33]    *See Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 136 (2d Cir. 1999) (allowing arguments in a Rule 50(b) motion where it was "apparent that [adversary's] counsel was alert to the alleged deficiencies in the case"); *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 288 (2d Cir. 1998) (allowing arguments in a Rule 50(b) motion where "failure to specify the lack of proof . . . as a basis for its Rule 50(a) motion did not result in any prejudice").

[34]    *See, e.g.*, Tr. at 732:14-15 ("And there was never an obligation on the part of the Rich Dad group to go into that agreement."); *id.* at 869:20-23 ("I'll concede that they were doing business, but I don't see any proof anywhere that any of this business in any way was related to anything that Learning Annex did or is

provide the basis for my ruling overturning the jury verdict and granting a new trial

on damages.

### 1.    Reasonable Expectation of Compensation

Rich Dad offers two arguments as to why the evidence presented at

trial is legally insufficient to support the jury's finding that Learning Annex

reasonably expected to be compensated for the services it provided.  *First*, the

parties expressly agreed not to be bound in the MOU.  *Second*, Rich Dad contends

that Zanker acted in the *hope* of reaching an agreement that would allow plaintiffs

to share in Rich Dad's profits.  However, "a plaintiff does not reasonably expect

compensation for efforts to bring to fruition a new business that does not

materialize as the plaintiff had hoped."[35]

Defendants' first argument fails as I have already held that, despite the

language expressing an intention not to be bound in the MOU, a reasonable juror

could conclude that subsequent evidence establishes a contrary understanding.  In

particular, the following evidence could permit a reasonable juror to conclude that

Learning Annex did have a reasonable expectation of compensation – (1) Rich Dad

wrote a letter to Learning Annex on September 15, 2005 stating that "we authorize

entitled to recover for.").

[35]    Def. Mem. at 5.

you to develop and conduct free [Rich Dad] seminars with follow up courses in the United States and Canada";[36] (2) Zanker's email to a third party on September 29, 2005, copying Lechter, that the Rich Dad "brand has agreed to allow me to represent them in numerous new business ventures . . . . The first deal that I am doing is getting trainers to begin going around the country teaching through free seminars";[37] (3) Rich Dad's December 19, 2005 letter to Zanker asking him to "discontinue any negotiations you are involved in on our behalf"[38] and Rich Dad's December 27, 2005 letter stating that the agreement was "null and void";[39] and (4) Rich Dad's effort to obtain a waiver from Learning Annex on February 14, 2006.[40] Although defendants correctly note that the expression of an intent not to be bound would preclude recovery in *quantum meruit* if that were the end of the story,[41] that

---

[36]    Ex. 47.

[37]    Ex. 60.

[38]    Ex. 94.

[39]    Ex. 96.

[40]    *See* Ex. 143.

[41]    *See Jordan Panel Sys. Corp. v. Turner Constr. Co.*, 841 N.Y.S.2d 561, 565 (1st Dep't 2007) ("[C]ourts of [New York] will give effect to a party's clearly stated intention not to be contractually bound until it has executed a formal agreement."). *Jordan Panel* is also distinguishable because the written agreement contained provisions expressly stating that there would be no liability for any work performed, which is not the case with the MOU. *See id.* at 572 ("In light of the statement in the July 11 term sheet that, if Turner did not sign a subcontract with

is not the case here where subsequent interactions between the parties could support a reasonable expectation of compensation.  Simply put, the fact that Learning Annex and Rich Dad had not yet entered into a legally binding contract, and did not intend for the MOU to have legal effect, does not preclude Learning Annex from having a reasonable expectation of compensation for work performed after communications suggesting a contrary understanding.[42]

Likewise, Rich Dad's argument that a *quantum meruit* recovery is inappropriate here because Learning Annex cannot have a "reasonable expectation of compensation for services rendered in hope of earning profits in a new business venture" fails.[43]  The line of cases referred to by Rich Dad involved failed businesses.[44]  Here, by contrast, a juror could reasonably conclude that Learning

_____

Jordan, 'Turner shall have no liability to make payments for Work performed by [Jordan], if any,' Jordan could not have had any reasonable expectation of compensation for the work it performed in the absence of such a signed subcontract.").

