UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEARNING ANNEX HOLDINGS, LLC,
LEARNING ANNEX, LLC, and
LEARNING ANNEX, L.P.,

                Plaintiffs,

        v.

RICH GLOBAL, LLC and
CASHFLOW TECHNOLOGIES, INC.,

            Defendants.

09 Civ. 4432 (SAS) (GWG)

---

## DEFENDANT RICH GLOBAL LLC'S
## MEMORANDUM IN SUPPORT OF MOTIONS *IN LIMINE*

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
Lewis R. Clayton
Daniel J. Leffell
John H. Longwell
1285 Avenue of the Americas
New York, New York 10019
Tel.  (212) 373-3000

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ ii

I.    MOTION *IN LIMINE* #1: TO EXCLUDE THE
      TESTIMONY OF SETH MATLINS ........................................................................ 2

      A.    Mr. Matlins Is Not Qualified To Provide Expert
            Testimony on the Role or Compensation of a Licensing Agent. ........................... 3

      B.    Mr. Matlins' Conclusions About LA's Role Rest
            on Improper Factual Assumptions. ...................................................................... 10

            1.    "Introducing" ............................................................................................. 11

            2.    "Conceiving" ............................................................................................. 11

II.   MOTION *IN LIMINE* #2: TO EXCLUDE EVIDENCE OF
      RICH GLOBAL'S ALLEGEDLY IMPROPER TERMINATION
      OF THE RELATIONSHIP WITH LEARNING ANNEX .............................................. 13

III.  MOTION *IN LIMINE* #3: TO EXCLUDE EVIDENCE OF
      LEARNING ANNEX'S EXPECTATION OF A PERCENTAGE OF
      REVENUES FROM THE WHITNEY VENTURE........................................................ 14

IV.   MOTION *IN LIMINE* #4: TO EXCLUDE EVIDENCE OF
      SERVICES EITHER NOT PERFORMED OR FOR
      WHICH THE JURY REJECTED LIABILITY ............................................................. 16

V.    MOTION IN LIMINE #5: TO EXCLUDE MOU1 ...................................................... 17

CONCLUSION ...................................................................................................................... 17

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ancho* v. *Pentek Corp.*,
  157 F.3d 512 (7th Cir. 1998)..................................................................7

*Aristocrat Leisure Ltd.* v. *Deutche Bank Trust Co. Ams.*,
  No. 04 Civ. 10014 PKL, 2009 WL 3111766 (S.D.N.Y. Sept. 28, 2009)..............14

*United States* v. *Chang*,
  207 F.3d 1169 (9th Cir. 2000)..................................................................7

*Gable* v. *Nat'l Broad. Co.*,
  727 F. Supp. 2d 815 (C.D. Cal. 2010)......................................................7, 8

*Hettinger* v. *Kleinman*,
  733 F. Supp. 2d 421 (S.D.N.Y. 2010)..........................................................15

*Katt* v. *City of N.Y.*,
  151 F. Supp. 2d 313 (S.D.N.Y. 2001)..........................................................14

*Kumho Tire Co., Ltd.* v. *Carmichael*,
  526 U.S. 137 (1999) ..................................................................4

*Lantec, Inc.* v. *Novell, Inc.*,
  306 F.3d 1003 (10th Cir. 2002)..........................................................6, 10

*Mem'l Drive Consultants, Inc.* v. *Ony, Inc.*,
  29 F. App'x 56 (2d Cir. 2002)..........................................................15

*Revson* v. *Cinque & Cinque, P.C.*,
  221 F.3d 59 (2d Cir. 2000)..........................................................15

*Shreve* v. *Sears, Roebuck & Co.*,
  166 F. Supp. 2d 378 (D. Md. 2001) ..................................................................7

*Thomas J. Kline, Inc.* v. *Lorillard, Inc.*,
  878 F.2d 791 (4th Cir. 1989)..................................................................7

*Three Crown Ltd. P'ship* v. *Salomon Bros., Inc.*,
  906 F. Supp. 876 (S.D.N.Y. 1995)..........................................................13

OTHER AUTHORITIES

Fed. R. Evid. 401..........................................................13, 16, 17

Fed. R. Evid. 402..........................................................13, 16, 17

Fed. R. Evid. 403..........................................................14, 16, 17

Fed. R. Evid. 702..........................................................4, 12, 13

Fed. R. Evid. 703..........................................................10

## INTRODUCTION

Pursuant to the Court's order at the January 25, 2012, status conference, Defendant Rich Global LLC ("Rich Global") hereby submits its motions *in limine* in respect of the retrial on damages in this matter, which is scheduled to begin on April 23, 2012.