[42]    *See also* Rule 50(a) Opinion, 2011 WL 2732550, at *4-5 (discussing how some of this evidence, in the context of the statute of frauds, could permit a reasonable juror to conclude it was "unlikely . . . the parties contemplated the gratuitous rendition of services") (quotation omitted).

[43]    Def. Mem. at 8.

[44]    *See Beekman Inv. Partners v. Alene Candles*, No. 05 Civ. 8746, 2006 WL 330323, at *2 (S.D.N.Y. Feb. 14, 2006) ("The parties never executed a purchase agreement, nor did the planned transaction occur."); *Songbird Jet Ltd. v. Amax*, 581 F. Supp. 912, 917 (S.D.N.Y. 1984) (failed transaction); *Cunningham v.*

Annex was unfairly cut out of a highly successful business that it had some role (albeit minimal) in creating.  Accordingly, the question of whether Learning Annex had a reasonable expectation of compensation was properly submitted to the jury, there was sufficient evidence to support the jury's verdict on this point, and I do not find this element of the verdict to be a "'seriously erroneous result'" or "'a miscarriage of justice'" warranting a new trial.[45]

### 2.   Services Related to the Development of the Free Seminar Business

Rich Dad argues that there is insufficient evidence to support the jury's verdict that Learning Annex provided "services related to the development of the free seminar business" that Rich Dad formed and operated with Whitney. Rich Dad argues that all of the evidence presented by plaintiffs concerned services performed by Learning Annex for which the jury expressly rejected liability. Specifically, the jury could not find liability based on Learning Annex's promotional services or its introduction of Rich Dad and Whitney.  According to defendants, all of the evidence presented relates to those activities.

However, contrary to defendants' arguments, plaintiffs presented

_____

*Merchant-Sterling Corp.*, 587 N.Y.S.2d 492, 495 (Sup. Ct. N.Y. Co. 1991) (consummated transaction lost money).

[45]   *Tesser*, 370 F.3d at 320 (quoting *Hugo Boss Fashions*, 252 F.3d at 623-24).

evidence of "services related to the development of the free seminar business" by Learning Annex sufficient to support the jury's verdict. Specifically, plaintiffs presented evidence concerning (1) Learning Annex's identification of Whitney as the best sublicensee;[46] (2) Zanker's push for Whitney to submit a proposal, which presented the essential elements of the free seminar business;[47] (3) Zanker's meeting with Whitney in early December 2005 to discuss the proposal and steps to develop the brand;[48] (4) further meetings in January 2006 to develop the free seminar business, with Learning Annex, Whitney, and Rich Dad present;[49] and (5) another meeting in January 2006 with Learning Annex and Whitney discussing subjects for the seminars.[50] Moreover, plaintiffs point out that the business carried out by Rich Dad and Whitney was what Learning Annex conceived and designed (a free seminar followed by a paid three-day program), and the ten percent royalty was the amount Learning Annex suggested. Nothing in the jury's verdict, including its rejection of liability for Learning Annex's introduction of Whitney and Rich Dad, is inconsistent with its finding of liability for "services related to the

---

[46]    *See* Tr. at 129, 154-60.

[47]    *See* Exs. 69, 70.

[48]    *See* Ex. 90.

[49]    *See* Ex. 113.

[50]    *See* Tr. at 412, 527.

development of the free seminar business."  This portion of the verdict is supported by sufficient evidence and is not a "'seriously erroneous result'" or "'a miscarriage of justice.'"[51]

### 3.    Reasonable Value of the Services Rendered

Rich Dad contends that plaintiffs failed to establish the reasonable value of the services that Learning Annex rendered.  According to Rich Dad, the testimony of Learning Annex's expert on compensation standards, Seth Matlins, was insufficient to establish a "clear and accepted marketplace convention"[52] such that a percentage-based recovery would be allowed on a *quantum meruit* claim. Matlins testified about at least nine different compensation arrangements, and Rich Dad argues that none of these models is applicable to Learning Annex's services. Specifically, Rich Dad contends that Matlins' description of a "licensing agent" bore no resemblance to the work performed by Learning Annex.  Finally, because plaintiffs presented no evidence as to their hours worked and a reasonable hourly rate for such services, Rich Dad argues that plaintiffs have failed to establish the reasonable value of their services.