In this omnibus brief, Rich Global first moves *in limine*:

1.      To exclude the testimony of Seth Matlins, the putative expert proffered by Plaintiffs (collectively, "Learning Annex" or "LA"), on the grounds that (1) he is unqualified to provide expert opinions on the role and compensation of licensing agents and (2) his opinions are based on improper factual assumptions.

Rich Global also makes the following motions *in limine* seeking to ensure that the evidence at trial is tailored to the narrow scope of the issue for the jury, namely, to determine the reasonable value of services actually rendered by Learning Annex related to the development of the free seminar business:

2.      To exclude any evidence of or reference to allegedly improper conduct by Rich Global in the termination of its relationship with Learning Annex, on the grounds that such evidence is irrelevant and unduly prejudicial.

3.      To exclude any evidence of or reference to Learning Annex's expectation of participating in the free seminar venture or sharing in its revenues, on the grounds that such evidence is irrelevant and unduly prejudicial.

4.      To exclude any evidence of or reference to services either not performed by Learning Annex or for which the jury has rejected liability, on the grounds that such evidence is irrelevant and unduly prejudicial.

5.      To exclude any evidence of or reference to the parties' September 7, 2005, memorandum of understanding ("MOU1"), on the grounds that such evidence is irrelevant and unduly prejudicial.

Rich Global respectfully reserves the right to raise additional motions *in limine* to the extent they are necessitated by additional disclosures or positions taken on the evidence by Learning Annex subsequent to the date of this filing.

## I.
## MOTION *IN LIMINE* #1:
## TO EXCLUDE THE TESTIMONY OF SETH MATLINS

On March 5, 2012, Learning Annex disclosed the Supplemental Expert Report of Seth Matlins ("Supplemental Report"), a former marketing executive who testified at the initial trial about the roles of various agents and other participants in the entertainment industry and their compensation. (Ex. A,[1] July 2011 Trial Tr. at 553.)  In the Supplemental Report, Mr. Matlins opines as to the purported role of a "licensing agent" (Ex. B, Matlins Supp. Rept. ¶¶ 20-21), and the "clear and accepted industry standard" compensation for such an agent (*id.* ¶ 23). Mr. Matlins then concludes, purportedly based on the "facts of the case" (*id.* ¶ 31), that LA "played the role of a licensing agent in connection with the free seminar business" (*id.* ¶ 32), and that LA "is reasonably due 35% of the gross revenues Rich Dad received as the licensor of the free seminar business" (*id.* ¶ 37).

The proposed testimony of Mr. Matlins should be excluded, in its entirety, for two independent reasons: *first*, because Mr. Matlins is not qualified to offer expert opinion on the role or compensation of a licensing agent, and, *second*, because Mr. Matlins has based his

---

[1]    All references to "Ex. __" refer to exhibits attached to the accompanying Declaration of Lewis R. Clayton.

opinion about LA's role, in significant part, on services either not performed by LA or for which the initial jury expressly rejected liability.

**A.    Mr. Matlins Is Not Qualified To Provide Expert Testimony on the Role or Compensation of a Licensing Agent.**

Although Mr. Matlins goes to great lengths in the Supplemental Report to bolster his qualifications, at deposition it became clear that Mr. Matlins' qualifications are woefully insufficient to provide expert testimony with regard to the role and compensation of licensing agents.  Most significantly:

- Mr. Matlins conceded that the only actual licensing agency agreements he has *ever seen* were those submitted by Defendant's expert, Thomas Pastore, in support of Mr. Pastore's expert report.  (Ex. C, Matlins Mar. 15, 2012 Dep. Tr. at 373:9-17 ("Q: [A]re those the only licensing agency agreements that you can identify that you've actually seen?  A:  Mr. Pastore's?  Q:  Yes.  A:  Actual papered agreements, yes."); 254:12-14 ("I have never seen the individual agreements because that is not a level I have played.").)

- Mr. Matlins admitted that if he had been personally involved in *any* transactions involving a licensing agent, they would have been "[v]ery, very few, because if a licensing agent was involved, I wouldn't have been directly involved in them." (*Id.* at 86:2-4.)