Learning Annex responds that uncontradicted expert testimony

---

[51]     *Tesser*, 370 F.3d at 320 (quoting *Hugo Boss Fashions*, 252 F.3d at 623-24).

[52]     *Carlino*, 139 F. Supp. 2d at 565.

supports the jury's finding that Learning Annex established the reasonable value of the services they provided.  Matlins testified that the industry standard of payment for licensing agents is thirty-five percent, and the jury awarded thirty-five percent of the audited financial statements of defendants' revenues.[53]  Moreover, Learning Annex contends that the evidence demonstrates that the services it rendered are those of a licensing agent.  The purpose of the MOU was to bring Rich Dad's "brand to the 'next level,'" and Zanker monetized the brand by convincing Kiyosaki to use the free seminar business to spread the Rich Dad name and message all over the country.[54]  Plaintiffs also cite to the evidence discussed above relating to the services Learning Annex provided in developing the free seminar business.[55]

The entire evidentiary basis for the jury's determination of the "reasonable value" of Learning Annex's services rests solely on the following brief testimony by Matlins:

> Q. Mr. Matlins, is one of those categories something called licensing representation?

---

[53]     *See* Ex. 212.

[54]     Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial ("Opp. Mem.") at 18.

[55]     *See supra* Part IV.A.2.

A. Yes, it is.

Q. And could you please describe that for the jury?

A. Yeah, absolutely. A licensing agent, a licensing representative will take on the responsibility for monetizing. And when I say monetizing, you'll forgive me if I define that, which is to make money on a given brand. So an example of that might be, let's use Coca Cola, again. Coca Cola is in the business of selling brand coke Coca Cola, fizzy sugar water. They, however, make a great deal of money through licensing everything from T-shirts to teddy bears and cups and mirrors and posters and hats. A licensing agent will represent those endeavors and those initiatives *on a certain basis and on certain terms*.

Q. And what is the industry standard, the type of fee a licensing agent would ordinarily receive?

A. 35 percent is the industry standard.

Q. And it's 35 percent of what?

A. Licensing revenues generated.

Q. [What a]re licensing revenues?

A. Royalties, typically speaking.

Q. And that would be royalties to the client?

A. To the licensor, yes.

Q. So Coke -- so Coca Cola license, I'll just give an example. If Coca Cola licensed its right to use its image on a T-shirt and Coca Cola received $1,000 as a royalty payment for that, how much typically would the licensing agent get?

A. It would have been easier if you used 100 because I could do that math, but $350.

Q. And is that 35 percent, is there a range?

A. Yes, there are -- excuse me, I'm sorry. There are always ranges, but 35 percent is the industry standard.[56]

Although there is some minimal evidence supporting the jury's award

---

of approximately $14.6 million in damages,[57] I find that this result was a

"'seriously erroneous result'" and "'a miscarriage of justice'" warranting a new

trial on damages.[58]  *First*, there was extremely little evidence to support a finding

that Learning Annex acted as a licensing agent as Matlins described it.  Matlins

simply testified that a licensing agent monetizes a brand, and gave the example of

Coca Cola making profits by licensing its brand to sell various merchandise.

Further, Matlins' testimony that a "licensing agent will represent those endeavors

and those initiatives on a *certain* basis and on *certain* terms,"[59] simply begs the

question – on what basis and what terms might a licensing agent represent a

licensing endeavor?  Learning Annex's counsel never asked this question.  Instead,

the jury was left with little guidance to determine whether Learning Annex's

services might fit within the rubric of services provided by a licensing agent.  The

most discernable connection to the work of a licensing agent in the record here is

that the free seminar business involved licensing agreements; however, Learning

Annex *never* participated in the negotiation of those licensing agreements.  The

---

[57]     *See id.* ("Q. And what is the industry standard, the type of fee a licensing agent would ordinarily receive? A. 35 percent is the industry standard.").