- Other than "being pitched" or "pitching" a handful of transactions that never came to fruition, Mr. Matlins could *not identify any particular transaction* in his entire experience in which a licensing agent was to be paid based on a commission. (*Id.* at 255:15-256:13.)

3

In light of these admissions, Defendant respectfully submits that Mr. Matlins is unqualified to offer opinions on the role and compensation of licensing agents. The federal rules require that a witness proposing to offer an expert opinion must be "qualified as an expert by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702. Because of the substantial risk of prejudice when a jury hears unreliable expert testimony, the district court acts as a "gatekeeper" to preclude such testimony. *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 141 (1999) ("*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The Court's gatekeeping is needed here. Because Mr. Matlins has never even seen a licensing agency agreement (other than those submitted by Defendant's expert in this case), and lacks sufficient experience with licensing agents to make up for this shortcoming, he lacks the relevant "knowledge" and "experience" to offer expert testimony on the role and compensation of licensing agents.

The Supplemental Report mischaracterizes Mr. Matlins' prior experience, suggesting it is relevant to the business of licensing agents when in fact it is not. Mr. Matlins repeatedly claims to have been "*in and around* licensing proposals, programs, and agencies" during his more than 25-year career in Hollywood. (Ex. B ¶ 3 (emphasis added); Ex. C at 49:11-12; 181:5; 110:25-111:6 ("Q: And when you say in and around licensing, are you referring to licensing more broadly than . . . deals involving licensing agents? A: Yes.").) He also cites his involvement in "hundreds of deals" involving the "right and license" for one party to use the brand or intellectual property of another. (Ex. B ¶ 4.) But upon examination, Mr. Matlins

conceded that his experience was solely "around" and *not* "in" the business of licensing agents, and not very proximately "around" at that.

For example, although Mr. Matlins provides in the Supplemental Report a list of *eighteen* transactions purporting to involve "licensing" (*id.* ¶ 18), at deposition he conceded that he was not involved in any of those transactions, and had no idea whether any of them involved licensing agents (Ex. C at 249:6-253:24). The same is true of the "hundreds of deals" that Mr. Matlins cited as providing a basis for his opinions (Ex. B ¶ 4): at deposition, he stated that "very, very few" of them involved licensing agents (Ex. C at 85:23-86:17).

Indeed, the only direct experience with licensing agents that Mr. Matlins could identify was extremely minimal (contrary to the impression the Supplemental Report conveys). Over his 25-year career, Mr. Matlins could identify only the following:

- Mr. Matlins said he was "pitched" by licensing agents between 1989 and 1994, when he was an executive at Evian. Although he could not identify any of the agents involved or any other terms of the licensing deals being "pitched," he claims to recall specifically that the agents were seeking a 35% commission. (*Id.* at 181:24-184:7.)

- In his report, Mr. Matlins claims to have had responsibility for his firm's joint venture with CMG, a licensing agency, while at ProServ in the late 1990s. Although Mr. Matlins characterized this experience as "running the licensing division" of ProServ in his report (Ex. B ¶ 24), he conceded upon examination that he did not in fact oversee CMG's operations (Ex. C at 205:4-7), never even saw the joint venture agreement (*id.* at 200:18-20), and could not identify a specific transaction that ProServ ever did with CMG (*id.* at 194:24-195:7).

- Mr. Matlins stated that while at Rock the Vote, he called Seth Siegel, a licensing agent with the Beanstalk agency, and was told that he would charge a 35% commission for acting as Rock the Vote's licensing agent. (*Id.* at 67:13-68:14.)  Rock the Vote did not retain Mr. Siegel and did not do any licensing deals. (*Id.*)

- Mr. Matlins stated that while at CAA, he represented an author who was considering licensing her brand; once again, he called Mr. Siegel at Beanstalk. (*Id.* at 68:24-69:24.) He stated that he recalls that Mr. Siegel would charge a 35% commission, but no other terms of the proposal, which was abandoned. (*Id.* at 70:24-71:5.)