[58]     *Tesser*, 370 F.3d at 320 (quoting *Hugo Boss Fashions*, 252 F.3d at 623-24).

[59]     Tr. at 562:18-20 (emphasis added).

evidence merely showed that Learning Annex identified potential sublicensees, participated in meetings, and encouraged proposals.  The jury had little basis to conclude that Matlins' imprecise testimony proved that such minimal services constitute the work of a licensing agent.[60]

        Learning Annex's attempt to piece together fragments of the record to support the verdict is unavailing.  Learning Annex argues that testimony showing that Zanker sought to bring the Rich Dad brand to the "next level" and "make some real money" support the jury's verdict.[61]  However, these statements are too vague to establish that the services Learning Annex provided should be compensated as the services of a licensing agent based on Matlins' sparse testimony.  In addition, Learning Annex argues that Zanker "spent over two years convincing RD that the free seminar business would provide an opportunity for Mr. Kiyosaki to remain in Arizona and perform very little work, while spreading the RD name and message all over the country."[62]  However, the work Zanker did for the two years before the

---

[60]    *See Space Hunters*, 429 F.3d at 429 (holding that judgment as a matter of law is appropriate where "the jury's findings could only have been the result of sheer surmise and conjecture").

[61]    Opp. Mem. at 18.

[62]    *Id.*

20

MOU is not relevant to this action.[63]  Learning Annex also points to testimony that (1) "LA persuaded RD to consider monetizing the brand" with the free seminar business; (2) "LA aggressively pushed Whitney for a proposal and then met with Whitney"; and (3) "LA then arranged a meeting for all three of the parties to discuss an agreement and a joint venture."[64]  As discussed above, the jury's apparent finding that Learning Annex's work in arranging meetings and soliciting proposals are the standard functions of a licensing agent based solely on Matlins' testimony is a seriously erroneous result and a miscarriage of justice warranting a new trial on this element.  Although I permitted the jury to determine the nature of the services that Learning Annex provided,[65] that ruling did not abrogate plaintiffs' burden to produce adequate evidence of each possible compensation model to support a jury verdict.

   *Second*, even if Matlins' testimony adequately established that Learning Annex acted as a licensing agent, the jury's conclusion that the reasonable value of the minimal services rendered by Learning Annex is thirty-five

---

  [63] *See* Tr. at 936-97 ("At the start of the relationship, it was agreed that each man would profit off additional sales of products that each had developed and owned before entering the relationship; products that they, themselves, brought into the relationship with them.").

  [64] Opp. Mem. at 19.

  [65] *See* 6/18/11 Order [Docket No. 87] at 6.

percent of Rich Dad's royalties is an erroneous result and a miscarriage of justice.

Plaintiffs have failed to establish a "clear and accepted marketplace convention"[66]

with respect to licensing agents.  In *Carlino v. Kaplan*, Judge Alvin Hellerstein

noted that, although *quantum meruit* damages are normally calculated based on an

hourly rate, there are

> well-recognized exceptions based on clear and accepted market
> place conventions. Real estate and other business brokers and
> finders are generally compensated by percentages of the purchase
> price customary to the locality or the business.  Where a business
> appropriates an invention or project devised by another and would
> be unjustly enriched by the appropriation, a percentage of the
> profits produced by that invention or device is likely to be
> awarded.  In such cases, the value of the benefit conferred is likely
> to be disproportionate to the value of the services rendered,
> causing unjust and inequitable results if compensation were to be
> based on hourly rates rather than the benefits that were
> appropriated.[67]

In *Carlino*, Judge Hellerstein declined to allow damages based on a percentage

method, because plaintiff failed to demonstrate an industry standard for consulting

agreements in the adult entertainment industry when plaintiff submitted various

consulting agreements to the court that did "not follow any well-established

convention, but var[ied] greatly in defining the scope of services provided by the

consultants, the length of time over which the services were to be delivered, and

---

[66]     *Carlino*, 139 F. Supp. 2d at 565.