     In sum, Mr. Matlins' experience with licensing agents amounts to nothing more than a handful of conversations over the course of a 25-year career, none of which actually resulted in the engagement of a licensing agent to represent a licensor. (*Id.* at 261:10-262:10 (discussing basis of Mr. Matlins' opinions).)  This is simply not sufficient to qualify Mr. Matlins as an expert on the role or compensation of licensing agents. *See, e.g., Lantec, Inc.* v. *Novell, Inc.*, 306 F.3d 1003, 1025-26 (10th Cir. 2002) (finding "particularly troubling" putative expert's reliance on "personal experience" consisting of "anecdotes from a handful of personal conversations" and "attemp[t] to spin" such experience into a basis for expert opinion).

     Mr. Matlins suggests that his lack of experience with licensing agents is insignificant because he spent his career in the field of "marketing," of which he claims "licensing" is a part. (Ex. C at 12:13-13:4 ("Q:  Is your 25 years of experience, would you characterize that as in the licensing industry?  A:  I would characterize my experience as being in the marketing industry and licensing is a component part of marketing."); 15:19-16:19 ("Q: Your experience is in the marketing industry, correct?  Would you consider yourself a specialist

in licensing?  A:  I am not a licensing agent."); 63:24-64:8 ("Q:  Do you live licensing in the same way that you live marketing?  A:  I do not.").)

      But Mr. Matlins is wrong: as court after court has held, where a putative expert's opinions relate to a specialty within a broader field, general experience in the broader field does not make up for a lack of experience in the specialty.  *See, e.g.*, *Shreve* v. *Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392 (D. Md. 2001) ("[A]n expert who is a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering.  Unless he is to testify only to general engineering principles that any mechanical engineer would know, the engineer must possess 'some special skill, knowledge, or experience' concerning the particular issue before the Court."); *Gable* v. *Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 830-31, 833 (C.D. Cal. 2010) (rejecting opinions of proffered experts in entertainment industry standards and similarity of literary works); *United States* v. *Chang*, 207 F.3d 1169, 1172-73 (9th Cir. 2000) (upholding district court's exclusion of expert where his "'practical experience in international finance' did not amount to practical experience determining whether a particular security is counterfeit"); *Ancho* v. *Pentek Corp.*, 157 F.3d 512, 517 (7th Cir. 1998) (mechanical engineer with no experience designing or evaluating factories not an expert on industrial plant configuration); *Thomas J. Kline, Inc.* v. *Lorillard, Inc.*, 878 F.2d 791, 799-800 (4th Cir. 1989) (rejecting opinion of proposed expert where there "was no indication, for example, that [expert's] general business education included any training in the area of antitrust or credit" and expert "admitted that she lacked any other experience in such matters").

      At deposition, it became clear that Mr. Matlins' actual "marketing" experience has no relevance to the role and compensation of a licensing agent.  To the contrary, Mr. Matlins conceded that his experience was predominantly in working as a marketing advisor to corporate

clients in areas other than licensing. (*See, e.g.*, Ex. C at 123:9-12 ("Q: Would licensing agents typically be involved in these deals with the corporate clients you did at ProServ? A: No. . . ."); 218:6-8 ("Q: Did you represent corporate clients primarily in the marketing group? A: Primarily, yes.").) These clients typically paid Mr. Matlins' firm a retainer, not commissions, for Mr. Matlins' work, which revolved around sponsorship and endorsement deals. (Ex. D, Matlins May 10, 2011 Dep. Tr. at 34:8-14 ("Our corporate clients [at CAA] were typically not on commission structure. They were on retainer fee.").) To the extent these corporate clients were involved in licensing their brands, they worked with in-house licensing professionals (who do not charge commissions) or third-party agencies with which Mr. Matlins had little very contact, if any. (*See, e.g.*, Ex. C at 86:11-22; 126:25-127:6; 127:18-128:2; 129:5-8.) Such experience is simply not "sufficiently related to the subject matter upon which [Mr. Matlins] offers an opinion." *Gable*, 737 F. Supp. 2d at 833.