[67]     *Id.*

er

the amounts of consulting fees and incentive payments that the adult entertainment

clubs agreed to pay."[68]

Like the evidence in *Carlino*, the testimony here established that

"there are always *ranges*"[69] to the scope of compensation for licensing agents, who

"represent . . . endeavors and . . . initiatives on a *certain* basis and on *certain*

terms."[70]  Learning Annex offered *no* evidence as to (1) the range of percentages

for compensating licensing agents; (2) the variables that would effect whether the

compensation would be on the high or low end of that range.[71]  In other words,

Matlins' *ipse dixit* statement that the industry standard is thirty-five percent did not

establish a "clear and accepted marketplace convention"[72] where there is

admittedly a range of compensation models and *no* evidence has been introduced

---

[68]     *Id.* at 566.

[69]     Tr. at 563:11-13 [Matlins] (emphasis added).

[70]     *Id.* at 562:18-20 [Matlins] (emphasis added).

[71]     Matlins did testify as to the range of other compensation models and
the variables that determine where in that range particular services would fall.
However, these models were rejected as a basis for liability, so I need not
determine whether they were sufficient to sustain a verdict.  *See, e.g.*, Tr. at 568
("Q. . . . . [W]hat is the industry standard . . . for a percentage of revenues that
promoters would take?  A. It does depend on what type of promoter, what caliber
promoter and what type of event we're talking about, and then the industry
standards will differ based on ticket revenue and non-ticket revenue.").

[72]     *Carlino*, 139 F. Supp. 2d at 565.

as to how wide that range is or where Learning Annex's services might fit on that

range.  Indeed, I previously ruled that

> after hearing Matlins' expert opinion as to the typical
> compensation *structure* for a particular type of deal and the typical
> *range* of commissions and/or percentages of
> fees/revenues/royalties paid in such deals, the jury may use that
> information to decide whether the services allegedly provided by
> Learning Annex – which Plaintiffs intend to identify at trial – fall
> into anyone (or several) of those categories. They may use that
> information further to decide whether the reasonable value of
> [LA's] services should be determined by reference to an hourly or
> percentage rate and, if the latter, whether that percentage should
> be based on profits, revenues, or some other metric and what that
> percentage should be.[73]

Despite this ruling, plaintiffs offered no expert testimony on the *range* of

commissions to licensing agents.  Once again, the ruling permitting Matlins'

testimony did not abrogate plaintiffs' obligation to present adequate evidence, for

each particular compensation model, to support a jury verdict that the "reasonable

value of the services"[74] provided were a certain percentage of Rich Dad's royalties.

Under these circumstances, the jury's verdict that Learning Annex is entitled to

nearly $14.6 million because of the minimal services rendered is a "'seriously

---

[73]   6/18/11 Order at 6 (quotation omitted).

[74]   *Mid-Hudson Catskill*, 418 F.3d at 175.

erroneous result'" and "'a miscarriage of justice'"[75] requiring a new trial on damages.

### 4.   CTI

Defendants argue that plaintiffs' claim against CTI should be dismissed because "there is no evidence that CTI earned revenues upon which, under plaintiffs' theory, an award of damages based on a percentage fee could be sustained against CTI."[76]  Plaintiffs point to the following evidence to support the verdict against CTI – (1) CTI signed the MOU;[77] (2) Lechter's September 15, 2005 letter was on combined Rich Dad/CTI letterhead;[78] (3) the contemplated venture was among LA, Whitney, and CTI;[79] (4) CTI's report for "sales by division" captures defendants' income from similar businesses;[80] (5) as owner of Rich Dad trademarks and intellectual property, CTI must at least benefit from licensing

---

[75]    *Tesser*, 370 F.3d at 320 (quoting *Hugo Boss Fashions*, 252 F.3d at 623-24).  I note that together with prejudgment interest the jury's award now amounts to approximately $20 million for a few months of work.

[76]    Def. Mem. at 15.

[77]    *See* Ex. 41A.

[78]    *See* Ex. 47.

[79]    *See* Ex. 122A.