At deposition, it also became clear that even experiences Mr. Matlins emphasizes in the Supplemental Report as involving licensing did not include *his* personal involvement with licensing or licensing agents. Mr. Matlins' claim to being "'present at the creation' of CAA's Licensing business unit" and assertion that he "hired the person who started the Licensing Group at CAA" are good examples. (Ex. B ¶ 9.) Mr. Matlins conceded that he hired the person in question for *his* group—the Marketing Group—and she was subsequently transferred to the Licensing Group. (Ex. C at 222:19-223:4 ("I didn't hire her for the licensing group. I hired her for the marketing group.").) And Mr. Matlins testified that his understanding of commissions charged by the Licensing Group arose from a single staff meeting. (*Id.* at 49:15-19 ("So, for example, I was not directly involved in CAA's licensing business. I was, however, a senior executive at CAA when we got into the licensing business."); 225:2-17 ("Q: Beyond [CAA's

Lisa Shotland] saying that they were getting into the business because of a 35 percent commission . . . did you have any further involvement with the licensing group regarding its commissions?  A:  No.  Q:  So you don't know one way or the other whether they actually charged the 35 percent commission to any client, do you?  A:  I have not been privy to the agreements.").)

Despite the inadequacy of his qualifications to opine on licensing agents from experience, Mr. Matlins did not attempt to review any actual licensing agent agreements, nor did he review any literature or conduct formal research.  (*Id.* at 307:14-18 ("I don't need to validate 25 years of experience, quite frankly, as this proves.  If I didn't know what I was doing, I wouldn't be serving as an expert witness.").)  And although Mr. Matlins states that he has published or appeared in numerous media outlets, none of his articles or appearances had anything to do with licensing.  (*E.g.*, *id.* at 24:23-25:8.)

Finally, Mr. Matlins attempted to bolster his experience in the Supplemental Report by reference to "conversations with individuals who are in the industry."  (Ex. B ¶ 15.) As with much else in the report, though, these conversations turned out not to be what they seemed.  At deposition, Mr. Matlins originally stated that he had "spoken with the head of licensing for Fremantle," "heard from the head of licensing for the NBA International," and spoken to Mr. Matlins' attorney.  (Ex. C at 5:20-6:4.)  When pressed, however, Mr. Matlins revealed that the head of licensing at Fremantle was "David somebody," with whom Mr. Matlins had never spoken, and that his information was secondhand through a former Fremantle employee.  (*Id.* at 6:25-7:4.)  Similarly, Mr. Matlins could not identify the head of licensing at the NBA International, and claimed only to have received information through a former employee.  (*Id.* at 9:3-4.)  Like the rest of the casual conversations that form the basis of Mr.

Matlins' opinions on licensing agents, these double-hearsay conversations with purported industry sources do not constitute the kinds of facts or data upon which "experts in the field would reasonably rely . . . in forming opinions on the subject," rendering his opinions inadmissible under Rule 703 of the Federal Rules of Evidence. *See also, e.g., Lantec*, 306 F.3d at 1025-26. And to the extent Mr. Matlins is permitted to testify at all, Rich Global respectfully requests that the Court prohibit Mr. Matlins from disclosing his clearly inadmissible hearsay conversations with his attorney and former employees of Fremantle and the NBA International. *See* Fed. R. Evid. 703 (proponent of opinion may not disclose to the jury otherwise inadmissible facts or data unless "their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect").

**B.      Mr. Matlins' Conclusions About LA's Role Rest on Improper Factual Assumptions.**

Mr. Matlins' opinions are also flawed, and should not be admitted, because they are based on improper factual assumptions about services either that LA did not provide or for which the jury expressly rejected liability. In the Supplemental Report, Mr. Matlins concludes that LA acted as a licensing agent based, in part, on factual assumptions that LA (1) *introduced* Rich Dad and Whitney; and (2) *conceived* the Rich Dad free seminar idea. Both of these assumptions are improper. The jury expressly rejected liability for any "introduction" by LA of Rich Dad to Whitney. And there is no record support for Mr. Matlins' assumption that LA "conceived" Rich Dad's free seminar business. Rich Global therefore respectfully requests that the Court preclude Mr. Matlins from offering an opinion that LA acted as a licensing agent based on the factual assumptions that LA introduced Rich Dad and Whitney and/or conceived the free seminar idea.

10

1.   **"Introducing"**

Mr. Matlins expressly assumes that "Learning Annex introduced Rich Dad to Whitney for purposes of starting the free seminar business." (Ex. B ¶ 31.f.)  In the Appendix supporting his conclusion that LA acted as a licensing agent, Mr. Matlins notes that "[i]ntroducing the licensor and licensee" is a service that may be performed by a licensing agent, and notes that Learning Annex performed this service when it "[b]rought Rich Dad and Whitney together specifically for purposes of Whitney's role in the free seminar business." (*Id.* App'x A.)