[80]    *See* Ex. 197.

royalties paid for such intellectual property.[81]

The shreds of evidence pointed to by plaintiffs are insufficient to support a jury verdict against CTI.  The first three pieces of evidence that plaintiffs rely on merely show that at one point CTI contemplated being a part of the venture. However, it was ultimately Rich Dad that received the benefit of the services Learning Annex provided to expand the free seminar business.  The main evidence submitted in favor of CTI's liability is a spreadsheet showing that CTI earned revenues from plaintiffs' coaching and seminar services.[82]  However, as discussed, the jury rejected liability for such services.  Finally, plaintiffs' argument that CTI "must" have benefitted from Learning Annex's services because CTI owns Rich Dad's intellectual property is too speculative to sustain a verdict.  Because the services rendered by Learning Annex for which the jury found defendants liable were performed for the benefit of, and accepted by Rich Global, LLC, not CTI, I grant CTI judgment as a matter of law on the *quantum meruit* claim against it.

### B.    Unjust Enrichment Claim

Plaintiffs argue that the Unjust Enrichment Opinion was in error and that their unjust enrichment claim should be reinstated.  *First*, plaintiffs contend

---

[81]    *See* Pl. Opp. Mem. at 15.

[82]    *See* Ex. 197.

that New York law permits plaintiffs to "proceed with alternative legal theories as long as the theories and remedies sought are consistent with each other," and that Learning Annex's claims for *quantum meruit* and unjust enrichment are not inconsistent.[83] *Second*, plaintiffs point to caselaw where courts have analyzed unjust enrichment and *quantum meruit* separately.  Although courts *may* analyze the claims together, plaintiffs argue that there is no obligation to merge the claims after they have been litigated separately to a jury verdict.[84]

As I have previously noted, I recognize there is a lack of clarity in this area of law.[85]  Although I appreciate the need for a clearer statement of law as to whether both *quantum meruit* and unjust enrichment claims are available to recover the value of services rendered, I decline to reverse my prior ruling dismissing plaintiffs' unjust enrichment claim.  None of plaintiffs' arguments, which I will address in turn, satisfy the standard for reconsideration, which requires that plaintiffs identify "'controlling decisions or data that the court

---

[83]     Plaintiffs' Memorandum of Law in Support of Their Motion to Reinstate Their Claim for Unjust Enrichment and for Entry of Judgment on that Claim ("Pl. Mem.") at 9-10.

[84]     *See id.* at 11-12.

[85]     *See* Unjust Enrichment Opinion, 2011 WL 3586138, at *2 ("Neither the New York Court of Appeals nor the Second Circuit (interpreting New York law) has explained precisely how to proceed when both *quantum meruit* and unjust enrichment are pled.").

overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'"[86]

Plaintiffs' first argument misapprehends the Unjust Enrichment Opinion.  There is no dispute that a plaintiff may receive a judgment based on two consistent legal theories.[87]  The issue here, however, is whether *quantum meruit* and unjust enrichment are distinct grounds for recovery in the context of a claim for services rendered in the absence of an enforceable contract.  Unless and until binding case law holds otherwise, I conclude that they are not distinct grounds for recovery.

Plaintiffs' only attempted distinction of two Second Circuit opinions affirming the merger of *quantum meruit* and unjust enrichment claims – *Newman & Schwartz v. Asplundh Tree Expert Co.*[88] and *Mid-Hudson Catskill*[89] – is that the district courts merged the unjust enrichment and *quantum meruit* claims early in

---

[86]    *In re BDC 56 LLC*, 330 F.3d at 123 (quoting *Shrader*, 70 F.3d at 257).

[87]    *See, e.g.*, *Siderpali, S.P.A. v. Judal Indus. Inc.*, 833 F. Supp. 1023, 1033 (S.D.N.Y. 1993) ("A party must elect between two remedies only when the remedies available to a party are inconsistent or mutually exclusive.").

[88]    102 F.3d 660, 663 (2d Cir. 1996) ("Counts Two and Three for quantum meruit and unjust enrichment were quite properly subsumed by the district court into a single count for restitution.").