In light of the jury verdict at the first trial, however, it is impermissible for Mr. Matlins to base his opinion that LA acted as a licensing agent on the factual assumption that LA introduced Rich Dad to Whitney.  The jury expressly declined to find Rich Dad liable for that introduction, just as it found no liability for the alleged "promotional services" that LA claimed to have performed. (*See* Order of Jan. 11, 2012 at 14 ("Specifically, the jury could not find liability based on Learning Annex's promotional services or its introduction of Rich Dad and Whitney.").)  In opining on the reasonable value of the services LA provided, Mr. Matlins may not consider the introduction of Rich Dad to Whitney or any other service for which LA is not entitled to damages.  By itself, the fact that he lists "[i]ntroducing the licensor and licensee," as one of the services of a licensing agent, and concludes that LA acted as a licensing agent based, in part, on the assumption that LA made such an introduction, renders Mr. Matlins' opinion improper.

2.   **"Conceiving"**

Mr. Matlins also concludes that Learning Annex "contributed the overwhelming share of the value supplied by a licensing agent – to *conceive*, develop and successfully arrange the licensing transaction." (Ex. B ¶ 35 (emphasis added.)  LA's purported role in the "creation" of Rich Dad's free seminar business is central to Mr. Matlins' opinion that LA acted as a

11

licensing agent. (*Id.* ¶ 32.) In the Appendix identifying the "services performed by Learning Annex" (*id.*) upon which his opinion is based, Mr. Matlins puts "[c]onceived the Rich Dad free seminar idea" at the top of the list, (*id.* App'x A).

The assumption that LA "[c]onceived the Rich Dad free seminar idea," however, is unsupported by the record. What Mr. Matlins means is unclear: when asked at deposition to identify his support for that assumption, he cited only the parties' September 7, 2005 memorandum of understanding, which Mr. Matlins then acknowledged does not show that LA conceived of anything. (Ex. C at 332:17-20; 336:2-9.) To the extent that Mr. Matlins means that LA "invented" the free seminar business model, that is demonstrably false. (*E.g.*, Joint Pretrial Order, June 10, 2011, Undisputed Facts at 3 ("Beginning in 1998, Whitney's business model involved the 'free seminar' business[.]").) To the extent that Mr. Matlins means that LA first suggested that Rich Dad *pursue* the free seminar model, this too is contrary to the record. Indeed, as Mr. Matlins is aware, LA's president filed a declaration in this case acknowledging that Whitney had approached Rich Dad well before LA became involved. (Ex. E, Affidavit of Bill Zanker in Opposition to Motion for Summary Judgment ¶ 9 (attached as Exhibit 7 to Expert Report of Seth Matlins, Apr. 6, 2011) (Russ Whitney "told [Zanker] his company had unsuccessfully solicited RD to do business years ago").) Therefore, there is simply no basis for Mr. Matlins' assumption that LA "[c]onceived the Rich Dad free seminar idea."

\*       \*       \*

Under the federal rules, expert testimony must be based on "sufficient facts or data" and the expert must "reliably appl[y]" his analysis "to the facts of the case." Fed. R. Evid. 702(b), (d). Because Mr. Matlins has relied on factual assumptions that are either unsupported by the record or impermissible as a matter of law, he has failed to satisfy the standards of Rule

702. *See Three Crown Ltd. P'ship* v. *Salomon Bros., Inc.*, 906 F. Supp. 876, 894 (S.D.N.Y. 1995) (excluding expert testimony based on expert's unsupported assumptions, citing "danger . . . that the jury may accept as fact not just the faulty assumptions on which he relied, but may also accept the conclusions that are drawn through his use of these assumptions") (quoting *Tyger Constr. Co.* v. *Pensacola Constr. Co.*, 29 F.3d 137, 144 (4th Cir. 1994)).  We respectfully request that the Court should bar his opinions to the extent they are based on such factual assumptions.  At a minimum, to the extent that Learning Annex contends that these assumptions are not essential to Mr. Matlins' opinions, we request that Mr. Matlins be required to submit a revised Supplemental Report restating the factual assumptions underlying his opinions.