[89]    418 F.3d at 175 ("Applying New York law, we may analyze quantum meruit and unjust enrichment together as a single quasi contract claim.").

the proceeding, while here both claims were submitted to the jury (the unjust enrichment claim for an advisory verdict). This distinction is unavailing. Simply because I erred in permitting both claims to proceed independently, when the unjust enrichment claim should properly have been "subsumed" into the *quantum meruit* claim,[90] does not prevent me from correcting that error later in the proceedings, even after a jury verdict.[91]

Plaintiffs' reliance on caselaw analyzing the distinct elements of unjust enrichment and *quantum meruit* separately is insufficient to require reconsideration of the Unjust Enrichment Opinion. Indeed, the Unjust Enrichment Opinion recognized that courts have analyzed unjust enrichment and *quantum meruit* applying different legal standards and that courts have distinguished the "causes of action based on the type of, and rationale for, the relief sought."[92] Nonetheless, I concluded that, in the context of services rendered, both theories

---

[90]    *See Newman & Schwartz*, 102 F.3d at 663.

[91]    However, I note that another case that defendants rely on to support the proposition that *quantum meruit* and unjust enrichment are identical in the context of services rendered does not bear the weight defendants give it. *Snyder v. Bronfman* states that "unjust enrichment and quantum meruit are, *in this context*, essentially identical claims." 893 N.Y.S.2d 800, 802 (2009) (emphasis added). *Snyder* is referring to the context of the application of the statute of frauds, and its holding does not necessarily extend any further.

[92]    Unjust Enrichment Opinion, 2011 WL 3586138, at *2.

seek to recover the reasonable value of the services rendered, and that "courts 'may analyze *quantum meruit* and unjust enrichment together as a single quasi contract claim,' or as a single claim for unjust enrichment."[93]   Moreover, the cases relied on by plaintiffs do not contain any analysis for whether *quantum meruit* and unjust enrichment are distinct theories of recovery for services rendered.[94]   Accordingly, plaintiffs have failed to demonstrate that the dismissal of the unjust enrichment claim was erroneous, and I decline to reinstate plaintiffs' claim for unjust enrichment.

## V.   CONCLUSION

For the aforementioned reasons, defendants' Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial is granted in part to the extent I grant judgment as a matter of law to CTI and a new trial on damages to Rich Global, LLC.  Plaintiffs' Motion to Reinstate Their Claim for Unjust Enrichment and for Entry of Judgment on that Claim is denied.  The Clerk of the Court is

---

[93]   *Id.* (quoting *Mid-Hudson Catskill*, 418 F.3d at 175).

[94]   *See Argilus, LLC v. PNC Fin. Servs. Grp., Inc.*, 419 Fed. App'x 115, 119-20 (2d Cir. 2011) (summarily dismissing *quantum meruit* and unjust enrichment claims asserted by different parties on different facts, where the unjust enrichment claim was not based on services rendered); *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004) (dismissing *quantum meruit* and unjust enrichment claims on the same grounds based on relationship terminable at-will).

directed to close this motion [Docket No. 130].[95]  A conference is scheduled for

January 25, 2012 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            January 11, 2012

---

[95]     Plaintiffs' Motion to Reinstate Their Claim for Unjust Enrichment and
for Entry of Judgment on that Claim was not docketed as a motion.

31

**-Appearances-**

**For Plaintiffs:**

Jonathan Harris, Esq.                    David Deitch, Esq.
Julie Withers, Esq.                      Ifrah PLLC
Charlotte Houghteling, Esq.              1627 Eye Street NW, Suite 1100
Harris Cutler & Houghteling LLP          Washington, D.C. 20006
111 Broadway, Suite 402                  (202) 524-4147
New York, New York 10006
(212) 397-3370

Edwin G. Schallert, Esq.
Debevoise & Plimpton, LLP
919 Third Avenue, 31st Floor
New York, New York 10022
(212) 909-6000

**For Defendants:**

John D. Rapoport, Esq.
John D. Rapoport, PC
c/o Marulli, Lindenbaum, LLP
5 Hanover Square, 4th Floor
New York, New York 10022
(914) 588-3415

Lewis Richard Clayton, Esq.
Daniel J. Leffell, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3215