## II.
## MOTION *IN LIMINE* #2:
## TO EXCLUDE EVIDENCE OF RICH GLOBAL'S ALLEGEDLY IMPROPER <u>TERMINATION OF THE RELATIONSHIP WITH LEARNING ANNEX</u>

In the first trial, Learning Annex placed great emphasis on Rich Global's allegedly improper termination of its relationship with Learning Annex, repeatedly suggesting that the termination was deceitful and that Learning Annex was wrongfully "cut out" of the Rich Dad Education venture.  (*See, e.g.*, Ex. A at 955:8-9; 173:1-3 (Zanker: "They fraudulently cut me out."); 963:12-15 (Closing Arg.: "Mr. Kiyosaki cut out Bill Zanker . . . because he didn't want to pay the fees that Bill Zanker was going to charge him.").)  Learning Annex appears poised to make a similar accusation at the retrial.  (*See, e.g.*, Ex. C at 280:20-22 ("I think they helped to conclude the deal before the deal was concluded because they got cut out."); Ex. F, Sharon Lechter Nov. 19, 2009 Dep. Tr. at 83:24-84:2:  "Robert Kiyosaki inappropriately cuts out his business partners.") (designated on Plaintiffs' Prospective Exhibit List).)

Because the sole issue at the retrial is the reasonable value of certain services rendered, such accusations of alleged wrongdoing are entirely irrelevant. Fed. R. Evid. 401, 402.

Moreover, any suggestion that Learning Annex was the victim of fraud, bad faith, wrongfully excluded from continuing the relationship, or somehow "cut out" of participating in the free seminar business, threatens significant prejudice to Rich Global by improperly suggesting to the jury that it should award damages to punish, rather than compensate. Fed. R. Evid. 403; *see Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 360 (S.D.N.Y. 2001) ("The Court must be careful to exclude evidence that unfairly prejudices the defense . . . by suggesting that the defendant is a bad person who has likely engaged in other forms of misconduct for which he should be punished." (emphasis omitted)); *Aristocrat Leisure Ltd. v. Deutche Bank Trust Co. Ams.*, No. 04 Civ. 10014 PKL, 2009 WL 3111766, at *7 (S.D.N.Y. Sept. 28, 2009) (granting motion *in limine* preventing plaintiff from making "inflammatory remarks" linking defendant to "financial crisis"). Any accusation of misconduct will be nothing more than a highly inflammatory distraction, threatening to divert the jury from its proper function of valuing Learning Annex's services related to development of the free seminar business. Accordingly, we respectfully request that the Court preclude Learning Annex from introducing any evidence of, or making reference to, alleged misconduct by Rich Global in the termination of the relationship with Learning Annex.

### III.
### MOTION *IN LIMINE* #3:
### TO EXCLUDE EVIDENCE OF LEARNING ANNEX'S EXPECTATION OF A PERCENTAGE OF REVENUES FROM THE WHITNEY VENTURE

Evidence purporting to show that the parties expected Learning Annex to share in the revenues of the Whitney venture is entirely irrelevant to the issue of damages at retrial. Recognizing as much in the first trial, the Court properly instructed the jury that it "should not consider MOU1 or MOU2 in [its] determination of damages." (*See* Ex. A at 992:11-12.) Because the only issue for retrial is damages, we respectfully request that the Court preclude any

14

evidence or reference to the parties' expectations about whether LA would share in the revenues of the free seminar venture.

The fundamental difference between damages in *quantum meruit* and contract is that the former focuses on the objective value of services actually performed, while the latter is based on the expectations of the contracting parties. *E.g.*, *Mem'l Drive Consultants, Inc.* v. *Ony, Inc.*, 29 F. App'x 56, 61 (2d Cir. 2002) (evidence concerning "the benefit of [the parties'] bargain" under an unenforceable contract "improperly [seeks] to establish something like [the plaintiff's] *expectation* interest," which is not "the proper focus of *quantum meruit*" (citing *Collins Tuttle & Co., Inc.* v. *Leucadia, Inc.*, 544 N.Y.S.2d 604, 605 (N.Y. App. Div. 1st Dep't 1989))). For this reason, for the purpose of establishing *quantum meruit* damages, the parties' expectations about how the plaintiff would be compensated are irrelevant. *Revson* v. *Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000); *see also Hettinger* v. *Kleinman*, 733 F. Supp. 2d 421, 449 (S.D.N.Y. 2010) ("The Second Circuit has held that the terms of unenforceable agreements are inadmissible to determine reasonable value of services with respect to quantum meruit claims.") (citing *Revson*, 221 F.3d at 69; *Longo* v. *Shore & Reich, Ltd.*, 25 F.3d 94, 97 (2d. Cir. 1994)).

It is clear that what LA may have hoped or expected to be compensated for its services, or what Rich Global may or may not have had in mind for that matter, is not a proper basis for valuing those services at the retrial. Indeed, Learning Annex's own expert has disavowed any reliance on MOU1 or LA's expectations of compensation in his opinions on damages. (Ex. C at 339:13-340:2; 341:18-342:21.) Evidence of such expectations, moreover, would likely be prejudicial to Rich Global by improperly suggesting to the jury that LA could be entitled to compensation in a particular form, or for services not provided. For these reasons,

Rich Global moves to exclude from the retrial any evidence of, or reference to, the parties' expectations regarding the form or amount of compensation Learning Annex would receive in connection with its services related to the development of the free seminar business.  Fed. R. Evid. 401, 402, 403.  This would include, among other things, MOU1's reference to any "split" of revenues.

**IV.**
**MOTION *IN LIMINE* #4:**
**TO EXCLUDE EVIDENCE OF SERVICES EITHER**
**NOT PERFORMED OR FOR WHICH THE JURY REJECTED LIABILITY**

Although the first trial was replete with evidence of alleged contributions by Learning Annex to the value of the Rich Dad brand, the jury rejected liability for most of the services Learning Annex allegedly performed in the course of the parties' relationship.  In particular, the jury rejected liability for "promotional" services (such as efforts to secure a PBS sponsor, a book deal with Donald Trump, and marketing of Rich Dad appearances at various LA expos), and also rejected liability for the "introduction" of Whitney to Rich Global.  (*See* Order of Jan. 11, 2012 at 14 ("Specifically, the jury could not find liability based on Learning Annex's promotional services or its introduction of Rich Dad and Whitney.").)  Thus, the only services to be valued at the retrial are those specifically "related to the development of the free seminar business" other than the Whitney introduction, as previously identified by the Court.  (*Id.* at 14-15.)  We therefore respectfully request that the Court exclude as legally irrelevant any evidence of "promotional services," or any suggestion that Learning Annex introduced Rich Global and Whitney.  Fed. R. Evid. 401, 402.  Such evidence would also be unduly prejudicial, suggesting that the jury should compensate Learning Annex for services for which it is not entitled to compensation.  Fed. R. Evid. 403.

16

We also respectfully request, for similar reasons, that the Court exclude evidence of services that were not performed at all, but which Learning Annex may have expected or intended to perform, under MOU1 or otherwise. (*See, e.g.*, Ex. C at 344:6-345:2 ("Q: Why do you note what Learning Annex was willing to do . . .? A: . . . Because they got cut out of the deal and they would have proceeded . . . but for the fact that they were cut out . . . .").)

**V.**
**MOTION IN LIMINE #5:**
**<u>TO EXCLUDE MOU1</u>**

The parties' September 7, 2005, memorandum of understanding ("MOU1") is irrelevant and should not be admitted in evidence at the retrial.  The Court instructed the jury at the first trial that MOU1 should not be considered in determining damages (Ex. A at 992:11-12), which is the *only* issue at the retrial.  MOU1 also contains extensive references to contemplated "promotional" services and other services for which the first jury rejected liability.  Finally, to the extent MOU1 refers to the development of the free seminar business, it contains only non-binding expectations of services to be performed and potential compensation, which, as noted above, are inadmissible to determine damages in *quantum meruit*.  For these reasons, we respectfully request that MOU1 be excluded in its entirety under Rules 401 and 402 of the Federal Rules of Evidence.  Alternatively, to the extent MOU1 has any relevance, its probative value is substantially outweighed by the risk of confusing the jury and prejudicing Rich Global with evidence of services and expectations that are not relevant.  Fed. R. Evid. 403.

**CONCLUSION**

For the reasons stated above, we respectfully request that the Court grant Defendant's motions *in limine*.

17

Dated: March 23, 2012

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP


By:    /s/ John H. Longwell
    Lewis R. Clayton (lclayton@paulweiss.com)
    Daniel J. Leffell (dleffell@paulweiss.com)
    John H. Longwell (jlongwell@paulweiss.com)

1285 Avenue of the Americas
New York, New York 10019
Tel. (212) 373-3000


*Attorneys for Defendant*